

# CIV-201007-CIV-DS2021913-CASEEN-125502

## Scanned Document Coversheet

System Code:   CIV
Case Number:   DS2021913
Case Type:     CIV
Action Code:   CASEEN
Action Date:   10/07/20
Action Time:   12:55
Action Seq:    0002
Printed by:    ACORT

THIS COVERSHEET IS FOR COURT PURPOSES ONLY, AND THIS IS NOT A PART OF THE OFFICIAL RECORD. YOU WILL NOT BE CHARGED FOR THIS PAGE

# Complaint and Party information entered



NEW FILE

1  James L. Greeley (SBN 218975)
    jgreeley@vgcllp.com
2  Diyari Vázquez (SBN 222461)
    dvazquez@vgcllp.com
3  Alexander R. Safyan (SBN 277856)
    asafyan@vgcllp.com
4  VGC, LLP
   1515 7th Street, No. 106
5  Santa Monica, California 90401
   Telephone: (424) 256-8296
6
7  *Attorneys for Plaintiff*
   JOSEPH DIAZ, JR.
8

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

OCT 07 2020

BY _____
ANAI CORTEZ-RAMIREZ, DEPUTY

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                **FOR THE COUNTY OF SAN BERNARDINO**

11

| | |
|---|---|
| 12  JOSEPH DIAZ, JR., | Case No. **CIV DS  2 0 2 1 9 1 3** |
| 13              Plaintiff, | **COMPLAINT FOR:** |
| 14        v. | **1. FRAUD** |
| 15  RALPH HEREDIA, true name RAFAEL HEREDIA TARANGO, a/k/a RAFAEL HEREDIA, a/k/a RAFAEL BUSTAMANTE; JOHN DOE, ESQ.; and JANE DOES 1 through 20, inclusive, | **2. BREACH OF FIDUCIARY DUTY**<br>**3. BREACH OF IMPLIED-IN-FACT CONTRACT** |
| 16 | **4. CONVERSION** |
| 17              Defendants. | **5. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| 18 | **6. VIOLATION OF THE MUHAMMAD ALI BOXING REFORM ACT (15 U.S.C. §§ 6301, *et seq.*)** |
| 19 | |
| 20 | **7. QUANTUM MERUIT**<br>**8. ACCOUNTING** |
| 21 | **JURY TRIAL DEMANDED** |

22

23

24

25

26

27

28

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

OCT 07 2020

RECEIVED

Plaintiff JOSEPH DIAZ, JR. ("Diaz" or "Plaintiff") brings this Complaint against Defendants RALPH HEREDIA, true name RAFAEL HEREDIA TARANGO, a/k/a RAFAEL HEREDIA, a/k/a RAFAEL BUSTAMANTE ("Heredia"), JOHN DOE, ESQ., and JANE DOES 1 through 20 (collectively, "Defendants") and alleges, based on knowledge as to himself and his own acts and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Diaz is a world champion professional boxer.  He holds the International Boxing Federation super featherweight title, which he won on January 30, 2020. He is a former U.S. National Champion and U.S. Olympian, having fought for the United States in the 2012 Summer Olympics in London.

2.      Heredia is Diaz's boxing manager.  This is a defined role that means he represents Diaz in contractual negotiations relating to boxing contests, exhibitions, and training exercises.  As a boxing manager, Heredia's compensation is a percentage of the money the boxer (Diaz) earns, which amount is supposed to be fixed by contract, and which contract must be approved by the California State Athletic Commission.

3.      As discussed more fully below, a boxing manager is supposed to be wholly devoted to his or her client's best interests.  The manager is a fiduciary.  The manager has a professional, legal, and ethical responsibility to handle a boxer's business affairs with care and trust.

4.      Heredia did not do that for Diaz.  Instead, Heredia manipulated, exploited, and stole from his champion client in violation of both state law and the federal Muhammad Ali Boxing Reform Act ("Ali Act").  As discussed more fully below, Heredia first induced Diaz into an illicit arrangement whereby Heredia's half-brother, Moses Heredia, was Diaz's manager "on paper," while Defendant Heredia served as Diaz's de facto manager.  The reason for this arrangement was that Moses Heredia was licensed by the California State Athletic Commission as a boxing manager; Defendant Heredia was not.  And the reason Defendant Heredia was not licensed is likely due to the fact that he has been hiding his true identity.  Diaz's counsel has discovered that Ralph Heredia's true name is Rafael Heredia Tarango and that he has gone by many aliases, including Rafael Tarango and Rafael Bustamante.  The name "Ralph Heredia" is one such alias used to conceal his criminal

- 1 -

1  past. Defendant Heredia (as Rafael Bustamante) is a convicted felon who spent years in prison for

2  his role in running a drug trafficking ring in the 1990s. Of course, Defendant Heredia never disclosed

3  these facts to his client, Diaz, or the true reason why he had his half-brother, Moses, sign Diaz's

4  manager agreement that was submitted to the Commission (like every boxer-manager contract in

5  California must be).

6       5.    As part of his plot, after signing Diaz as a client, Heredia used Diaz to get his foot in

7  the door with the well-known boxing promotion firm, Golden Boy Promotions.   Once that

8  relationship was established, Heredia expressly and continuously put his own interests over Diaz's

9  interests and sought benefits for himself from Golden Boy rather than advocating for Diaz's

10  interests—a violation of the Ali Act and his duties as a manager.

11       6.    On top of all that, and as discussed more fully below, Heredia also repeatedly stole

12  from Diaz—both money and personal property. He did so with the help of an attorney, Defendant

13  John Doe, Esq., whose name Diaz does not know and whom he never agreed to retain.

14       7.    Through this action, Diaz seeks compensatory and punitive damages, as well as the

15  recovery of his attorneys' fees, against the Defendants for their violations of state and federal law, as

16  alleged herein.

