

James L. Greeley (SBN 218975)
  jgreeley@vgcllp.com
Diyari Vazquez (SBN 222461)
  dvazquez@vgcllp.com
Gina M. Simas (SBN 205367)
  gsimas@vgcllp.com
Andrew D. White (SBN 222628)
  Awhite@vgcllp.com

**VGC, LLP**
1515 7th Street, No. 106
Santa Monica, California 90401
Telephone: (424) 256-8296

*Attorneys for Plaintiff*
JOSEPH DIAZ, JR.

**Deleted:** Christian Anstett

**Deleted:** 40179

**Deleted:** canstett

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

JOSEPH DIAZ, JR.,

           Plaintiff,

     v.

RALPH HEREDIA, true name RAFAEL HEREDIA TARANGO, a/k/a RAFAEL HEREDIA, a/k/a RAFAEL BUSTAMANTE; JOHN DOE, ESQ.; and JANE DOES 1 through 20, inclusive,

           Defendants.

Case No. 5:20-cv-02332-JWH-KK

**SECOND AMENDED COMPLAINT FOR:**

**Deleted:** FIRST

1. **FRAUD**
2. **BREACH OF FIDUCIARY DUTY**
3. **BREACH OF IMPLIED-IN-FACT CONTRACT**
4. **CONVERSION**
5. **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
6. **VIOLATION OF THE MUHAMMAD ALI BOXING REFORM ACT (15 U.S.C. §§ 6301,** *et seq.***)**
7. **QUANTUM MERUIT**
8. **ACCOUNTING**

**JURY TRIAL DEMANDED**

Plaintiff JOSEPH DIAZ, JR. ("Diaz" or "Plaintiff") brings this Second Amended Complaint against Defendants RALPH HEREDIA, true name RAFAEL HEREDIA TARANGO, a/k/a RAFAEL HEREDIA, a/k/a RAFAEL BUSTAMANTE ("Heredia"), JOHN DOE, ESQ., JANE DOE 1 which has been identified as HEREDIA BOXING MANAGEMENT, LLC ("HBM"), and JANE DOES 2 through 20 (collectively, "Defendants") and alleges, based on knowledge as to himself and his own acts and on information and belief as to all other matters, as follows:

**INTRODUCTION**

1.     Diaz is a world champion professional boxer.  He holds the International Boxing Federation super featherweight title, which he won on January 30, 2020.  He is a former U.S. National Champion and U.S. Olympian, having fought for the United States in the 2012 Summer Olympics in London.

2.     Heredia was Diaz's boxing manager.  This is a defined role that means he represented Diaz in contractual negotiations relating to boxing contests, exhibitions, and training exercises.  As a boxing manager, Heredia's compensation was a percentage of the money the boxer (Diaz) earned, which amount is supposed to be fixed by contract, and which contract must be approved by the California State Athletic Commission.

3.     As discussed more fully below, a boxing manager is supposed to be wholly devoted to his or her client's best interests.  The manager is a fiduciary.  The manager has a professional, legal, and ethical responsibility to handle a boxer's business affairs with care and trust.

4.     Heredia did not do that for Diaz.  Instead, Heredia manipulated, exploited, and stole from his champion client in violation of both state law and the federal Muhammad Ali Boxing Reform Act ("Ali Act").  As discussed more fully below, beginning in 2012 and continuing until at least 2020, Heredia first induced Diaz into an illicit arrangement whereby Heredia's half-brother, Moses Heredia, was Diaz's manager "on paper," while Defendant Heredia served as Diaz's de facto manager.  The

Deleted: First

Deleted: is

Deleted: s

Deleted: i

Deleted: s

Deleted: FIRST

reason for this arrangement was that Moses Heredia was licensed by the California State Athletic Commission as a boxing manager; Defendant Heredia was not licensed at all times.  And the reason Defendant Heredia was not licensed is likely due to the fact that he has been hiding his true identity.  Diaz's counsel has discovered that Ralph Heredia's true name is Rafael Heredia Tarango and that he has gone by many aliases, including Rafael Tarango and Rafael Bustamante.  The name "Ralph Heredia" is one such alias used to conceal his criminal past.  Defendant Heredia (as Rafael Bustamante) is a convicted felon who spent years in prison for his role in running a drug trafficking ring in the 1990s.  Of course, during any of his communications with Diaz since 2012, Defendant Heredia did not disclose these facts to his client, Diaz, or the true reason why he had his half-brother, Moses, sign Diaz's manager agreement that was submitted to the Commission (like every boxer-manager contract in California must be), until Defendant Heredia's relationship with Diaz had been irreparably harmed and, on information and belief, Defendant Heredia brought up his illicit past in order to intimidate Diaz.  The true facts are that Defendant Heredia from 2013 to the present, was not licensed by the California State Athletic Commission as a boxing manager, and was a convicted felon. Diaz reasonably relied on Defendant Heredia's representations (or fraudulent concealments) that he was licensed by the California State Athletic Commission as a boxing manager and was not a convicted felon when he agreed to allow Defendant Heredia to become his boxing manager and to receive compensation as Diaz's boxing manager.  Had Diaz known the true facts Diaz would not have agreed to allow Defendant Heredia to be his boxing manager, and would not have allowed Defendant Heredia to receive compensation as Diaz boxing manager. Diaz has been damaged by Defendant Heredia's false representations and fraudulent concealment of material facts which served to induce Diaz to allow Heredia, an unlicensed, and unqualified boxing manager to receive funds he was not entitled to, and by Defendant Heredia's theft of money and personal property from Diaz.

- 2 -

**Deleted:** FIRST

5.      As part of his plot, after signing Diaz as a client in 2012, Heredia used Diaz to get his foot in the door with the well-known boxing promotion firm, Golden Boy Promotions.  Once that relationship was established, Heredia expressly and continuously put his own interests over Diaz's interests and sought benefits for himself from Golden Boy rather than advocating for Diaz's interests—a violation of the Ali Act and his duties as a manager.

6.      On top of all that, and as discussed more fully below, Heredia also repeatedly stole from Diaz—both money and personal property.  He did so with the help of an attorney, Defendant John Doe, Esq., whose name Diaz does not know and whom he never agreed to retain.

7.      Through this action, Diaz seeks compensatory and punitive damages, as well as the recovery of his attorneys' fees, against the Defendants for their violations of state and federal law, as alleged herein.

**THE PARTIES**

8.      Plaintiff Joseph Diaz, Jr. is an individual residing in San Bernardino County, California.

9.      Defendant Ralph Heredia, true name Ralph Heredia Tarango, a/k/a Rafael Heredia, a/k/a Rafael Bustamante, is an individual residing in San Bernardino County, California.

10.     Defendant Heredia Boxing Management ("HBM") is a California corporation.  Defendant Ralph Heredia is listed on the Statement of Information filed by HBM as its Secretary and Chief Financial Officer.  Moses Heredia is listed as HBM's Chief Executive Officer.

11.     Defendant John Doe, Esq. is a licensed attorney practicing in California, who will be identified through discovery in this case.

12.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Jane Does 2 through 20, inclusive, are presently unknown to Plaintiff, who therefore sues said defendants by such fictitious names.  Each

**Deleted:** FIRST

fictitiously named defendant is in some way responsible for, participated in, or contributed to the matters alleged herein. Plaintiff will amend this Complaint to allege the true names and capacities of Defendants Jane Does 2 through 20 when they are ascertained.

13. Each and every Defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other Defendant, and in performing or failing to perform the acts alleged herein each Defendant was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary, and/or conspiracy.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action because the amount of damages claimed, exclusive of interest and costs, is in excess of $25,000.00.

15. This Court has personal jurisdiction over Defendants because they reside in California, do substantial business in California, have substantial minimum contacts with California, and/or intentionally avail themselves of the benefits and protections of California law through the promotion, sale, marketing, and provision of services in California.