17                        **THE PARTIES**

18       8.    Plaintiff Joseph Diaz, Jr. is an individual residing in San Bernardino County,

19  California.

20       9.    Defendant Ralph Heredia, true name Ralph Heredia Tarango, a/k/a Rafael Heredia,

21  a/k/a Rafael Bustamante, is an individual residing in San Bernardino County, California.

22       10.    Defendant John Doe, Esq. is a licensed attorney practicing in California, who will be

23  identified through discovery in this case.

24       11.    The true names and capacities, whether individual, corporate, associate, or otherwise,

25  of Defendants Jane Does 1 through 20, inclusive, are presently unknown to Plaintiff, who therefore

26  sues said defendants by such fictitious names. Each fictitiously named defendant is in some way

27  responsible for, participated in, or contributed to the matters alleged herein. Plaintiff will amend this

28

COMPLAINT

1   Complaint to allege the true names and capacities of Defendants Jane Does 1 through 20 when they

2   are ascertained.

3        12.     Each and every Defendant was the agent, servant, employee, joint venturer, partner,

4   subsidiary, and/or co-conspirator of each other Defendant, and in performing or failing to perform

5   the acts alleged herein each Defendant was acting individually as well as through and in the foregoing

6   alleged capacity and within the course and scope of such agency, employment, joint venture,

7   partnership, subsidiary, and/or conspiracy.

8                   **JURISDICTION AND VENUE**

9        13.     This Court has subject matter jurisdiction over this action because the amount of

10   damages claimed, exclusive of interest and costs, is in excess of $25,000.00.

11        14.     This Court has personal jurisdiction over Defendants because they reside in

12   California, do substantial business in California, have substantial minimum contacts with California,

13   and/or intentionally avail themselves of the benefits and protections of California law through the

14   promotion, sale, marketing, and provision of services in California.

15        15.     Venue is proper in this Court because Defendants reside and/or do business in this

16   judicial district.

17                   **FACTUAL ALLEGATIONS**

18                **The Professional Boxing Industry**

19                     *Managers*

20        16.     The preeminent Ali Act defines a "manager" as "a person who receives compensation

21   for service as an agent or representative of a boxer." 15 U.S.C. § 6301(5). Boxers must navigate

22   complex contractual relationships with various participants in the boxing industry. This can be

23   daunting, especially for fighters who are not experienced or educated in the business side of the

24   industry. A manager's professional role is to represent the boxer in various negotiations and

25   otherwise handle the boxer's business affairs in a fair and ethical manner. The manager serves as a

26   fiduciary to the boxer. The manager is supposed to be wholly devoted to his or her client's best

27   interests.

28

COMPLAINT

17. As compensation, the manager typically receives a percentage of the boxer's "purse" for each "bout," or fight. The purse is the amount of money the boxer receives from the promoter of a fight (defined below). The promoter guarantees the purse at the outset; the purse amount does not depend on the outcome of the fight. Because the manager's compensation is ordinarily tied to the boxer's purse, the manager has every incentive to negotiate vigorously with the promoter for as large a purse as possible.

### *Promoters*

18. Promoters play a different role in boxing. The Ali Act defines a "promoter" as "the person primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301(9). Promoters contract with boxers to provide a certain number of fights in return for compensation, in the form of a "purse" for each fight. Promoters make money primarily from selling tickets, television rights, and advertising rights for a bout, as well as from other promotional activities. Promoters guarantee the purse to the boxer and manager before the fight and then earn their profit by generating more money in revenue than they spend promoting the fight.

### *Sanctioning Organizations*

19. Under the Ali Act, a "sanctioning organization" is "an organization that sanctions professional boxing matches in the United States." 15 U.S.C. § 6301(14). Stated differently, these are the organizations that rate boxers and recognize championships and titles. There are four major sanctioning organizations: the World Boxing Association (WBA); the World Boxing Council (WBC); the World Boxing Organization (WBO); and the International Boxing Federation (IBF).

### Federal and State Regulation of Professional Boxing

20. Professional boxing in the United States is governed at both the federal and state level. At the federal level, there are two primary laws that regulate the boxing industry: the Professional Boxing Safety Act and the Ali Act.

21. After a number of boxing bills were introduced in Congress from the 1970s through the 1990s aimed at addressing practices such as bribery, racketeering, licensing, and safety, in 1996, with the sponsorship of Senators John McCain and Richard Bryan, Congress passed the Professional Boxing Safety Act, which was designed to ensure boxers' safety.

-4-

22.     While the Professional Boxing Safety Act sought to protect boxers from physical harm, it did not address abusive and exploitative business practices that had taken root in the boxing industry.  Congress was particularly concerned with the financial exploitation of boxers by other participants in the industry with more experience and bargaining power.

23.     Such exploitation could be avoided if the boxer had competent and independent representation.  This is where boxing managers enter the picture.  Ideally, a manager should fiercely and exclusively advocate for the boxer's interests when negotiating with sophisticated business entities.  In reality, however, that did not always happen:

> "A manager is supposed to have some degree of independent judgment. . . . [T]here are situations where a manager is actually a paid employee of a promoter or even an officer of a promotion company.  Sometimes this is quite overt, and since one of the roles of manager is to represent a boxer in negotiations with a promoter it is obvious that appropriate objectivity cannot exist in such a circumstance."

*Business Practices in the Professional Boxing Industry: Hearing Before the Committee on Commerce, Science, and Transportation*, S. Hrg. 105-712, at 29 (1998) (prepared statement).