16. Venue is proper in this Court because Defendants reside and/or do business in this judicial district.

## FACTUAL ALLEGATIONS

### The Professional Boxing Industry

### *Managers*

17. The preeminent Ali Act defines a "manager" as "a person who receives compensation for service as an agent or representative of a boxer." 15 U.S.C. § 6301(5). Boxers must navigate complex contractual relationships with various participants in the boxing industry. This can be daunting, especially for fighters who are not experienced or educated in the business side of the industry. A manager's

- 4 -

**Deleted:** FIRST

professional role is to represent the boxer in various negotiations and otherwise handle the boxer's business affairs in a fair and ethical manner.  The manager serves as a fiduciary to the boxer.  The manager is supposed to be wholly devoted to his or her client's best interests.

18.     As compensation, the manager typically receives a percentage of the boxer's "purse" for each "bout," or fight.  The purse is the amount of money the boxer receives from the promoter of a fight (defined below).  The promoter guarantees the purse at the outset; the purse amount does not depend on the outcome of the fight.  Because the manager's compensation is ordinarily tied to the boxer's purse, the manager has every incentive to negotiate vigorously with the promoter for as large a purse as possible.

### *Promoters*

19.     Promoters play a different role in boxing.  The Ali Act defines a "promoter" as "the person primarily responsible for organizing, promoting, and producing a professional boxing match."  15 U.S.C. § 6301(9).  Promoters contract with boxers to provide a certain number of fights in return for compensation, in the form of a "purse" for each fight.  Promoters make money primarily from selling tickets, television rights, and advertising rights for a bout, as well as from other promotional activities.  Promoters guarantee the purse to the boxer and manager before the fight and then earn their profit by generating more money in revenue than they spend promoting the fight.

### *Sanctioning Organizations*

20.     Under the Ali Act, a "sanctioning organization" is "an organization that sanctions professional boxing matches in the United States."  15 U.S.C. § 6301(14).  Stated differently, these are the organizations that rate boxers and recognize championships and titles.  There are four major sanctioning organizations: the World Boxing Association (WBA); the World Boxing Council (WBC); the World Boxing Organization (WBO); and the International Boxing Federation (IBF).

**Deleted:** FIRST

**Federal and State Regulation of Professional Boxing**

21.     Professional boxing in the United States is governed at both the federal and state level.  At the federal level, there are two primary laws that regulate the boxing industry: the Professional Boxing Safety Act and the Ali Act.

22.     After a number of boxing bills were introduced in Congress from the 1970s through the 1990s aimed at addressing practices such as bribery, racketeering, licensing, and safety, in 1996, with the sponsorship of Senators John McCain and Richard Bryan, Congress passed the Professional Boxing Safety Act, which was designed to ensure boxers' safety.

23.     While the Professional Boxing Safety Act sought to protect boxers from physical harm, it did not address abusive and exploitative business practices that had taken root in the boxing industry.  Congress was particularly concerned with the financial exploitation of boxers by other participants in the industry with more experience and bargaining power.

24.     Such exploitation could be avoided if the boxer had competent and independent representation.  This is where boxing managers enter the picture.  Ideally, a manager should fiercely and exclusively advocate for the boxer's interests when negotiating with sophisticated business entities.  In reality, however, that did not always happen:

> "A manager is supposed to have some degree of independent judgment. . . . [T]here are situations where a manager is actually a paid employee of a promoter or even an officer of a promotion company.  Sometimes this is quite overt, and since one of the roles of manager is to represent a boxer in negotiations with a promoter it is obvious that appropriate objectivity cannot exist in such a circumstance."

**Deleted:** FIRST

1   *Business Practices in the Professional Boxing Industry: Hearing Before the Committee*
2   *on Commerce, Science, and Transportation*, S. Hrg. 105-712, at 29 (1998) (prepared
3   statement).

4       25.   In order to address abusive and exploitative business practices in the
5   boxing industry, Senators McCain and Bryan proposed the Ali Act in 1998.  According
6   to the initial Senate Report, the Ali Act was intended to "protect professional boxers
7   from coercive and exploitative business practices, assist state boxing officials to
8   provide proper oversight of the sport, and increase honest competition and the integrity
9   of the industry." S. Rep. 105-371, at 1 (Oct. 6, 1998).

10      26.   The bill also proposed to outlaw conflicts of interest between promoters
11  and managers.  The Senate Report emphasized that "it remains essential that managers
12  serve and protect the interest of the boxer" and that managers "should not be serving
13  the financial interests of the promoter, while simultaneously taking a [percentage]
14  earnings cut from the boxer for biased representation as manager." Id. at 7.

15      27.   Congress passed the Ali Act in 2000.  President Bill Clinton signed the
16  bill into law on May 26, 2000.

17      28.   Among other things, the Ali Act established the following major reforms:

18      a.   **"Firewall" Between Managers and Promoters:**   The Ali Act
19         establishes a "firewall" between managers and promoters.
20         Managers are prohibited from having a "direct or indirect financial
21         interest in the promotion of a boxer" and from being "employed by
22         or receiv[ing] compensation or other benefits from a promoter,
23         except for amounts received as consideration under the manager's
24         contract with the boxer." 15 U.S.C. § 6308(b).

25      b.   **Protection from Coercive Contracts:**   The Ali Act declares that
26         long-term "option" contracts are "in restraint of trade, contrary to
27         public policy, and unenforceable against any boxer." Id. § 6307b.

28

SECOND AMENDED COMPLAINT

**Deleted:** FIRST

     c.    **Required Disclosures:** Promoters and sanctioning organizations are required to make certain financial disclosures regarding the bouts they promote or oversee.  Id. §§ 6307d & 6307e.

29.    The Ali Act calls for severe sanctions against individuals who violate the manager-promoter "firewall," up to and including criminal penalties.  Id. § 6309.

30.    Because the amount a promoter makes is, in part, a function of how much it pays the boxer—that is, how big of a purse the promoter guarantees the boxer from a given bout—promoters and boxers are expected to negotiate hard over payment and other terms.  The promoter and the boxer sit on opposite sides of the bargaining table, and if they strike a deal, they become business partners.  It is the manager's job to represent the boxer in these negotiations.  The manager serves as a fiduciary to the boxer and is expected to protect and advance the boxer's interests.  Because the manager's fee is tied to the size of the purse—since the manager makes a percentage of what the boxer makes—the manager is supposed to have every incentive to bargain hard for a bigger payout to his or her client (and by extension, to him or herself).

31.    The Ali Act serves to protect boxers, the boxing industry, and the public from abusive, exploitative, and anticompetitive behavior.  The establishment of a strict "firewall" between managers and promoters underscores Congress's judgment that "*[a] manager must be a determined advocate for the boxer's interests* and not be influenced by financial inducements from a promoter."  S. Rpt. No. 106-83, at 11 (June 21, 1999) (emphasis added).

32.    Every state has its own boxing regulations as well.  In California, the State Athletic Commission, which is part of the Department of Consumer Affairs, is charged with regulating amateur and professional boxing, in addition to wrestling and other mixed martial arts.  The regulatory activities of the Commission protect the public, contestants, and state government from monetary losses due to fraudulent business practices.  Boxers are protected from injury by preventing mismatches and ensuring proper medical examinations.  The Commission also has the sole power to license all

**Deleted:** FIRST

1  professionals and amateurs who participate in these sports.  Each participant in the
2  boxing industry must be licensed before taking part in the sport, including managers,
3  fighters, matchmakers, and fight officials.

4      33.   The Commission primarily establishes requirements for licensure, issues
5  and renews licenses, approves and regulates events, assigns ringside officials,
6  investigates complaints received, and issues fines and/or suspends or revokes licenses
7  for misconduct.