24.     In order to address abusive and exploitative business practices in the boxing industry, Senators McCain and Bryan proposed the Ali Act in 1998.  According to the initial Senate Report, the Ali Act was intended to "protect professional boxers from coercive and exploitative business practices, assist state boxing officials to provide proper oversight of the sport, and increase honest competition and the integrity of the industry."  S. Rep. 105-371, at 1 (Oct. 6, 1998).

25.     The bill also proposed to outlaw conflicts of interest between promoters and managers.  The Senate Report emphasized that "it remains essential that managers serve and protect the interest of the boxer" and that managers "should not be serving the financial interests of the promoter, while simultaneously taking a [percentage] earnings cut from the boxer for biased representation as manager."  Id. at 7.

26.     Congress passed the Ali Act in 2000.  President Bill Clinton signed the bill into law on May 26, 2000.

COMPLAINT

27.     Among other things, the Ali Act established the following major reforms:

a.     **"Firewall" Between Managers and Promoters:** The Ali Act establishes a "firewall" between managers and promoters.  Managers are prohibited from having a "direct or indirect financial interest in the promotion of a boxer" and from being "employed by or receiv[ing] compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer." 15 U.S.C. § 6308(b).

b.     **Protection from Coercive Contracts:** The Ali Act declares that long-term "option" contracts are "in restraint of trade, contrary to public policy, and unenforceable against any boxer." Id. § 6307b.

c.     **Required Disclosures:** Promoters and sanctioning organizations are required to make certain financial disclosures regarding the bouts they promote or oversee. Id. §§ 6307d & 6307e.

28.     The Ali Act calls for severe sanctions against individuals who violate the manager-promoter "firewall," up to and including criminal penalties. Id. § 6309.

29.     Because the amount a promoter makes is, in part, a function of how much it pays the boxer—that is, how big of a purse the promoter guarantees the boxer from a given bout—promoters and boxers are expected to negotiate hard over payment and other terms.  The promoter and the boxer sit on opposite sides of the bargaining table, and if they strike a deal, they become business partners.  It is the manager's job to represent the boxer in these negotiations.  The manager serves as a fiduciary to the boxer and is expected to protect and advance the boxer's interests.  Because the manager's fee is tied to the size of the purse—since the manager makes a percentage of what the boxer makes—the manager is supposed to have every incentive to bargain hard for a bigger payout to his or her client (and by extension, to him or herself).

30.     The Ali Act serves to protect boxers, the boxing industry, and the public from abusive, exploitative, and anticompetitive behavior.  The establishment of a strict "firewall" between managers and promoters underscores Congress's judgment that "*[a] manager must be a determined*

- 6 -

1    *advocate for the boxer's interests* and not be influenced by financial inducements from a promoter."

2    S. Rpt. No. 106-83, at 11 (June 21, 1999) (emphasis added).

3        31.     Every state has its own boxing regulations as well. In California, the State Athletic

4    Commission, which is part of the Department of Consumer Affairs, is charged with regulating

5    amateur and professional boxing, in addition to wrestling and other mixed martial arts. The

6    regulatory activities of the Commission protect the public, contestants, and state government from

7    monetary losses due to fraudulent business practices. Boxers are protected from injury by preventing

8    mismatches and ensuring proper medical examinations. The Commission also has the sole power to

9    license all professionals and amateurs who participate in these sports. Each participant in the boxing

10    industry must be licensed before taking part in the sport, including managers, fighters, matchmakers,

11    and fight officials.

12        32.     The Commission primarily establishes requirements for licensure, issues and renews

13    licenses, approves and regulates events, assigns ringside officials, investigates complaints received,

14    and issues fines and/or suspends or revokes licenses for misconduct.

15        33.     In California, in addition to the federal Ali Act, boxing is regulated by the state Boxing

16    Act (Bus. & Prof. Code §§ 18600, *et seq.*), the California Code of Regulations (Cal. Code. Regs.,

17    title 4, §§ 201, *et seq.*), and other miscellaneous provisions of the Civil Code and Penal Code.

18        **Defendants' Relationship with Diaz and Violation of the Law**

19        34.     Diaz was introduced to Heredia when Diaz was approximately 14 or 15 years old.

20    Heredia maintained what Diaz describes as a "cordial" relationship with Diaz for several years,

21    periodically buying him gifts such as boxing gear and equipment. In or around 2011, when Diaz

22    began to win national boxing tournaments and gain more recognition, Heredia took a greater interest

23    in Diaz. In 2011, Diaz won the U.S. Men's National Tournament. Then he won at the U.S. Olympic

24    trials and qualified for the 2012 Olympics. Around that time, Heredia approached Diaz and his father

25    and asked whether he could sign Diaz as a boxing client.

26        35.     Shortly after the 2012 Olympics, Diaz agreed to allow Heredia to be his manager and

27    signed a manager agreement. But the manager agreement was not directly signed by Heredia as

28

-7-

1 Diaz's manager. Instead, Heredia had his half-brother, Moses Heredia, sign the manager agreement
2 with Diaz and be the manager of record.

3     36.    The reason Defendant Heredia had his half-brother, Moses, sign the manager
4 agreement was that Moses Heredia was licensed as a manager by the California State Athletic
5 Commission; Defendant Heredia was not. In fact, to this day, Defendant Heredia is not licensed as
6 a manager by the Commission. This is likely due to the fact that Defendant Heredia has a documented
7 criminal history and did not want to reveal his true identity to the Commission (or to Diaz). Indeed,
8 Defendant Heredia's true name is Rafael Heredia Tarango. Defendant Heredia has gone by many
9 aliases, including Rafael Tarango and Rafael (or Ralph) Bustamante. The name "Ralph Heredia" is
10 one such alias used to conceal his criminal past. Defendant Heredia (as Rafael Bustamante) was
11 indicted in connection with a headline-making extortion and threatened murder plot against Los
12 Angeles Rams player Darryl Henley over a $350,000 debt stemming from a drug deal involving over
13 twenty-five pounds of cocaine. He was ultimately convicted of a felony for conspiracy to possess
14 and distribute cocaine for which he was sentenced to nearly twenty years in prison. Defendant
15 Heredia never disclosed these facts to Diaz or the true reason he had his half-brother, Moses, sign the
16 manager agreement.