8      34.   In California, in addition to the federal Ali Act, boxing is regulated by the
9  state Boxing Act (Bus. & Prof. Code §§ 18600, *et seq.*), the California Code of
10  Regulations (Cal. Code. Regs., title 4, §§ 201, *et seq.*), and other miscellaneous
11  provisions of the Civil Code and Penal Code.

12      35.   Under the State Boxing Act, a boxing "Manager" means *any* person who
13  does any of the following: (b) directs or controls the professional boxing or martial arts
14  activities of any professional boxer or martial arts fighter…(d) Is an officer, director,
15  shareholder, or member of any corporation or organization which receives, or is
16  entitled to receive more than 10 percent of the gross purse of any professional boxer
17  or martial arts fighter for any services relating to the person's participation in a
18  professional contest. (Bus & Prof. Code §18628(b) and (d); emphasis added.)
19  Therefore, under the Boxing Act, it is not required that a boxing manager enter into a
20  written contract with a professional fighter to be considered a fighter's boxing
21  "Manager." That is, even if a person does not enter into a written boxing management
22  contract identifying themselves as a boxing manager, a person who provides the
23  services set forth in any of the subsections of Bus & Prof. Code §18628, including
24  subsections (b) or (d) identified above, are considered "Manager(s)" under the Boxing
25  Act, requiring the appropriate licensure from the California State Athletic
26  Commission, as well as owing all of the fiduciary duties owed by a boxing manager to
27  a professional fighter under the Ali Act.

28

- 9 -
SECOND AMENDED COMPLAINT

**Deleted:** for purposes of the Boxing Act.

**Deleted:** e

**Deleted:** FIRST

36.  On information and belief, since 2012 and continuing, Heredia has either directed or controlled the professional boxing activities of Diaz, and/or has been an officer or director of Defendant HBM, which is received more than 10 percent of the gross purses of Diaz for services relating to Diaz's participation in professional contests.

**Defendants' Relationship with Diaz and Violation of the Law**

37.  Diaz was introduced to Heredia when Diaz was approximately 14 or 15 years old.  Heredia maintained what Diaz describes as a "cordial" relationship with Diaz for several years, periodically buying him gifts such as boxing gear and equipment.  In or around 2011, when Diaz began to win national boxing tournaments and gain more recognition, Heredia took a greater interest in Diaz.  In 2011, Diaz won the U.S. Men's National Tournament.  Then he won at the U.S. Olympic trials and qualified for the 2012 Olympics.  Around that time, Heredia approached Diaz and his father and asked whether he could sign Diaz as a boxing client.

38.  Shortly after the 2012 Olympics, Diaz agreed to allow Heredia to be his manager and signed a manager agreement.  On or around September 4, 2012, Diaz signed a Management Agreement (the "2012 Agreement").  Rafael and Moses Heredia also signed and dated the 2012 Agreement.  There is also an unknown signature on the blank labeled "witnessed by commission representative."

39.  At the time of execution and at all relevant times subsequent to the execution of the 2012 Agreement, Diaz looked to Heredia to provide appropriate advice and guidance on all aspects of his boxing career – including ensuring that the parties took the appropriate legal steps necessary to legally consummate the boxer-manager relationship.  Throughout the relationship, Heredia expressly encouraged Diaz to place his trust and confidence in Heredia to do exactly that: manage all of the business details of the boxer-manager relationship.  At no point during Diaz's almost nine-year relationship with Heredia did Heredia ever advise Diaz that he was not a licensed boxing manager, or that Diaz might benefit from hiring independent legal,

Deleted: entitled to

Deleted: FIRST

financial or other advisors to represent Diaz's interests vis-a-vis the Heredias' interests. Rather, Heredia actively discouraged Diaz from engaging independent advisors and insisted that Diaz trust Heredia and Heredia's agents exclusively in all boxing related matters.

40.    The term of the 2012 Agreement ran from September 4, 2012 to September 3, 2017.  The 2012 Agreement states on its face in all capital, bold letters "THIS CONTRACT IS NOT VALID UNTIL THE DATE ON WHICH IT HAS BEEN SIGNED AND APPROVED BY THE COMMISSION'S EXECUTIVE OFFICER OR DESIGNEE."  Paragraph C8 also states that the agreement is not valid unless and until both parties appear before the Commission at the same time for approval by the California Athletic Commission.  Paragraph C2 of the 2012 Agreement states: "[t]his contract may be declared null and void if at any time during the term the Manager, after notice from the Commission pursuant the provisions of Rule 221, is not duly licensed by the Commission."  In Paragraph C6, the parties certified that "no other person or party in any way or in any degree shares or participates in the ring earnings of the Boxer or in the Manager's or Boxers portion of such earnings."

41.    At all times, beginning when Diaz entered into the 2012 Agreement and to the present, Heredia represented to Diaz that the 2012 Agreement was a valid and enforceable boxing agreement that complied with all relevant legal requirements and that Heredia was a boxing manager licensed by the California State Athletic Commission. Diaz did not know that the 2012 Agreement was void and unenforceable or that Heredia's California boxing managers license expired in 2013 and was never reinstated.  Heredia, however, knew or should have known that the 2012 Agreement did not comply with California law and that he was acting as Diaz's boxing manager without the requisite license.  Heredia's failure to seek the Commission's approval of the 2012 Agreement was clearly intentional since, in September 2012 and continuing throughout the term of the 2012 Agreement, Heredia knew that he was not a licensed

- 11 -

**Deleted:** .

**Deleted:** FIRST

boxing manager at all times and that he was or became ineligible for a boxing license due to his criminal record.

42.   Diaz did not learn of the invalidity of the 2012 Agreement until after he filed the original complaint in this matter, when his counsel obtained a copy of the 2012 Agreement.  Prior to his counsel's receipt of the 2012 Agreement in or around May 2021, Diaz had no reason to suspect that the 2012 Agreement was not a valid, binding contract.  During a June 2021 arbitration involving Diaz and Moses Heredia, the California Athletic Commission expressly ruled that the 2012 Agreement was not a valid boxer-manager contract and "was invalid on its face" because it was not executed or approved by the Commission, in direct violation of the Commission's regulations.

43.   After signing the 2012 Agreement, Heredia caused Diaz to perform the 2012 Agreement pursuant to its terms.  For almost five years, Heredia collected 20% of every fight purse won by Diaz, despite the fact that Heredia had no valid claim to any amount of money due to the invalidity of the 2012 Agreement and because Heredia was not a licensed boxing manager.

44.   At some point during the pendency of the 2012 Agreement and as Diaz's career and earnings continued to grow, Heredia understood that he needed to enter into a legally enforceable agreement with Diaz.  However, Heredia remained unlicensed and ineligible for a license.  For this reason, Heredia decided to use his brother Moses as a "paper manager."

45.   In or around February 2017, Heredia told Diaz that it was time to sign a second boxer-manager contract to govern their relationship because the 2012 Agreement was soon set to expire by its terms.  At no point did Heredia claim that his role as Diaz's manager would change. At no point did Heredia disclose to Diaz that he was not a licensed boxing manager. To the contrary, Heredia assured Diaz that the relationship would continue as it had before.  Nor did Heredia indicate that the roles that Moses and Heredia played vis-a-vis Diaz would change.  At the time, Diaz was

- 12 -

**Deleted:** Heredia

**Deleted:** FIRST

1  unaware of any reason why the working relationship between he, Moses and Heredia
2  would need to change.  From Diaz's perspective, it seemed reasonable to enter into a
3  further contract given that the 2012 Agreement was set to expire by its terms later in
4  2017.  Diaz had similarly re-negotiated his boxer-promoter contract with Golden Boy
5  around the same time.