17     37.    At all relevant times, Moses Heredia was only a "paper manager." At all relevant
18 times, Defendant Ralph Heredia handled all of Diaz's financial affairs and was the true manager for
19 the duration of the parties' relationship (continuing to this day). Diaz had met Moses only once
20 before signing the manager agreement. After signing the agreement, Diaz hardly interacted with
21 Moses at all.

22     38.    Defendant Ralph Heredia arranged all of Diaz's boxing commitments. He negotiated
23 all of Diaz's media workouts and interviews. He negotiated what few, paltry sponsorship
24 opportunities Diaz entered (and caused Diaz to miss out on the many he did not). And he was
25 primarily involved in the negotiations with Golden Boy, who became Diaz's promoter.

26     39.    Prior to signing Diaz, Ralph (and Moses) Heredia were relatively unknown in the
27 boxing industry. They did not have many, if any, other clients. After signing Diaz, Defendant
28 Heredia traded on Diaz's name and reputation to advance his own interests rather than Diaz's.

- 8 -

COMPLAINT

1  Heredia used Diaz to get his foot in the door with Golden Boy. He then traded on Diaz and Golden

2  Boy's names and reputations to sign other fighters, such as Luis Feliciano and Francisco Vargas.

3  Today, all of Heredia's clients are signed with Golden Boy.

4       40.    Defendant Heredia's arrangement with his other clients is similar to his arrangement

5  with Diaz. Moses Heredia is the signor of the manager agreement with the boxer. Moses Heredia is

6  the manager of record as far as the California State Athletic Commission is aware. But Defendant

7  Ralph Heredia is the true manager, operating without a contract or the necessary licensure or approval

8  from the Commission.

9       41.    Over the course of the parties' relationship, Heredia failed to adequately protect or

10  advance Diaz's interests. Diaz brought to Heredia's attention repeatedly that other fighters with

11  worse qualifications than Diaz were getting better matches, greater purses, and more sponsorship

12  opportunities. Heredia always dismissed these concerns and assured Diaz that Heredia would take

13  care of everything.

14       42.    In reality, Diaz was often forced to strike his own deals and advance his own interests

15  without (and often in spite of) Heredia. For example, Diaz had to promote himself on social media

16  to obtain sponsorship opportunities. Diaz also pushed for his championship bout against Tevin

17  Farmer (who was not signed with Golden Boy) on January 30, 2020 in Miami, Florida, while Heredia

18  was advocating for worse matchups in other locations, which were more favorable to Heredia and/or

19  Golden Boy. Heredia was more concerned with his relationship with Golden Boy than with Diaz.

20  Since Heredia used Diaz as his ticket to get in with Golden Boy, and since all of his clients were

21  Golden Boy clients, Heredia could not, and did not, negotiate vigorously with Golden Boy on Diaz's

22  behalf. Heredia knew that if he bargained too hard with Golden Boy for Diaz, it would hurt him with

23  his other clients.

24       43.    Heredia did not just fail to adequately protect Diaz's interests. He also *stole* from

25  Diaz. In or around February 2017, Heredia approached Diaz and told him that he wanted to enter

26  into a new manager agreement and change the terms of their deal—specifically, to increase the

27  manager's fee to 20%. After some consideration, Diaz agreed to a fee of 18%, not 20%. On or

28

-9-

1   around February 23, 2017, Diaz signed the new manager agreement memorializing the 18% fee (the

2   "Current Agreement").

3        44.    The Current Agreement was signed solely by Heredia's half-brother, Moses, as Diaz's

4   manager.  To wit, there is no name or signature indicating a co-manager.

The parties hereto have read and signed this contract and agreement in each other's presence and in the presence of the Commission Representative who has orally reviewed the terms of this contract with the Boxer on this 23 day of February 2017.

THIS CONTRACT IS NOT VALID UNTIL THE DATE ON WHICH IT HAS BEEN SIGNED AS APPROVED BY THE COMMISSION'S EXECUTIVE OFFICER OR DESIGNEE.

IF THE PARTIES HAVE ANY OTHER AGREEMENTS CONCERNING THE BOXER'S COMPENSATION OR CAREER THAN THOSE SET FORTH ON THIS CONTRACT, THEY MAY NOT BE ENFORCED BY THE COMMISSION.

Commission Representative Signature

Manager's Signature

Print Name: _____ Barry Edwards

Print Name: **Moses Heredia**

Boxer's Signature

Co-Manager's Signature (if applicable)

Print Name: **Joseph Diaz Jr.**

Print Name _____

Co-Manager's Signature (if applicable)

Print Name _____

Accepted and Approved by Executive Officer or Designee

Date

I hereby acknowledge that the provisions of this contract reviewed with me and by a Commission Representative

Boxer's Signature

Date

Print Name: **Joseph Diaz Jr.**

21        45.    The Current Agreement was presented to the California State Athletic Commission

22   for approval and approved on February 24, 2017.  Defendant Ralph Heredia's name does not appear

23   anywhere on the Current Agreement.  But this did not stop Defendant Ralph Heredia (who, again, is

24   not licensed by the Commission) from serving and holding himself out as Diaz's manager.