6         46.    On or around February 23, 2017, Diaz signed a boxer-manager agreement
7  with Moses Heredia (the "2017 Agreement").   At the time he signed the 2017
8  Agreement, Diaz believed that he continued the same management arrangement as set
9  forth in the 2012 Agreement – i.e. Heredia would continue as his primary boxing
10 manager.  Diaz did not understand or appreciate the legal significance of the fact that
11 Heredia only signed the 2012 Agreement (not filed with the Commission) and did not
12 himself sign the 2017 Agreement.   At no point before or after signing the 2017
13 Agreement did Diaz's working relationship with Heredia change in any respect.  By
14 refusing to sign the 2017 Agreement, Heredia sought both to conceal his role managing
15 Diaz from the Commission and to place himself beyond the Commission's reach.  The
16 2017 Agreement mandated that all disputes arising be arbitrated by the California
17 Athletic Commission.  As a nonparty to the 2017 Agreement, Heredia understood that
18 the Commission would lack jurisdiction over him.  The 2017 Agreement contained the
19 same provisions noted in Paragraph 40 above.

**Deleted:** 38

20        47.    Concurrently with the execution of the 2017 Agreement, Heredia, Moses
21 Heredia and Diaz signed a February 23, 2017 Release of Contract (the "Release").
22 Strangely, a representative from the California Athletic Commission signed the
23 Release, despite the fact that the 2012 Agreement had never been approved by the
24 Commission and was therefore void.  While styled a "release," the 2017 Agreement
25 applied on a going-forward basis and did not release prior claims: "We, the
26 undersigned, hereby mutually release each other from any *further* liability or obligation
27 [under the 2012 Agreement]." (Emphasis added).  The Release states that it is effective
28 "from the 23 day of February 2017."  Of course, the Release reinforced in Diaz's mind

**Deleted:** FIRST

- 13 -

that the 2012 Agreement had been valid, and that Heredia was a licensed boxing manager. The Commission's representative signature on the Release appeared to be the Commission's confirmation that the 2012 Agreement had been a valid boxer-manager contract—it was not.

48.     The reason Defendant Heredia had his half-brother, Moses, sign the 2017 Agreement was that Moses Heredia was licensed as a manager by the California State Athletic Commission; Defendant Heredia was not. In fact, to this day, Defendant Heredia is not licensed as a manager by the Commission. This is likely due to the fact that Defendant Heredia has a documented criminal history and did not want to reveal his true identity to the Commission (or to Diaz). Indeed, Defendant Heredia's true name is Rafael Heredia Tarango. Defendant Heredia has gone by many aliases, including Rafael Tarango and Rafael (or Ralph) Bustamante. The name "Ralph Heredia" is one such alias used to conceal his criminal past. Defendant Heredia (as Rafael Bustamante) was indicted in connection with a headline-making extortion and threatened murder plot against Los Angeles Rams player Darryl Henley over a $350,000 debt stemming from a drug deal involving over twenty-five pounds of cocaine. He was ultimately convicted of a felony for conspiracy to possess and distribute cocaine for which he was sentenced to nearly twenty years in prison. Defendant Heredia never disclosed these facts to Diaz or the true reason he had his half-brother, Moses, sign the 2017 Agreement, that Heredia was not a licensed boxing manager and could not be licensed due to his criminal past.

49.     At all relevant times, from 2012 to 2021, Moses Heredia was only a "paper manager." At all relevant times, Defendant Ralph Heredia handled all of Diaz's financial affairs and was the true manager for the duration of the parties' relationship (continuing to this day). Diaz had met Moses only a handful of times before signing the 2017 Agreement. Heredia claimed that Moses assisted with certain negotiations and "behind the scenes" kinds of roles. After signing the agreement, Diaz hardly interacted with Moses at all. Even if Moses did provide some management services to

- 14 -

Deleted: ed

Deleted: FIRST

1   Diaz, it is irrelevant as to whether Ralph Heredia was also acting as Diaz's boxing
2   manager while not properly licensed.   Under relevant law and common sense, boxers
3   can have more than one manager.   The Commission's form boxer-manager contract
4   even has a signature blank for "co-managers" – and Ralph and Moses signed the 2012
5   Agreement as co-managers.

6        50.    Since the 2012 Agreement until early 2020, Defendant Ralph Heredia
7   arranged all of Diaz's boxing commitments.   He negotiated all of Diaz's media
8   workouts and interviews.   He negotiated what few, paltry sponsorship opportunities
9   Diaz entered (and caused Diaz to miss out on the many he did not).   And he was
10  primarily involved in the negotiations with Golden Boy, who became Diaz's promoter.

11       51.    Prior to signing Diaz, Ralph (and Moses) Heredia were relatively
12  unknown in the boxing industry.   They did not have many, if any, other clients.   After
13  signing Diaz, Defendant Heredia traded on Diaz's name and reputation to advance his
14  own interests rather than Diaz's.   Heredia used Diaz to get his foot in the door with
15  Golden Boy.  He then traded on Diaz and Golden Boy's names and reputations to sign
16  other fighters, such as Luis Feliciano and Francisco Vargas.   Today, all of Heredia's
17  clients are signed with Golden Boy.

18       52.    Defendant Heredia's arrangement with his other clients is similar to his
19  arrangement with Diaz.   Moses Heredia is the signor of the manager agreement with
20  the boxer.   Moses Heredia is the manager of record as far as the California State
21  Athletic Commission is aware.   But Defendant Ralph Heredia is the true manager,
22  operating without a contract or the necessary licensure or approval from the
23  Commission.

24       53.    Over the course of the parties' relationship from 2012 to 2020, Heredia
25  failed to adequately protect or advance Diaz's interests.   Diaz brought to Heredia's
26  attention repeatedly that other fighters with worse qualifications than Diaz were getting
27  better matches, greater purses, and more sponsorship opportunities. Diaz was unaware
28  at all relevant times that this was because Heredia was not a licensed and qualified

**Deleted:** FIRST

1  boxing manager, and because Heredia always put his interests before the interests of
2  Diaz. Heredia always dismissed these concerns and assured Diaz that Heredia would
3  take care of everything.

4         54.    In reality, Diaz was often forced to strike his own deals and advance his
5  own interests without (and often in spite of) Heredia.  For example, Diaz had to
6  promote himself on social media to obtain sponsorship opportunities.  Diaz also pushed
7  for his championship bout against Tevin Farmer (who was not signed with Golden
8  Boy) on January 30, 2020 in Miami, Florida, while Heredia was advocating for worse
9  matchups in other locations, which were more favorable to Heredia and/or Golden Boy.
10  Heredia was more concerned with his relationship with Golden Boy than with Diaz.
11  Since Heredia used Diaz as his ticket to get in with Golden Boy, and since all of his
12  clients were Golden Boy clients, Heredia could not, and did not, negotiate vigorously
13  with Golden Boy on Diaz's behalf.  Heredia knew that if he bargained too hard with
14  Golden Boy for Diaz, it would hurt him with his other clients.

15         55.    Heredia did not just fail to adequately protect Diaz's interests.  He also
16  *stole* from Diaz.  In or around February 2017, Heredia approached Diaz and told him
17  that he wanted to enter into a new manager agreement and change the terms of their
18  deal—specifically, to increase the manager's fee to 20%.  After some consideration,
19  Diaz agreed to a fee of 18%, not 20%.  On or around February 23, 2017, Diaz signed
20  the new 2017 Agreement memorializing the 18% fee.

21         56.    The 2017 Agreement was signed solely by Heredia's half-brother, Moses,
22  as Diaz's manager.  To wit, there is no name or signature indicating a co-manager.