25        46.    Only weeks after inducing Diaz to enter into the Current Agreement signed only by

26   Moses, Defendant Ralph Heredia negotiated Diaz's promotional agreement with Golden Boy.

27   Critically, Moses Heredia is not the only "manager" listed on the Golden Boy Agreement.  Defendant

28   Ralph Heredia also signed the Golden Boy Agreement as Diaz's "manager."

- 10 -

By its signature below, each party confirms its understanding of, and agreement to the foregoing.

PROMOTER:                                    BOXER:

GOLDEN BOY PROMOTIONS, LLC                   JOSEPH DIAZ JR.

By: _____               By: _____

Name: RICARDO ARELLANO                       Name: Joseph Diaz Jr

Title: FIGHTER RELATIONS                      Boxer

Date: 3 / 22 / 2017                          Date: 3/22/17

                                    Page 14

---

MOSES HEREDIA                                RALPH HEREDIA

By: _____               By: _____

Title: MANAGER                               Title: MANAGER

Date: 3/24/17                                Date: 3·22·17

47.     Despite the fact that Moses signed the Current Agreement as Diaz's purported "sole and exclusive" manager and is the manager of record as far as the California State Athletic Commission is aware, Defendant Ralph Heredia continued to serve as Diaz's true manager (and continues to do so to this day). This was a fraud perpetrated on the Commission. It was also a fraud perpetrated on Diaz. Heredia never disclosed to Diaz the true nature of the parties' relationship. He did not disclose the true reason why he had his half-brother, Moses, sign the Current Agreement as the manager, rather than him. The true reason was that Heredia was trying to hide his criminal past

- 11 -

from the Commission and from Diaz.  He was not (and is not) qualified or licensed to serve as Diaz's manager.  He did not (and does not) have the necessary approvals to serve as Diaz's manager.  He did not (and does not) have the requisite qualifications to handle Diaz's affairs or represent him in all the relevant contractual negotiations relating to his boxing career.  The truth is, this illicit arrangement was the only way to enable Heredia to gain full access to Diaz's finances, to be able to divert Diaz's money and property into his own coffers and to create illicit revenue streams and benefits of his own with Golden Boy.

48.    Furthermore, despite the fact that the Current Agreement calls for an 18% fee, Diaz eventually realized that Heredia was actually taking a 20% fee (even though Diaz had expressly rejected the 20% fee).  When Diaz confronted Heredia about the extra 2%, Heredia responded that this was the fee for "Diaz's lawyer" who Heredia had retained on Diaz's behalf to help with his affairs.

49.    But Diaz never agreed to any lawyer.  The truth is, the extra 2% was used to pay for *Heredia's* lawyer, not "Diaz's lawyer."  This lawyer is Defendant John Doe, Esq.  Diaz does not know the identity of John Doe, Esq.  Diaz never signed a retainer agreement with John Doe, Esq.  He does not recall seeing any correspondence from John Doe, Esq.  He believes he may have met John Doe, Esq. once, but does not recall having any conversation with him about any legal matter or issue. John Doe, Esq. was hired by Heredia for the benefit of *Heredia*.  Diaz never agreed to hire John Doe, Esq. or to be represented by John Doe, Esq., who in turn necessarily violated the rules of professional conduct and the law to the extent he purported to represent Diaz without his knowledge or consent, and without an engagement agreement.

50.    At a minimum, Heredia stole the extra 2% manager's fee from Diaz.  John Doe, Esq. was directly aware of and participated in this scheme to steal the 2% from Diaz.

51.    Practically speaking, Heredia also stole whatever portion he received of the 18% manager's fee from Diaz.  Heredia was not a party to the Current Agreement.  He was not entitled to *any* manager's fee from Diaz.  But he has been pocketing a portion of the manager's fee under the Current Agreement.  He is able to do this because, by virtue of his role as Diaz's manager, Heredia has full access to Diaz's finances, including the compensation paid by Golden Boy.  Heredia induced

- 12 -

Diaz to enter into the Current Agreement under false pretenses, while concealing his criminal past and the fact that he did not have the proper licensure or qualifications to manage Diaz, which render the Current Agreement null and void.

52.    Heredia also stole money from Diaz in another explicit way.  In or around October 2019, Heredia purchased a 2016 Lexus RC350 purportedly for Diaz's benefit and agreed to make a (presumably unlicensed) "auto loan" to Diaz until Diaz could pay it off.  The parties agreed that Diaz would pay Heredia for the vehicle from his boxing proceeds (in addition to the contractual manager's fee).  After one particular bout, Diaz paid Heredia $25,000.00 toward the vehicle.  Heredia accepted this money.  Diaz also paid $4,000.00 to have the vehicle (which was originally painted white) wrapped in matte black.

53.    On or about September 8, 2020, despite the fact that Diaz had invested $29,000.00 into the vehicle, Heredia intentionally and maliciously had the vehicle repossessed and took it back for himself.  He did not give any notice to Diaz that Diaz was purportedly in default on payments for the vehicle (because he was not).  He never asked Diaz for any additional payments toward the vehicle.  He did not give Diaz any notice that he would be repossessing the vehicle.  He also did not return the $25,000.00 that Diaz had paid him toward the vehicle or the $4,000.00 that Diaz had paid for improvements to the vehicle.  And Diaz had, among other personal effects, approximately $300.00 in cash in the vehicle, which was never returned to him.

54.    Diaz believes that Heredia repossessed his vehicle and stole his $29,000.00 investment (plus approximately $300.00 in cash in the vehicle) in retaliation for Diaz signing a business advisory agreement with another company.  Heredia was jealous and believed that the other company was infringing on his manager's rights with Diaz, which it was not.

55.    Yet another way that Heredia stole from Diaz was by taking tickets provided by Golden Boy to Diaz's fights that were supposed to be for Diaz's family and friends and converting them to his own use.  Specifically, Heredia stole the best seats for himself and his conspirators, and gave only a few, much worse, seats to Diaz's family and friends.