23
24
25
26
27
28

The parties hereto have read and signed this contract and agreement in each other's presence and in the presence of the Commission Representative who has orally reviewed the terms of this contract with the Boxer on this ___23___ day of ___February___ 2017

THIS CONTRACT IS NOT VALID UNTIL THE DATE ON WHICH IT HAS BEEN SIGNED AS APPROVED BY THE
COMMISSION'S EXECUTIVE OFFICER OR DESIGNEE.
IF THE PARTIES HAVE ANY OTHER AGREEMENTS CONCERNING THE BOXER'S COMPENSATION OR CAREER THAN THOSE
SET FORTH ON THIS CONTRACT, THEY MAY NOT BE ENFORCED BY THE COMMISSION.

Commission Representative Signature          Manager's Signature
Print Name: _Larry Elam_                      Print Name: Moses Heredia

Boxer's Signature                            Co-Manager's Signature (if applicable)
Print Name: Joseph Diaz Jr.                  Print Name:

                                             Co-Manager's Signature (if applicable)
                                             Print Name:

Accepted and Approved by Executive Officer or Designee     Date  2/24/17

I hereby acknowledge that the provisions of this contract reviewed with me and by a Commission Representative.

PLAINT

**Deleted:** FIRST

57. The 2017 Agreement was presented to the California State Athletic Commission for approval and approved on February 24, 2017. Defendant Ralph Heredia's name does not appear anywhere on the 2017 Agreement. But this did not stop Defendant Ralph Heredia (who, again, is not licensed by the Commission) from serving and holding himself out as Diaz's manager.

58. Only weeks after inducing Diaz to enter into the 2017 Agreement signed only by Moses, Defendant Ralph Heredia negotiated Diaz's promotional agreement with Golden Boy. Critically, Moses Heredia is not the only "manager" listed on the Golden Boy Agreement. Defendant Ralph Heredia also signed the Golden Boy Agreement as Diaz's "manager."

By its signature below, each party confirms its understanding of, and agreement to the foregoing.

PROMOTER:

GOLDEN BOY PROMOTIONS, LLC

By: _____

Name: Rolando Arellano

Title: Fighter Relations

Date: 3/22/2017

BOXER:

JOSEPH DIAZ JR.

By: _____

Name: Joseph Diaz Jr

Boxer

Date: 3/22/17

Page 14

59.     Despite the fact that Moses signed the 2017 Agreement as Diaz's purported "sole and exclusive" manager and is the manager of record as far as the California State Athletic Commission is aware, Defendant Ralph Heredia continued to serve as Diaz's true manager (and continues to do so to this day).  This was a fraud perpetrated on the Commission.  It was also a fraud perpetrated on Diaz.  Since their relationship began in approximately 2010, Heredia never disclosed to Diaz the true nature of the parties' relationship.  He did not disclose the true reason why he had his half-brother, Moses, sign the 2017 Agreement as the manager, rather than him.  The true reason was that Heredia was trying to hide his criminal past from the Commission and from Diaz, and because he was not licensed by the Commission.  He did not disclose he was not (and is not) qualified or licensed to serve as Diaz's manager.  He did not disclose he did not (and does not) have the necessary approvals to serve as Diaz's manager.  He did not disclose he did not (and does not) have the requisite qualifications to handle Diaz's affairs or represent him in all the relevant contractual negotiations relating to his boxing career.  The truth is, this illicit arrangement was the

- 18 -

Deleted: H

Deleted: H

Deleted: H

Deleted: FIRST

only way to enable Heredia to gain and keep full access to Diaz's finances, to be able to divert Diaz's money and property into his own coffers and to create illicit revenue streams and benefits of his own with Golden Boy.

60.   Furthermore, despite the fact that the 2017 Agreement calls for an 18% fee, Diaz eventually realized that Heredia was actually taking a 20% fee (even though Diaz had expressly rejected the 20% fee).  When Diaz confronted Heredia about the extra 2%, Heredia responded that this was the fee for "Diaz's lawyer" who Heredia had retained on Diaz's behalf to help with his affairs.

61.   But Diaz never agreed to any lawyer.  The truth is, the extra 2% was used to pay for *Heredia's* lawyer, not "Diaz's lawyer."  This lawyer is Defendant John Doe, Esq.  Diaz does not know the identity of John Doe, Esq.  Diaz never signed a retainer agreement with John Doe, Esq.  He does not recall seeing any correspondence from John Doe, Esq.  He believes he may have met John Doe, Esq. once, but does not recall having any conversation with him about any legal matter or issue.  John Doe, Esq. was hired by Heredia for the benefit of *Heredia*.  Diaz never agreed to hire John Doe, Esq. or to be represented by John Doe, Esq., who in turn necessarily violated the rules of professional conduct and the law to the extent he purported to represent Diaz without his knowledge or consent, and without an engagement agreement.

62.   At a minimum, Heredia stole the extra 2% manager's fee from Diaz.  John Doe, Esq. was directly aware of and participated in this scheme to steal the 2% from Diaz.

63.   Practically speaking, Heredia also stole whatever portion he received of the manager's fee from Diaz.  Heredia was not a party to the 2017 Agreement.  He was not entitled to *any* manager's fee from Diaz.  But he has been pocketing a portion of the manager's fee under the 2017 Agreement.  He is able to do this because, by virtue of his role as Diaz's manager, Heredia has full access to Diaz's finances, including the compensation paid by Golden Boy.  Heredia induced Diaz to enter into the 2017

- 19 -

**Deleted:** FIRST

1 Agreement under false pretenses, while concealing his criminal past and the fact that

2 he did not have the proper licensure or qualifications to manage Diaz.

3   64.   Defendant HBM is a California Corporation and another vehicle of

4 Heredia's theft from Diaz.  The only officers and directors listed for HBM in its public

5 filings with the California Secretary of State are Moses and Ralph Heredia.   The

6 address listed for HBM in its public filings, 2120 Foothill Blvd Ste 107, La Verne, CA,

7 is the same address for Moses Heredia's credit processing business, Global Processing

8 Systems Inc.  Those same filings describe HBM as a "boxing management" business.

9 But the California Athletic Commission has no record stating that HBM has ever

10 received a license.  Despite California law requiring all managers be licensed, and

11 despite language in the 2017 Agreement stating that no person other than the managers

12 listed on the 2017 Agreement participate in the boxer's ring earnings, HBM received

13 hundreds of thousands of dollars of Diaz's ring earnings as Diaz purported boxing

14 manager.   HBM was directly paid these monies in checks issued by Golden Boy

15 Promotions.  Heredia is authorized to deposit and withdraw money from HBM's bank

16 account and used money paid by Golden Boy to HBM for fights relating to Diaz as his

17 own. By having the ring payments made to a business entity, Heredia concealed his

18 participation and receipt of funds from Diaz at times where he was not a licensed boxer

19 manager.  All of the payments to HBM, and/or benefits received from Golden Boy,

20 were illicit and improper, and in breach of the 2017 Agreement and in violation of the

21 Ali Act,

22   65.   Heredia also stole money from Diaz in other ways.  In or around October

23 2019, Heredia purchased a 2016 Lexus RC350 purportedly for Diaz's benefit and by

24 his actions allowing Diaz sole and exclusive use of the vehicle, made an unlicensed

25 "auto loan" to Diaz until Diaz could pay it off.  The conduct of the parties wherein

26 Heredia allowed Diaz sole and exclusive use of the vehicle and Diaz paid Heredia

27 money for the vehicle indicated that Diaz would pay Heredia for the vehicle from his

28 boxing proceeds (in addition to the contractual manager's fee).  After one particular

**Deleted:** .

**Deleted:** agreed

**Deleted:** to make

**Deleted:** (presumably

**Deleted:** )

**Deleted:** parties agreed

**Deleted:** FIRST

1   bout, Diaz paid Heredia $25,000.00 toward the vehicle.  Heredia accepted this money.

2   Diaz also paid $4,000.00 to have the vehicle (which was originally painted white)

3   wrapped in matte black.