56.    Heredia also leveraged his relationship with Golden Boy to obtain additional benefits for himself at Diaz's expense.  For example, on at least one occasion, Heredia represented to Golden

- 13 -

Boy that *Diaz* wanted tickets to a highly anticipated bout between Saul "Canelo" Álvarez and Gennadiy Golovkin in Las Vegas, Nevada (Diaz was not fighting on this card). In reality, Heredia wanted—and took—the tickets for himself. After the bout, Heredia complained to Golden Boy about the quality of the tickets, stating that *Diaz* was upset the tickets were not floor seats and felt that Golden Boy was not taking care of Diaz's "team." Diaz never expressed such a sentiment. This was Heredia taking an illicit benefit for himself (in violation of the Ali Act) and then complaining that the benefit was not beneficial enough.

57.    At all relevant times, Heredia acted in his own best interests rather than in Diaz's best interests. Heredia used Diaz to enrich himself and his conspirators, did not adequately protect or advance Diaz's boxing career, and acted precisely in the ways that the Ali Act is designed to protect against.

58.    Heredia induced Diaz into an illicit arrangement whereby his half-brother, Moses, was Diaz's manager "on paper," while he served as Diaz's de facto manager. Heredia used Diaz to get his foot in the door with Golden Boy and then favored his own relationship with Golden Boy instead of vigorously advocating for his client, Diaz. And Heredia actively stole money and personal property from Diaz.

59.    Defendant John Doe, Esq. conspired with Heredia to steal from Diaz. John Doe, Esq. was aware of the illicit arrangement whereby Moses Heredia was Diaz's "paper manager," but Defendant Ralph Heredia served as Diaz's de facto manager. He was aware that the Current Agreement called for an 18% manager's fee. He was aware that Ralph took a 20% fee—2% more than the Current Agreement allowed. And he accepted that extra 2% for himself for purported legal services. He did not obtain Diaz's agreement or approval for the provision of legal services or for any payment for legal services. At all relevant times, John Doe, Esq. took Diaz's money earned under the Current Agreement and converted it to his own personal use.

- 14 -

COMPLAINT

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud

### (Against Heredia)

60.     Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

61.     At all relevant times, Heredia and Diaz were in a fiduciary relationship, a relationship of trust and confidence. A boxing manager owes a fiduciary duty to his client, the boxer. A boxing manager must act with the utmost care, trust, and good faith for the benefit of his client, the boxer. The boxer places his confidence in the manager and trusts that the manager will protect his interests, not take advantage of him, and not place his own interests over those of the boxer.

62.     Heredia intentionally concealed and failed to disclose material facts to Diaz in connection with their relationship and Heredia's role as Diaz's manager. As alleged above, those material facts included:

       a.    That Heredia was not licensed as a manager by the California State Athletic Commission.

       b.    That Heredia had a criminal history, including a felony conviction.

       c.    That the name "Ralph Heredia" was his alias used to conceal his criminal history.

       d.    That Heredia used his half-brother, Moses Heredia, as the signor on the Current Agreement to evade scrutiny from the California State Athletic Commission.

       e.    That Heredia was not qualified to represent Diaz as a boxing manager.

       f.    That Heredia was taking benefits from Golden Boy for himself at Diaz's expense.

       g.    That Heredia was taking an additional 2% manager's fee from Diaz.

COMPLAINT

h.   That Heredia never intended to actually sell the 2016 Lexus RC350 that he purportedly purchased for Diaz's benefit but always intended to accept Diaz's money and then take the vehicle back for himself.

63.   Heredia intentionally concealed these material facts from Diaz to induce Diaz to enter into an arrangement with him whereby Heredia could manipulate, exploit, and take advantage of Diaz. This was the only way to enable Heredia to gain full access to Diaz's finances, to be able to divert Diaz's money and property into his own coffers and to create illicit revenue streams and benefits of his own with Golden Boy.

64.   The facts that Heredia intentionally concealed and/or failed to disclose to Diaz were known only to Heredia and his co-conspirators. Diaz did not know these facts. Diaz did not, and could not, discover the true facts until the months leading up to the filing of this complaint with the help of his counsel's investigation. Even with reasonable diligence, Diaz could not have discovered the true facts but for his counsel's investigation.

65.   Heredia's fraudulent concealment as alleged in this Complaint was knowing and intentional and intended to deceive Diaz. Had Heredia disclosed the material facts he concealed, Diaz would not have allowed him to serve as his boxing manager, would not have allowed him to have access to his business and financial affairs, and would not have allowed him to steer his boxing career.

66.   Heredia's fraudulent concealment was a substantial factor in causing harm to Diaz.

67.   As a direct and proximate result of Heredia's conduct, Diaz has suffered damages in an amount to be proved at trial.

68.   Heredia's conduct, as alleged in this Complaint, was also intentional, willful, malicious, and oppressive, and therefore justifies an award of punitive damages.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Heredia)

69.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

- 16 -

70.     As alleged above, a boxing manager owes a fiduciary duty to his client, the boxer.

71.     Heredia was Diaz's true boxing manager at all relevant times herein. As such, Heredia owed a fiduciary duty to Diaz.

72.     Heredia breached his fiduciary duty to Diaz by taking advantage of Diaz, placing his own interests over Diaz's interests, and stealing from Diaz, in all the ways alleged in this Complaint.

73.     Heredia's breach of fiduciary duty was a substantial factor in causing harm to Diaz.

74.     As a direct and proximate result of Heredia's conduct, Diaz has suffered damages in an amount to be proved at trial.