4       66.   On or about September 8, 2020, despite the fact that Diaz had invested

5   $29,000.00 into the vehicle, Heredia intentionally and maliciously had the vehicle

6   repossessed and took it back for himself.  He did not give any notice to Diaz that Diaz

7   was purportedly in default on payments for the vehicle (because he was not).  He never

8   asked Diaz for any additional payments toward the vehicle.  He did not give Diaz any

9   notice that he would be repossessing the vehicle.  He also did not return the $25,000.00

10  that Diaz had paid him toward the vehicle or the $4,000.00 that Diaz had paid for

11  improvements to the vehicle.  And Diaz had, among other personal effects,

12  approximately $300.00 in cash in the vehicle, which was never returned to him.

13      67.   Diaz believes that Heredia repossessed his vehicle and stole his

14  $29,000.00 investment (plus approximately $300.00 in cash in the vehicle) in

15  retaliation for Diaz signing a business advisory agreement with another company.

16  Heredia was jealous and believed that the other company was infringing on his

17  manager's rights with Diaz, which it was not.

18      68.   Yet another way that Heredia stole from Diaz was by taking tickets

19  provided by Golden Boy to Diaz's fights that were supposed to be for Diaz's family

20  and friends and converting them to his own use.  Specifically, Heredia stole the best

21  seats for himself and his conspirators, and gave only a few, much worse, seats to Diaz's

22  family and friends.

23      69.   Heredia also leveraged his relationship with Golden Boy to obtain

24  additional benefits for himself at Diaz's expense.  For example, on at least one

25  occasion, Heredia represented to Golden Boy that *Diaz* wanted tickets to a highly

26  anticipated bout between Saul "Canelo" Álvarez and Gennadiy Golovkin in Las Vegas,

27  Nevada (Diaz was not fighting on this card).  In reality, Heredia wanted—and took—

28  the tickets for himself.  After the bout, Heredia complained to Golden Boy about the

**Deleted:** FIRST

1   quality of the tickets, stating that *Diaz* was upset the tickets were not floor seats and
2   felt that Golden Boy was not taking care of Diaz's "team." Diaz never expressed such
3   a sentiment. This was Heredia taking an illicit benefit for himself (in violation of the
4   Ali Act) and then complaining that the benefit was not beneficial enough.

5       70.   Heredia also manipulated and stole from Diaz by extending various
6   undocumented "street loans." The loans were a near constant fixture of the relationship
7   between Diaz and Heredia. While some details of the loans have been uncovered, the
8   extent, terms and amounts of these loans has never been reconciled or examined by
9   Diaz or qualified, third-party accountants. The extent of the undisclosed,
10  undocumented loans is excessive – Heredia continuously took advances from Diaz's
11  purse and framed them as loans with unspecified interest rates. Diaz, in turn, paid
12  Heredia back. This loan arrangement enabled Heredia to both control and manipulate
13  Diaz, because Diaz' continuous debts kept him beholden to Heredia and prevented him
14  from seeking out other qualified advisors. The debts also caused Diaz to accept fights
15  to raise money, even if those fights did not make sense from an economic or career
16  perspective.

17      71.   At all relevant times, since 2012 to at least 2020, Heredia acted in his own
18  best interests rather than in Diaz's best interests. Heredia used Diaz to enrich himself
19  and his conspirators, did not adequately protect or advance Diaz's boxing career, and
20  acted precisely in the ways that the Ali Act is designed to protect against.

21      72.   Heredia induced Diaz into an illicit arrangement whereby his half-brother,
22  Moses, was Diaz's manager "on paper," while he served as Diaz's de facto manager.
23  Heredia used Diaz to get his foot in the door with Golden Boy and then favored his
24  own relationship with Golden Boy instead of vigorously advocating for his client,
25  Diaz. And Heredia actively stole money and personal property from Diaz.

26      73.   Defendant John Doe, Esq. conspired with Heredia to steal from Diaz.
27  John Doe, Esq. was aware of the illicit arrangement whereby Moses Heredia was
28  Diaz's "paper manager," but Defendant Ralph Heredia served as Diaz's de facto

- 22 -

**Deleted:**

**Deleted:** FIRST

manager.  He was aware that the 2017 Agreement called for an 18% manager's fee.
He was aware that Ralph took a 20% fee—2% more than the 2017 Agreement allowed.
And he accepted that extra 2% for himself for purported legal services.  He did not
obtain Diaz's agreement or approval for the provision of legal services or for any
payment for legal services.  At all relevant times, John Doe, Esq. took Diaz's money
earned under the 2017 Agreement and converted it to his own personal use.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud

### (Against Heredia)

74.     Diaz incorporates by reference and realleges each and every allegation
contained in the paragraphs above as though fully set forth herein.

75.     At all relevant times from 2012 to 2020, Heredia and Diaz were in a
fiduciary relationship, a relationship of trust and confidence.  A boxing manager owes
a fiduciary duty to his client, the boxer.  A boxing manager must act with the utmost
care, trust, and good faith for the benefit of his client, the boxer.  The boxer places his
confidence in the manager and trusts that the manager will protect his interests, not
take advantage of him, and not place his own interests over those of the boxer.

76.     Beginning when Heredia first signed Diaz in 2012 to be his boxing
manager and continuing to the present, Heredia intentionally concealed and
intentionally failed to disclose material facts to Diaz in connection with their
relationship and Heredia's role as Diaz's manager.  Heredia was under a duty not to
conceal such facts, and to disclose them to Diaz as Diaz's boxing manager, beginning
in 2012 and thereafter.  As alleged above, those material facts included:

> a.     That Heredia was not licensed as a manager by the California State
>          Athletic Commission and that his failure to hold a license made him
>          legally ineligible to manage Diaz.
>
> b.     That Heredia had a criminal history, including a felony conviction.

- 23 -

**Deleted:**

**Deleted:** FIRST

c.     That the name "Ralph Heredia" was his alias used to conceal his criminal history.

d.     That Heredia used his half-brother, Moses Heredia, as the signor on the 2017 Agreement to evade scrutiny from the California State Athletic Commission.

e.     That the 2012 Agreement was not legally valid and was not properly approved by the Commission;

f.     That Heredia was not qualified to represent Diaz as a boxing manager.

g.     That Heredia was taking benefits from Golden Boy for himself at Diaz's expense.

h.     That Heredia was taking an additional 2% manager's fee from Diaz.

i.     That Heredia never intended to actually sell the 2016 Lexus RC350 that he purportedly purchased for Diaz's benefit but always intended to accept Diaz's money and then take the vehicle back for himself.

77.     Beginning when Heredia first signed Diaz in 2012 to be his boxing manager and continuing to the present, Heredia intentionally concealed these material facts from Diaz to induce Diaz to enter into, and remain in, an arrangement with him whereby Heredia could manipulate, exploit, and take advantage of Diaz. Heredia's concealments and failures to disclose took place in any location where Heredia communicated with Diaz, and/or anybody working on behalf of Diaz, verbally and/or in writing, wherein Heredia did not disclose the true facts as set forth above to Diaz. Heredia knew this was the only way to enable Heredia to gain and keep full access to Diaz's finances, to be able to divert Diaz's money and property into his own coffers and to create illicit revenue streams and benefits of his own with Golden Boy.

**Deleted:** T

**Deleted:** FIRST

78.     The facts that Heredia intentionally concealed and/or failed to disclose to Diaz were known only to Heredia and his co-conspirators.  Diaz did not know these facts.  Diaz did not, and could not, discover the true facts until the months leading up to the filing of this complaint with the help of his counsel's investigation.  Even with reasonable diligence, Diaz could not have discovered the true facts but for his counsel's investigation. Therefore, Diaz's reliance on the facts intentionally concealed from him by Heredia, or intentionally not disclosed, was justifiable.