### THIRD CAUSE OF ACTION

#### Breach of Implied-in-Fact Contract

#### (Against Heredia)

75.     Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

76.     In or around October 2019, Diaz and Heredia entered into an implied-in-fact contract relating to the 2016 Lexus RC350 purchased by Heredia purportedly for Diaz's benefit. Under this implied-in-fact contract, Heredia agreed to "loan" the vehicle to Diaz until Diaz could pay it off, which he would do from his boxing proceeds (in addition to the contractual manager's fee). After one particular bout, Diaz paid Heredia $25,000.00 toward the vehicle. Heredia accepted this money. Diaz also paid $4,000.00 to have the vehicle wrapped in matte black.

77.     The parties intended that their conduct relating to the vehicle—namely, Heredia "loaning" the vehicle to Diaz and Diaz paying for the vehicle from his boxing proceeds—would create a contract between them, and each knew that the other would interpret their conduct as creating a contract.

78.     Diaz performed all, or substantially all, of the acts required of him under the parties' implied-in-fact contract, except those things that were excused by Heredia's breach.

79.     Heredia breached the parties' implied-in-fact contract. On or about September 8, 2020, Heredia intentionally and maliciously had the vehicle repossessed and took it back for himself, in violation of the parties' agreement that Diaz could use the vehicle as his own and then would own

COMPLAINT

the vehicle once he paid it off.  Heredia did not give any notice to Diaz that Diaz was purportedly in default on payments for the vehicle (because he was not).  He never asked Diaz for any additional payments toward the vehicle.  He did not give Diaz any notice that he would be repossessing the vehicle.  He also did not return the $25,000.00 that Diaz had paid him toward the vehicle or the $4,000.00 that Diaz had paid in improvements to the vehicle.

80.   As a direct and proximate result of Heredia's breach of contract, Diaz has been damaged in an amount to be proved at trial, but which amount is not less than $29,000.00.

## FOURTH CAUSE OF ACTION

### Conversion

### (Against All Defendants)

81.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

82.   At all relevant times, Diaz had ownership or the right to possession of certain property alleged in this Complaint, including his money and boxing tickets provided for his benefit by Golden Boy.

83.   Defendants intentionally and substantially interfered with Diaz's rights to his money and personal property.  Defendants wrongfully converted Diaz's money and personal property in at least the following ways:

a.   Heredia converted approximately $29,300.00 of Diaz's money by repossessing Diaz's vehicle and failing to return his payment of $25,000.00 toward the vehicle, $4,000.00 in improvements to the vehicle, and approximately $300.00 in cash that was in the vehicle at the time it was repossessed.

b.   Defendants converted whatever portion they received of the 18% manager's fee under the Current Agreement from Diaz.  Heredia was not a party to the Current Agreement.  Nor was John Doe, Esq.  They were not entitled to *any* of Diaz's money under the Current Agreement.  This is a knowable amount, which will be established at trial.

- 18 -

c.    Defendants converted an extra 2% of Diaz's manager's fee by taking a 20% fee instead of the 18% fee set forth in the Current Agreement.  Heredia took this extra 2% fee without Diaz's knowledge or consent.   John Doe, Esq. accepted this extra 2% fee without Diaz's knowledge or consent.  This extra 2% fee is a knowable amount, which will be established at trial.

d.    Heredia converted tickets provided by Golden Boy to Diaz's fights that were supposed to be for Diaz's family and friends.  The value of these tickets is knowable and will be established at trial.

84.    Defendants had no legal right to interfere in such a manner with Diaz's property rights. Diaz did not consent in any manner to Defendants engaging in this wrongful conduct.

85.    As a direct and proximate result of Defendants' conversion, Diaz has been damaged in an identifiable amount which will be determined at trial.

86.    Defendants' acts of conversion, as alleged in this Complaint, were intentional, willful, malicious, and oppressive, and therefore justify an award of punitive damages.

87.    Diaz is further entitled to his attorneys' fees and costs pursuant to California Civil Code section 3336.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Heredia)

88.    Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

89.    An economic relationship existed between Diaz and his promoter, Golden Boy, for the promotion of certain bouts for which Diaz would earn a purse.

90.    Heredia had knowledge of the relationship between Diaz and Golden Boy.  Indeed, he (fraudulently) signed the promotional agreement between Diaz and Golden Boy as Diaz's "manager."

91.    The relationship between Diaz and Golden Boy offered valuable prospective economic benefits to Diaz.  The more challenging and high-profile the bouts Diaz fought, and the

COMPLAINT

1  faster Diaz could build on his pedigree and further advance his career, the greater the purses Diaz
2  would obtain (and the more money he would earn).

3      92.     However, Heredia engaged in intentional and wrongful conduct designed to interfere
4  with or disrupt the relationship between Diaz and Golden Boy.  Heredia expressly and continuously
5  sought out benefits for himself and his other clients signed with Golden Boy instead of protecting
6  and advancing Diaz's interests with Golden Boy.  Heredia intentionally did not vigorously negotiate
7  with Golden Boy on Diaz's behalf so that Heredia could squeeze more out of Golden Boy for himself
8  and his other clients.

9      93.     Heredia actually disrupted and interfered with the relationship between Diaz and
10  Golden Boy.  Heredia cost Diaz multiple opportunities for more and better bouts that would be
11  promoted by Golden Boy and thereby cost Diaz the benefits of his relationship with Golden Boy.

12      94.     Diaz suffered actual harm as a direct and proximate result of Heredia's wrongful
13  conduct in an amount of damages to be proved at trial.

14      95.     Heredia's acts alleged herein were intentional, willful, malicious, and oppressive, and
15  therefore justify an award of punitive damages.