79.     Heredia's fraudulent concealment as alleged in this Complaint was knowing and intentional and intended to deceive Diaz.  Had Heredia disclosed the material facts he concealed, Diaz would not have allowed him to serve as his boxing manager, would not have allowed him to have access to his business and financial affairs, would not have allowed him to take a percentage of money from fight purses, would not have allowed him to steer his boxing career, and would have sought to hire a licensed and qualified boxing manager to competently steer his career, instead of Heredia.

80.     Heredia's fraudulent concealment was a substantial factor in causing harm to Diaz.  Had Heredia disclosed the material facts he intentionally concealed and/or failed to disclose to Diaz, Diaz would have sought to hire a boxing manager licensed by the California State Athletic Commission, and qualified to act as Diaz's boxing manager, as Defendant Heredia was not licensed and not qualified, which Heredia intentionally concealed and failed to disclose at all times in dealing with Diaz, and/or anybody working on behalf of Diaz.  Heredia's failure to disclose material facts and/or intentional concealment as set forth above caused Diaz to act to his detriment by causing Diaz not to hire a licensed boxing manager with the requisite qualifications to maximize Diaz's potential in the fight ring, and monetarily through larger purses, more sponsorships, more media opportunities and more fights, among other things.

81.     As a direct and proximate result of Heredia's conduct, and as set forth herein above, Diaz has suffered damages in an amount to be proved at trial.

Deleted: and

Deleted:

Deleted: FIRST

82.   Heredia's conduct, as alleged in this Complaint, was also intentional, willful, malicious, and oppressive, and therefore justifies an award of punitive damages.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Heredia)

83.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

84.   As alleged above, a boxing manager owes a fiduciary duty to his client, the boxer.

85.   Pursuant to the 2012 Agreement, and based upon Bus & Prof. Code §18628, (b) and/or (d) as set forth above, and based upon Heredia's course of conduct holding himself out as Diaz's boxing manager for all times since 2012 to at least 2020, Heredia was Diaz's true boxing manager at all relevant times herein.  As such, Heredia owed a fiduciary duty to Diaz.

86.   Heredia breached his fiduciary duty to Diaz by taking advantage of Diaz, placing his own interests over Diaz's interests, and stealing from Diaz, in all the ways alleged in this Complaint.

87.   Heredia's breach of fiduciary duty was a substantial factor in causing harm to Diaz.

88.   As a direct and proximate result of Heredia's conduct, Diaz has suffered damages in an amount to be proved at trial.

## THIRD CAUSE OF ACTION

### Breach of Implied-in-Fact Contract

### (Against Heredia)

89.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

SECOND AMENDED COMPLAINT

**Deleted:** FIRST

90.     In or around October 2019, Diaz and Heredia entered into an implied-in-fact contract relating to the 2016 Lexus RC350 purchased by Heredia purportedly for Diaz's benefit.   Under this implied-in-fact contract, Heredia's actions including allowing Diaz to solely and exclusively use the vehicle as his own, and Heredia's acceptance of money from Diaz for exclusive use of the vehicle, created an implied-in-fact contract whereby Heredia , "loaned" the vehicle to Diaz until Diaz could pay it off, which he would do from his boxing proceeds (in addition to the contractual manager's fee), and thereafter would own the vehicle after it was paid off.   After one particular bout, Diaz paid Heredia $25,000.00 toward the vehicle.   Heredia accepted this money.  Diaz also paid $4,000.00 to have the vehicle wrapped in matte black.

[Deleted: agreed to]

91.     The parties intended that their conduct relating to the vehicle—namely, Heredia "loaning" the vehicle to Diaz and Diaz paying for the vehicle from his boxing proceeds—would create a contract between them, and each knew that the other would interpret their conduct as creating a contract.

92.     Diaz performed all, or substantially all, of the acts required of him under the parties' implied-in-fact contract, except those things that were excused by Heredia's breach.

93.     Heredia breached the parties' implied-in-fact contract.   On or about September 8, 2020, Heredia intentionally and maliciously had the vehicle repossessed and took it back for himself, in violation of the parties' implied-in-fact contract that Diaz could solely and exclusively use the vehicle as his own and then would own the vehicle once he paid it off.  Heredia did not give any notice to Diaz that Diaz was purportedly in default on payments for the vehicle (because he was not).  He never asked Diaz for any additional payments toward the vehicle.  He did not give Diaz any notice that he would be repossessing the vehicle.  He also did not return the $25,000.00 that Diaz had paid him toward the vehicle or the $4,000.00 that Diaz had paid in improvements to the vehicle.

[Deleted: agreement]

- 27 -

[Deleted: FIRST]

94.     As a direct and proximate result of Heredia's breach of contract, Diaz has been damaged in an amount to be proved at trial, but which amount is not less than $29,000.00.

### FOURTH CAUSE OF ACTION

**Conversion**

**(Against All Defendants)**

95.     Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

96.     At all relevant times, Diaz had ownership or the right to possession of certain property alleged in this Complaint, including his money and boxing tickets provided for his benefit by Golden Boy.

97.     Defendants intentionally and substantially interfered with Diaz's rights to his money and personal property.  Defendants wrongfully converted Diaz's money and personal property in at least the following ways:

     a.    All amounts paid to Heredia or HBM under the 2012 Agreement were converted.  The 2012 Agreement was not valid and neither HBM nor Heredia were owed any sums pursuant to it.

     b.    Heredia converted approximately $29,300.00 of Diaz's money by repossessing Diaz's vehicle and failing to return his payment of $25,000.00 toward the vehicle, $4,000.00 in improvements to the vehicle, and approximately $300.00 in cash that was in the vehicle at the time it was repossessed.

     c.    Defendants converted whatever portion they received of the manager's fee under the 2017 Agreement from Diaz.  Heredia, HBM and John Doe, Esq. were not parties to the 2017 Agreement. They were not entitled to *any* of Diaz's money under the 2017 Agreement.  This is a knowable amount, which will be established at trial.

- 28 -

**Deleted:**

**Deleted:** FIRST

d.     Defendants converted an extra 2% of Diaz's manager's fee by taking a 20% fee instead of the 18% fee set forth in the 2017 Agreement.  This extra 2% fee is a knowable amount, which will be established at trial.

e.     Heredia converted tickets provided by Golden Boy to Diaz's fights that were supposed to be for Diaz's family and friends.  The value of these tickets is knowable and will be established at trial.

98.    Defendants had no legal right to interfere in such a manner with Diaz's property rights.  Diaz did not consent in any manner to Defendants engaging in this wrongful conduct.

99.    As a direct and proximate result of Defendants' conversion, Diaz has been damaged in an identifiable amount which will be determined at trial.

100.   Defendants' acts of conversion, as alleged in this Complaint, were intentional, willful, malicious, and oppressive, and therefore justify an award of punitive damages.

101.   Diaz is further entitled to his attorneys' fees and costs pursuant to California Civil Code section 3336.

### FIFTH CAUSE OF ACTION

**Tortious Interference with Prospective Economic Advantage**

**(Against Heredia)**

102.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

103.   An economic relationship existed between Diaz and his promoter, Golden Boy, for the promotion of certain bouts for which Diaz would earn a purse.

104.   Heredia had knowledge of the relationship between Diaz and Golden Boy. Indeed, he (fraudulently) signed the promotional agreement between Diaz and Golden Boy as Diaz's "manager."

- 29 -

**Deleted:** FIRST

105.   The relationship between Diaz and Golden Boy offered valuable prospective economic benefits to Diaz.  The more challenging and high-profile the bouts Diaz fought, and the faster Diaz could build on his pedigree and further advance his career, the greater the purses Diaz would obtain (and the more money he would earn).