## SIXTH CAUSE OF ACTION

### Violation of the Muhammad Ali Boxing Reform Act

### (Against Heredia)

19      96.     Diaz incorporates by reference and realleges each and every allegation contained in
20  the paragraphs above as though fully set forth herein.

21      97.     The Ali Act provides a private right of action to "[a]ny boxer who suffers economic
22  injury as a result of a violation of this chapter" and states that such boxer "may bring an action in the
23  appropriate Federal or State court and recover the damages suffered, court costs, and reasonable
24  attorneys fees and expenses." 15 U.S.C. § 6309(d).

25      98.     Among other things, the Ali Act establishes a "firewall" between managers and
26  promoters.  Managers are prohibited from having a "direct or indirect financial interest in the
27  promotion of a boxer" and from being "employed by or receiv[ing] compensation or other benefits

- 20 -

COMPLAINT

from a promoter, except for amounts received as consideration under the manager's contract with the boxer." 15 U.S.C. § 6308(b).

99.     Heredia violated the Ali Act by receiving benefits from Golden Boy that were for his own benefit and not for Diaz's benefit, as alleged in this Complaint.  These benefits were not part of any consideration Heredia was owed under a manager's contract with Diaz.  Heredia used Diaz as subterfuge for obtaining these benefits at Diaz's expense, as Diaz did not receive the full benefits of his relationship with Golden Boy as a result of the personal benefits given by Golden Boy to Heredia.

100.     The illicit benefits received by Heredia in violation of the Ali Act included tickets from Golden Boy to a highly anticipated bout between Saul "Canelo" Álvarez and Gennadiy Golovkin in Las Vegas, Nevada, which were worth thousands of dollars.  Heredia used Diaz's name and goodwill to obtain these tickets, then falsely blamed Diaz for being upset with the quality of the tickets, damaging Diaz's relationship with Golden Boy.

101.     Diaz suffered economic injury as a result of Heredia's violation of the Ali Act.  But for Heredia's violation, Diaz would have earned more money and/or benefits of his own from Golden Boy, which would have been *legitimate* (unlike Heredia's benefits).  The precise amount of damages suffered by Diaz will be determined at trial.

102.     In addition to his damages suffered, Diaz is entitled to recover his court costs and reasonable attorneys' fees and expenses under the Ali Act.

## SEVENTH CAUSE OF ACTION

### Quantum Meruit

### (Against All Defendants)

103.     Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

104.     Defendants received certain benefits from Diaz to which they were not entitled.  Specifically, Defendants received the following benefits:

a.     Heredia received approximately $29,300.00 of Diaz's money by repossessing Diaz's vehicle and failing to return his payment of $25,000.00 toward the

- 21 -

1    vehicle, $4,000.00 in improvements to the vehicle, and approximately $300.00

2    in cash that was in the vehicle at the time it was repossessed.

3        b.    Defendants received an extra 2% of Diaz's manager's fee by taking a 20% fee

4    instead of the 18% fee set forth in the Current Agreement.  Heredia took this

5    extra 2% fee without Diaz's knowledge or consent.  John Doe, Esq. accepted

6    this extra 2% fee without Diaz's knowledge or consent.  This extra 2% fee

7    amounts to tens, if not hundreds, of thousands of dollars, and the precise

8    amount will be established at trial.

9        c.    Heredia received tickets provided by Golden Boy to Diaz's fights that were

10   supposed to be for Diaz's family and friends.

11       105.    Furthermore, Heredia received the benefit of services owed by Diaz under the Current

12   Agreement, which services were supposed to be provided to Moses Heredia as the manager of record.

13   Thus, in addition to the extra 2% of Diaz's manager's fee alleged above, Heredia received the benefit

14   of whatever portion of Diaz's 18% manager's fee he took, to which he was not entitled.

15       106.    Defendants obtained the benefits alleged herein through wrongful and illegitimate

16   means.  Defendants have been enriched by these benefits, and it would be unjust for Defendants to

17   retain these benefits.

18       107.    Diaz is entitled to restitution from Defendants for the reasonable value of the benefits

19   conferred upon them.

20           **EIGHTH CAUSE OF ACTION**

21           **Accounting**

22           **(Against All Defendants)**

23       108.    Diaz incorporates by reference and realleges each and every allegation contained in

24   the paragraphs above as though fully set forth herein.

25       109.    As alleged in this Complaint, a fiduciary, contractual, and/or confidential relationship

26   existed between Diaz and Defendants.

27       110.    Diaz is unable to determine the exact amount of money owed by Defendants to Diaz

28   as a result of their conduct as alleged in this Complaint without an accounting.

- 22 -

111.   Accordingly, Diaz requests an accounting of all unsettled accounts between Defendants and Diaz.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and an award against Defendants as follows:

1. For compensatory damages in an amount to be determined at trial;

2. For pre- and post-judgment interest at the maximum rate allowed by law;

3. For punitive damages on the first, fourth, and fifth causes of action;

4. For an accounting as alleged herein;

5. For the recovery of reasonable attorneys' fees;

6. For the costs of this suit; and

7. For such other and further relief as the Court may deem just and proper.

Dated: October 7, 2020                          VGC, LLP

By: _____
                                                James L. Greeley
                                                Diyari Vázquez
                                                Alexander R. Safyan
                                                *Attorneys for Plaintiff*
                                                JOSEPH DIAZ, JR.

- 23 -

1

## DEMAND FOR JURY TRIAL

2      Plaintiff hereby demands a jury trial on all issues so triable.

3

4   Dated: October 7, 2020                      VGC, LLP

5

6                                          By: _____

7                                               James L. Greeley
                                                Diyari Vázquez
8                                               Alexander R. Safyan
                                                *Attorneys for Plaintiff*
9                                               JOSEPH DIAZ, JR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 24 -

COMPLAINT