106.   However, Heredia engaged in intentional and wrongful conduct designed to interfere with or disrupt the relationship between Diaz and Golden Boy.  Heredia expressly and continuously sought out benefits for himself and his other clients signed with Golden Boy instead of protecting and advancing Diaz's interests with Golden Boy.  Heredia intentionally did not vigorously negotiate with Golden Boy on Diaz's behalf so that Heredia could squeeze more out of Golden Boy for himself and his other clients.

107.   Heredia actually disrupted and interfered with the relationship between Diaz and Golden Boy.  Heredia cost Diaz multiple opportunities for more and better bouts that would be promoted by Golden Boy and thereby cost Diaz the benefits of his relationship with Golden Boy. But for Heredia's intentional and wrongful conduct designed to interfere with or disrupt the relationship between Diaz and Golden Boy, and in violation of the Ali Act, it was probable if not certain that Diaz would have realized further and/or quicker advancement in his career resulting in greater purses (and more money).

108.   Diaz suffered actual harm as a direct and proximate result of Heredia's wrongful conduct in an amount of damages to be proved at trial.

109.   Heredia's acts alleged herein were intentional, willful, malicious, and oppressive, and therefore justify an award of punitive damages.

## SIXTH CAUSE OF ACTION

**Violation of the Muhammad Ali Boxing Reform Act**

**(Against All Defendants)**

**Deleted:** .

**Deleted:** Heredia)

**Deleted:** FIRST

110.   Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

111.   The Ali Act provides a private right of action to "[a]ny boxer who suffers economic injury as a result of a violation of this chapter" and states that such boxer "may bring an action in the appropriate Federal or State court and recover the damages suffered, court costs, and reasonable attorneys fees and expenses." 15 U.S.C. § 6309(d).

112.   Among other things, the Ali Act establishes a "firewall" between managers and promoters. Managers are prohibited from having a "direct or indirect financial interest in the promotion of a boxer" and from being "employed by or receiv[ing] compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer." 15 U.S.C. § 6308(b).

113.   Defendants violated the Ali Act by, among other things, receiving benefits and money from Golden Boy that were for their own benefit and not for Diaz's benefit, as alleged in this Complaint. These benefits and money were not part of any consideration Defendants were owed under a manager's contract with Diaz—there was none. Defendants used Diaz as subterfuge for obtaining these benefits at Diaz's expense, as Diaz did not receive the full benefits of his relationship with Golden Boy as a result of the personal benefits given by Golden Boy to Defendants. In addition, Defendants also accepted benefits from Golden Boy in the form of favorable fights and terms for Defendants other boxing clients, in exchange for Defendants steering or forcing Diaz to accept relatively less favorable fights from Golden Boy that were not good fits for Diaz economically or in terms of his career.

114.   The illicit benefits received by Defendants in violation of the Ali Act included tickets from Golden Boy to a highly anticipated bout between Saul "Canelo" Álvarez and Gennadiy Golovkin in Las Vegas, Nevada, which were worth thousands of dollars. Defendants used Diaz's name and goodwill to obtain these tickets, then

- 31 -

**Deleted:** Heredia

**Deleted:** his

**Deleted:** Heredia

**Deleted:** as

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** Heredia's

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** FIRST

1  falsely blamed Diaz for being upset with the quality of the tickets, damaging Diaz's

2  relationship with Golden Boy.

3      115.   Diaz suffered economic injury as a result of Defendants' violation of the

4  Ali Act. But for Defendants' violation, Diaz would have earned more money and/or

5  benefits of his own from Golden Boy, which would have been *legitimate* (unlike

6  Defendants' benefits). The precise amount of damages suffered by Diaz will be

7  determined at trial.

8      116.   In addition to his damages suffered, Diaz is entitled to recover his court

9  costs and reasonable attorneys' fees and expenses under the Ali Act.

10  **SEVENTH CAUSE OF ACTION**

11  **Quantum Meruit**

12  **(Against All Defendants)**

13      117.   Diaz incorporates by reference and realleges each and every allegation

14  contained in the paragraphs above as though fully set forth herein.

15      118.   Defendants received certain benefits from Diaz to which they were not

16  entitled. Specifically, Defendants received the following benefits:

17          a.    Heredia received approximately $29,300.00 of Diaz's money by

18                repossessing Diaz's vehicle and failing to return his payment of

19                $25,000.00 toward the vehicle, $4,000.00 in improvements to the

20                vehicle, and approximately $300.00 in cash that was in the vehicle

21                at the time it was repossessed.

22          b.    Defendants received payments under the 2012 and 2017

23                Agreements to which they were not entitled since the 2012

24                Agreement was void and invalid and Defendants were not parties

25                to the 2017 Agreement. The fees amount to hundreds of thousands

26                of dollars, and the precise amount will be established at trial. In

27                addition, Defendants took an extra 2% of Diaz's manager's fee by

28                taking a 20% fee instead of the 18% fee set forth in the 2017

- 32 -

**Deleted:** Heredia's

**Deleted:** Heredia's

**Deleted:** Heredia's

**Deleted:** FIRST

Agreement.  This extra 2% fee amounts to tens, if not hundreds, of thousands of dollars, and the precise amount will be established at trial.

c.   Defendants received tickets provided by Golden Boy to Diaz's fights that were supposed to be for Diaz's family and friends.

119.  Furthermore, Defendants received the benefit of services owed by Diaz under the 2017 Agreement, which services were supposed to be provided to Moses Heredia as the manager of record.  Thus, in addition to the extra 2% of Diaz's manager's fee alleged above, Defendants received the benefit of whatever portion of Diaz's 18% manager's fee they took, to which Defendants were not entitled.

120.  Defendants obtained the benefits alleged herein through wrongful and illegitimate means.  Defendants have been enriched by these benefits, and it would be unjust for Defendants to retain these benefits.

121.  Diaz is entitled to restitution from Defendants for the reasonable value of the benefits conferred upon them.

### EIGHTH CAUSE OF ACTION

#### Accounting

#### (Against All Defendants)

122.  Diaz incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

123.  As alleged in this Complaint, a fiduciary, contractual, and/or confidential relationship existed between Diaz and Defendants.

124.  Diaz is unable to determine the exact amount of money owed by Defendants to Diaz as a result of their conduct as alleged in this Complaint without an accounting.

125.  Defendants made a number of unauthorized, undocumented loans to Diaz, and there has never been a proper accounting or examination of these loans and the amounts paid by Diaz to Defendants pursuant to them.

- 33 -

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** Heredia

**Deleted:** FIRST

126.   Accordingly, Diaz requests an accounting of all unsettled accounts between Defendants and Diaz.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and an award against Defendants as follows:

1.     For compensatory damages in an amount to be determined at trial;

2.     For pre- and post-judgment interest at the maximum rate allowed by law;

3.     For punitive damages on the first, fourth, and fifth causes of action;

4.     For an accounting as alleged herein;

5.     For the recovery of reasonable attorneys' fees;

6.     For the costs of this suit; and

7.     For such other and further relief as the Court may deem just and proper.

Dated:     September 2, 2022     **VGC, LLP**

**Deleted:** September 2, 2022September 1, 2022August 26, 2022

By: _____

James L. Greeley
Diyari Vázquez
*Attorneys for Plaintiff*
JOSEPH DIAZ, JR.

- 34 -

SECOND AMENDED COMPLAINT

**Deleted:** FIRST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 35 -

SECOND AMENDED COMPLAINT

**Deleted:** FIRST

1

**DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands a jury trial on all issues so triable.

3

4    Dated:  September 2, 2022                    **VGC, LLP**

5

6                                        

7                            By:

8                               _____
                                James L. Greeley
9                               Diyari Vázquez
                                *Attorneys for Plaintiff*
10                              JOSEPH DIAZ, JR.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    - 36 -
                            SECOND AMENDED COMPLAINT

**Deleted:** September 2, 2022September 1, 2022August 26, 2022

**Deleted:** FIRST