Rajan O. Dhungana (SBN: 297794)
rdhungana@fedpractice.com
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905

Eric S. Montalvo (admitted *Pro Hac Vice*)
emontalvo@fedpractice.com
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
Fax: (888) 899-6083

*Attorneys for Defendant / Counterclaim Plaintiff*

Ralph Heredia

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (EASTERN DIVISION)

| | |
|---|---|
| Joseph Diaz, Jr., | Case No. 5:20-cv-02332-JWH-KK |
| Plaintiff, | |
| vs. | **DEFENDANT RALPH HEREDIA'S** |
| RALPH HEREDIA; JOHN DOE, ESQ.; | **ANSWER TO THE SECOND** |
| and JANE DOES 1 through 20, | **AMENDED COMPLAINT AND** |
| inclusive, | **COUNTERCLAIMS-** |
| Defendants. | |

## DEFENDANT RALPH HEREDIA'S ANSWER TO THE
## SECOND AMENDED COMPLAINT AND COUNTERCLAIMS

Pursuant to Rule 12(a) of the Federal Rules of Civil Procedure and this Court's August 15, 2022 Order (ECF 138), Defendant Ralph Heredia, by counsel, timely answers and otherwise responds to the Second Amended Complaint, asserts its counterclaims against Plaintiff Joseph Diaz, Jr. ("Diaz"), and states as follows:

### First Defense

The Second Amended Complaint fails to state a claim upon which relief can be granted.

### Second Defense

### INTRODUCTION

1.      Paragraph 1 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

2.      Paragraph 2 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

3.      Paragraph 3 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

4.      Defendant admits that he is a convicted felon. Defendant denies the remaining allegations of this paragraph.

5.      Defendant denies the allegations of this paragraph.

6.      Defendant denies the allegations of this paragraph.

7.      Paragraph 7 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

8.      Defendant is without knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

9.      Defendant admits the allegations of this paragraph.

10.     Defendant is without knowledge or information sufficient to admit or deny the allegations in sentences 1 and 3 of this paragraph and therefore denies them.  Defendant admits the allegation in sentence 2 of this paragraph.

11.     Defendant is without knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

12.     Defendant is without knowledge or information sufficient to admit or deny the allegations of sentences 1 and 3 of this paragraph and therefore denies them. The allegations of sentence 2 of this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations.

13.     The allegations of this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, Defendant is without knowledge or information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

## JURISDICTION AND VENUE

14. Paragraph 14 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

15. Paragraph 15 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

16. Paragraph 16 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

## FACTUAL ALLEGATIONS

17. Paragraph 17 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

18. Paragraph 18 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

19. Paragraph 19 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

20. Paragraph 20 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

21. Paragraph 21 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

22. Paragraph 22 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

23.     Paragraph 23 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

24.     Paragraph 24 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

25.     Paragraph 25 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

26.     Paragraph 26 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

27.     Paragraph 27 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

28.     Paragraph 28 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

29.     Paragraph 29 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

30.     Sentence 1 of Paragraph 30 contains no allegations to which a response is required. To the extent a response is required to the allegations of that sentence, Defendant denies them. Sentence 2 consists of legal conclusions to which no response is required. To the extent a response is required, Defendant denies them. Defendant admits the allegations of Sentences 3 and 4. Sentence 5 contains no allegations to which a

response is required. To the extent a response is required to the allegations of that sentence, Defendant denies them.

31. Paragraph 31 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

32. Paragraph 32 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

33. Paragraph 33 contains no allegations to which a response is required. To the extent a response is required, Defendant denies them.

34. Paragraph 34 states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies them.

35. Paragraph 35 states legal conclusions to which no response is required. To the extent a response is required, Defendant denies them.

36. Defendant denies the allegations of this paragraph.

37. Defendant admits the allegations of this paragraph.

38. Defendant admits the allegations of this paragraph.

39. Defendant denies the allegations of this paragraph.

40. Defendant admits the allegations of this paragraph.

41. Defendant denies the allegation in sentence 1 of this paragraph. Defendant is without knowledge or information sufficient to admit or deny the allegations in sentence 2 of this paragraph and therefore denies

them. Defendant denies the allegations in sentences 3 and 4 of this paragraph.

42.   Defendant is without knowledge or information sufficient to admit or deny the allegations in sentences 1 and 2 of this paragraph and therefore denies them.  Defendant admits that the allegation in sentence 3 correctly states the arbitrator's decision with respect to the validity of the 2012 contract. All remaining allegations of Paragraph 42 are denied.

43.   Defendant denies the allegations of this paragraph.

44.   Defendant denies the allegations of this paragraph.

45.   Defendant denies the allegations in sentences 1, 2, 3, 4, and 5 of this paragraph. Defendant is without knowledge or information sufficient to admit or deny the allegations in sentences 6, 7, and 8 of this paragraph and therefore denies them.

46.   Defendant admits the allegations in sentences 1, 6, and 8 of this paragraph. Defendant is without knowledge or information sufficient to admit or deny the allegations in sentences 2 and 3 of this paragraph and therefore denies them.  Defendant denies the allegations in sentences 4, 5, and 7 of this paragraph.

47.   Defendant denies the allegation in sentence 1 of this paragraph that the Release was signed concurrently with the 2017 Agreement. Defendant

admits the remaining allegations in sentence 1. With respect to sentence 2, Defendant admits that a representative of the California Athletic Commission signed the Release; denies that it was "strange[];" and states that the final phrase of sentence 2 sets forth a legal conclusion to which no response is required. To the extent a response to such legal conclusion is required, Defendant denies the allegations of the last phrase of sentence 2 of this paragraph. Defendant denies the allegations of sentence 3 in that the 2017 Agreement was not styled a "release." To the extent that sentence 3 refers to the Release and not the 2017 Agreement, Defendant denies that the Release did not release prior claims. Defendant admits the allegations in sentence 4. Defendant is without knowledge or information sufficient to admit or deny the allegations of sentence 5 and therefore denies them. Sentence 6 sets forth a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in sentence 6.

48. Defendant admits the allegations in sentences 5 and 7 of this paragraph. Defendant denies the allegations in sentences 1, 2, 3, 4, 6, 8, and 9 of this paragraph.

49. Defendant denies the allegations of this paragraph.

50. Defendant denies the allegations of this paragraph.

51.   Defendant denies the allegations of this paragraph.

52.   Defendant denies the allegations of this paragraph.

53.   Defendant denies the allegations in sentences 1, 2, and 4 of this paragraph. Defendant is without knowledge or information sufficient to admit or deny the allegations of sentence 3 and therefore denies them.

54.   Defendant denies the allegations of this paragraph.

55.   Defendant denies the allegations of this paragraph.

56.   Defendant admits the allegations of this paragraph.

57.   Defendant admits the allegations in the sentences 1 and 2 of this paragraph. Defendant denies the allegations in sentence 3 of this paragraph.

58.   Defendant denies that he "induced" Diaz to enter into the 2017 Agreement but admits the remaining allegations in sentence 1 of this paragraph. However, Defendant believes that the title was taken out of context. Defendant denies the remaining allegations of this paragraph.

59.   Defendant denies the allegations of this paragraph.

60.   Defendant denies the allegations of this paragraph.

61.   Defendant denies the allegations in sentences 2 and 7 of this paragraph. Defendant is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of this paragraph and therefore denies them.

62.    Defendant denies the allegations of this paragraph.

63.    Defendant denies the allegations of this paragraph.

64.    Defendant denies the allegations in sentence 1, 6, 8, and 9 of this paragraph. Defendant admits the allegations in sentences 2 and 4 of this paragraph. Defendant is without knowledge or information sufficient to admit or deny the allegations in sentences 3, 5, and 7 of this paragraph and therefore denies them. Sentence 10 of this paragraph sets forth a legal conclusion to which no response is required and further it does not reference the Defendant so Defendant is without knowledge sufficient to admit or deny the allegation.

65.    Defendant denies the allegations in sentences 1, 2, and 3 of this paragraph. Defendant admits that Plaintiff was to pay Defendant for the vehicle but denies that this payment was "in addition to the contractual manager's fee." Defendant admits the allegations in sentences 4, 5 and 6 of this paragraph.

66.    Defendant denies the allegations of this paragraph.

67.    Defendant denies the allegations of this paragraph.

68.    Defendant denies the allegations of this paragraph.

69.     Defendant denies the allegations of this paragraph.

70.     Defendant denies the allegations of this paragraph.

71.     Defendant denies the allegations of this paragraph.

72.     Defendant denies the allegations of this paragraph.

73.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore denies them.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Fraud

### (Against Heredia)

74.     Defendant repeats and incorporates by reference his responses to all previous paragraphs in response to this paragraph.

75.     Defendant denies the allegations of this paragraph.

76.     Defendant denies the allegations of this paragraph.

  76a.    Subparagraph 76a sets forth legal a conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this subparagraph.

  76b.    Defendant admits that he has a felony conviction.

  76c.    Defendant denies the allegations of this subparagraph.

76d.   Defendant denies the allegations of this subparagraph.

76e.   Defendant denies the allegations of this subparagraph.

76f.   Defendant denies the allegations of this subparagraph.

76g.   Defendant denies the allegations of this subparagraph.

76h.   Defendant denies the allegations of this subparagraph.

76i.   Defendant denies the allegations of this subparagraph.

77.   Defendant denies the allegations of this paragraph.

78.   Defendant denies the allegations of the first sentence of this paragraph. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore denies them.

79.   Defendant denies the allegations of this paragraph.

80.   The first sentence of Paragraph 80 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this sentence.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore denies them.

81. Paragraph 81 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

82. Paragraph 82 sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Heredia)

83. Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

84. Paragraph 84 contains no allegations to which a response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

85. Paragraph 85 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

86. Paragraph 86 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

87. Paragraph 87 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

88. Paragraph 88 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

## THIRD CAUSE OF ACTION

### Breach of Implied-in-Fact Contract

### (Against Heredia)

89. Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

90. Sentences 1 and 2 of this paragraph set forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations in sentences 1 and 2 of this paragraph. Defendant admits the allegations of sentences 3, 4, and 5 of this paragraph.

91. Paragraph 91 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

92. Defendant denies the allegations of this paragraph.

93.   Sentence 1 of Paragraph 93 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of sentence 1 of this paragraph. Defendant denies the remaining allegations of this paragraph.

94.   Paragraph 94 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

## FOURTH CAUSE OF ACTION

### Conversion

### (Against All Defendants)

95.   Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

96.   Paragraph 96 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph

97.   To the extent the allegations of Paragraph 97, including subparagraphs, relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information

sufficient to admit or deny those allegations. Defendant denies the allegations of Paragraph 97 that relate to him.

97a.   Subparagraph 97a sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this subparagraph that relate to him.

97b.   Subparagraph 97b sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegation of this subparagraph.

97c.   Subparagraph 97c sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this subparagraph that relate to him.

97d.   Subparagraph 97d sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this subparagraph that relate to him.

97e.   Subparagraph 97e sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this subparagraph.

98.   To the extent the allegations of Paragraph 98 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Further, Paragraph 98 sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

99.   To the extent the allegations of Paragraph 99 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Further, Paragraph 99 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

100.  To the extent the allegations of Paragraph 100 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or

deny those allegations. Further, Paragraph 100 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

101. Paragraph 101 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

## FIFTH CAUSE OF ACTION

**Tortious Interference with Prospective Economic Advantage**

**(Against Heredia)**

102. Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

103. Defendant admits the allegations of this paragraph.

104. Defendant admits the allegation in sentence 1 of this paragraph. Sentence 2 of this paragraph sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations.

105. Defendant admits the allegations of this paragraph.

106. Defendant denies the allegations of this paragraph.

107. Paragraph 107 sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

108. Paragraph 108 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

109. Paragraph 109 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

## SIXTH CAUSE OF ACTION

### Violation of the Muhammad Ali Boxing Reform Act

### (Against All Defendants)

110. Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

111. Paragraph 111 contains no allegations to which a response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

112. Paragraph 112 contains no allegations to which a response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

113.   Defendant denies the allegations of this paragraph.

114.   Defendant denies the allegations of this paragraph.

115.   Paragraph 115 sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

116.   Paragraph 116 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Quantum Meruit**

**(Against All Defendants)**

117.   Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

118.   To the extent the allegations of Paragraph 118, including subparagraphs, relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Defendant denies the allegations of Paragraph 118 that relate to him.

118a.  Defendant denies the allegations of this subparagraph.

DEFENDANT RALPH HEREDIA'S ANSWER TO THE SECOND AMENDED COMPLAINT AND COUNTERCLAIMS-
20

118b.  Defendant denies the allegations of this subparagraph that relate to him.

118c.  Defendant denies the allegations of this subparagraph.

119.  To the extent the allegations of Paragraph 119 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Defendant denies the allegations of this paragraph that relate to him.

120.  To the extent the allegations of Paragraph 120 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Further, Paragraph 120 sets forth legal conclusions to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

121.  To the extent the allegations of Paragraph 121, including subparagraphs, relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations

relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Further, Paragraph 121 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

## **EIGHTH CAUSE OF ACTION**

### **Accounting**

### **(Against All Defendants)**

122. Defendant repeats and incorporates by reference his response to all previous paragraphs in response to this paragraph.

123. To the extent the allegations of Paragraph 123 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Further, Paragraph 123 sets forth a legal conclusion to which no response is required. To the extent a response may be required, however, Defendant denies the allegations of this paragraph that relate to him.

124. To the extent the allegations of Paragraph 124 relate to entities other than Defendant, they do not require a response from Defendant. To the extent

a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Defendant is without knowledge sufficient to admit or deny the allegations of this paragraph and therefore denies them.

125. To the extent the allegations of Paragraph 125 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Defendant denies the remaining allegations of this paragraph.

126. To the extent the allegations of Paragraph 126 relate to entities other than Defendant, they do not require a response from Defendant. To the extent a response is required to those allegations relating to other entities, Defendant is without knowledge or information sufficient to admit or deny those allegations. Defendant denies the remaining allegations of this paragraph.

127. Any remaining allegations not specifically admitted are denied.

128. Plaintiff's claims are barred, in whole or in part, by his failure to join a necessary party.

129.   Plaintiff's claims are barred, in whole or in part, by his own prior

wrongful, negligent, or illegal acts or omissions directed at Defendant.

130.   Plaintiff's own negligent acts and omissions solely caused the injuries

and damages of which he complains, and thus he cannot recover damages

against Defendant.

131.   Plaintiff's claims are barred, in whole or in part, by the defense of

unclean hands.

132.   Plaintiff's claims are barred, in whole or in part, by the fact that the

actions alleged to have been taken by Defendant were not the proximate

cause of any injury to Plaintiff.

133.   Plaintiff's claims are barred, in whole or in part, by the applicable

statutes of limitation.

134.   Plaintiffs' claims are barred by a binding decision by an arbitrator.

135.   Defendant specifically reserves the right to assert all other defenses, not

currently known, which he may learn through discovery.

## **COUNTERCLAIMS**

136.   Counterclaim Plaintiff Ralph Heredia ("Heredia") hereby alleges against

Counterclaim Defendant Joseph P. Diaz Jr. ("Diaz") as follows:

**NATURE OF THE ACTION**

137. This is an action sounding in breach of contract, defamation, attempted extortion, abuse of process, and fraudulent inducement, with a request for an accounting.  Diaz began to personally deteriorate beginning in 2018.  His downward slide resulted in severe mismanagement of funds and a need for extraordinary financial resource.  Heredia, who maintained a genuine and personal affection for Diaz, strove to mentor him, provide resources, counseling, and guidance to assist him in becoming a responsible and successful adult.  Unfortunately, Diaz chose a path of greed and dishonesty.  Heredia's efforts to keep Diaz on a sustainable path were ultimately repudiated and Diaz chose to abandon a relationship that generated unparalleled success in the boxing world and trade his future with the highest bidder.  Contrary to Diaz's public smear campaign - Diaz owes Heredia money and an apology.  In light of the discovery produced in this matter, Diaz knew that he owed Heredia money as reflected through his own statements and the statements of his counsel through historic communications prior to his "departure."  Diaz has instead maliciously prosecuted this action against Heredia, knowing it to be false and only for purposes of harassment and to dismantle his reputation because he was told that he would have to live within his

means during March, 2020 by Heredia. Diaz's produced discovery, although minimal, establishes that Heredia assisted Diaz financially and Diaz ran away from this debt with the hope he wouldn't have to pay. Diaz's own documents prove that his statements to the media are defamatory towards Heredia. Finally, upon information and belief, Diaz, or an agent acting at Diaz's direction, recently sent Heredia a picture of an unknown woman, threatening to lie to Heredia's wife and implicate that Heredia was having an affair with her unless Heredia dropped all pending litigation against Diaz.

Heredia attempted several times to sit down with Diaz to mediate the situation which was repeatedly rejected by Diaz.  Heredia was unaware that Diaz would be filing suit against him.  Instead of resolving this as a professional Diaz decided to welch on his obligations and attempt to intimidate Heredia into submission.  Diaz's own words reveal his blatant lies.

## JURISDICTION AND VENUE

138.   Diaz has asserted that jurisdiction is proper in this Court because Diaz's Muhammad Ali Boxing Reform Act claim arises under federal law, 15 U.S.C. § 6301, *et seq.,* and that the Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1331. Diaz's additional claims are brought

pursuant to the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a)
Stipulating solely for the purposes of Heredia's counterclaims that Diaz's
Muhammad Ali Boxing Reform Act claim is jurisdictionally proper,
Heredia's counterclaims are brought pursuant to the Court's
supplemental jurisdiction, 28 U.S.C. § 1367(a) as so related to claims in
the action within such original jurisdiction that they form part of the same
case or controversy under Article III of the United States Constitution.

139. Diaz is subject to the Court's personal jurisdiction because the
counterclaims arise out of the same actions or occurrences that are the
subject of his claims, and because he consented to personal jurisdiction in
this Court by prosecuting his complaint in this Court.

140. Venue for the counterclaims is proper in this District because all parties
reside in this District.

**PARTIES**

141. According to his complaint, plaintiff and counterclaim defendant Joseph
Diaz, Jr. ("Diaz") is an individual residing in San Bernardino County,
California.

142. Defendant and counterclaim plaintiff Ralph Heredia ("Heredia") is an
individual residing in San Bernardino County, California.

## **FACTUAL ALLEGATIONS**

143.   Heredia and Diaz's relationship spans almost a decade of fiercely loyal and dedicated management that culminated in a World Championship. During the duration of the relationship the Heredias were extraordinarily successful in managing both Diaz's professional career and containing his increasingly poor judgment and choices which was the primary focus of Ralph Heredia efforts to contain.   These demons unfortunately encompass various lawful and unlawful personal choices that interfered in every realm of his life, personal and professional. Heredia, recognizing Diaz's potential as a person and a fighter, committed every resource he could muster to assist Diaz so that he could convert his talent into personal and professional success. Diaz would typically reach out to Heredia by text message, notifying Heredia that he needed money. [Exhibit 1]. (Heredia's allegations that refer to, e.g., "significant" amounts of money, "six-figure advances," or "poor personal choices" are non-specifically framed in observance of this Court's November 2021 Order (ECF 80) granting Diaz's request to file certain information under seal. While Heredia contemplates moving to unseal that information since Diaz has put his conduct squarely at issue herein by his choices inside and outside this litigation through the

media, Heredia has observed the Order. Heredia's underlying evidence, all of which is also in Diaz's possession, is specific and relevant to his claim.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



144.   In 2017, Diaz embarked on a journey of self-destruction and its first stop

was his departure from his parents' residence – a place that provided

structure and supervision in parallel with Heredia's watchful eye. Within

a year of leaving his parents' residence, Diaz's demons established a foothold and the darkness of those demons revealed themselves.

145. During 2018, Diaz's poor personal choices resulted in his fully paid-for Mercedes being repossessed on three separate occasions – the last time resulting in the costs of recovery so significant that he was financially unable to recover it. Heredia, after the first repossession, had great concern and made inquiry. At this time Diaz confessed that he had been obtaining loans funded by "Cash Cow" and "Title Loan." These loans carried with them repayment interest rates on the order of 35%. Heredia counseled Diaz against these loans and provided financial assistance to get the car back into Diaz's possession in the hopes that Diaz would get himself back on track. This ended with the final repossession. Heredia then persuaded Diaz to stop utilizing these sorts of lenders and Heredia would attempt to work out his financial concerns sans interest.

146. Instead of being appreciative and working with the financial advisor Heredia helped retain for Diaz, Diaz's vices became even more entrenched, and Diaz was without money again within weeks of receiving his purse for a World Title Challenge against Gary Russell. Heredia sought counseling and provided financial assistance to Diaz with his bills to mitigate Diaz's poor judgments and provide a path for

him to focus on his boxing career—efforts that were largely successful while Heredia was at the helm.  This contrasts with the public demise of Diaz's conduct and professional competence since his break with the Heredias.

From: Joseph Diaz <jojotheboxer@gmail.com>
Sent: Thursday, October 25, 2018 8:03 AM
To: Ralph Heredia
Subject: .

Morning Ralph,  please email me the manager contract. Misplaced my copy, thank you. Have a great day.

Sent from my iPhone

On Oct 11, 2018, at 11:26 AM, Ralph Heredia <rheredia@gprocessing.com> wrote:

> Jojo,
>
> Is being very urgent that we meet. And you refuse to have a meeting with your father and myself.  You need to look at reality and get out of the web.
> Once we meet we can structure a plan..
> And you have to hold yourself accountable for your actions. You continue putting yourself in this terrible position. And is not ▮▮▮▮▮▮ You need to be real with yourself. I'm not better than you and I'm not judging you. Just calling it the way it is. Real talk!
> For years all we have been doing is putting a Band-Aid.
> Without structure and strategy it will never work . You will continue being in serious debt.
> Real talk!!!
>
> Get Outlook for iOS
>
> From: Joseph Diaz <jojotheboxer@gmail.com>
> Sent: Thursday, October 11, 2018 11:06:50 AM
> To: Ralph Heredia
> Subject: Urgent.
>
> Ralph can you do me a favor please. I'm trying to get a loan but haven't heard back yet and my rent, electricity, phone, and insurance are due. Can you loan me the money for I can pay those you can put it in lynnay's account if you don't trust me so she can pay them for me. My electricity just shut off and my rent is due today before they put me on eviction notice. If I don't pay it today it'll go up 600 dollars
>
> This is what I need today to be good for this month. I'll pay u in full after my next fight if you can do that please, thank you.

1

**Heredia Exh334**

Rent 2199
Electricity 300
Car insurance 888 (cause of my dui)
Phone bill 350

Total 3737
The loan I'll be getting will help me for the month of November. So I'll be good next month.

On Oct 8, 2018, at 8:59 AM, Ralph Heredia <rheredia@gprocessing.com> wrote:

> Wow!
>
> I've been helping you out for years. And all it has done was put a Band-Aid on the problem.
> Your dad knows that and your mother knows it your girl knows it.  But if you want to believe deep in your heart that everybody's wrong.
>
> Ok. I will text your dad with the next flight.
>
> I don't know how much money you have left with your financial advisor.  But like I told you in Vegas I'm glad you have save some money with your advisor.
>
>
> Get Outlook for iOS
> _____
> **From:** Joseph Diaz <jojotheboxer@gmail.com>
> **Sent:** Monday, October 8, 2018 8:39:13 AM
> **To:** Ralph Heredia
> **Subject:** Re: Travel Reservation to WASHINGTON REAGAN, DC on May 15 for RAFAEL HEREDIA
>
> You know what Ralph, I see what your doing and how your going about things. I understand but just know I'm not happy with this. I'll find money elsewhere then if you want to act like that and not help me out. It's a business for you and imma start treating it like a business from here on out. Thanks Ralph. Text my pops when you have a fight scheduled I'll be ready.
>
> Sent from my iPhone
>
> On Oct 8, 2018, at 4:01 AM, Ralph Heredia <rheredia@gprocessing.com> wrote:
>
>> Jojo,
>>
>> You known you have a ▮▮▮▮ problem for long time! And unfortunately you have not been able to stop. I believe you do want to change but unfortunately you can't. You told me you're done with this shit I'm going to the ▮▮▮▮ sign the papers. Always the same story.. You told me you went to ▮▮▮▮ signed the papers there on your girls car. You also told me and promised me you're going ▮▮▮▮ ▮▮▮▮ I asked you for the papers never got them.
>> You tell me some bullshit story that you didn't know something but you're looking to it.

2

**Heredia Exh335**

Bottom line you told me you signed them and they were on your girls car.
And as far ███████████ I'm pretty sure you haven't made it either
There's so much to address.

I told you on my patio I will not continue supporting your habits.

You need to be honest with yourself.  I can't help you nobody can. Unless you want to help yourself.  And make serious lifestyle changes in your life. But again if you can't see that.  Unfortunately nothing will ever change.

Bottom line your father knows your financial problems. And you know he does.

What will be best is for your father and your girl to be present.  And so you can make the necessary changes in your life. Because you cannot do it alone.

And for the meantime please call your financial advisor and tell him you need to pull more money out.

You can call me on a conference call with your financial advisor. And I will tell him you will  put the money back on your next flight.

I'm pretty sure he will do it shit he did in Las Vegas!

Get Outlook for iOS

From: Joseph Diaz <jojotheboxer@gmail.com>
Sent: Sunday, October 7, 2018 6:13:18 PM
To: Ralph Heredia
Subject: Re: Travel Reservation to WASHINGTON REAGAN, DC on May 15 for RAFAEL HEREDIA

I won't hide anything from you Ralph if you just give me a shot. And we do this between us

3

**Heredia Exh336**

Sent from my iPhone

On Oct 7, 2018, at 4:20 PM, Ralph Heredia
<rheredia@gprocessing.com> wrote:

> Jojo,
>
> Is very important that you get to the root of the
> problem.
> Your dad knows your business already.
> He is your dad and he wants his son to do better that's
> all he wants.
>   Your dad has requested a meeting with all of us  He
> even suggested your mother and your girlfriend.
>     Your dad believes the issues are out of control and
> must be address for your best interest.
>
>
> Get Outlook for iOS
>
> From: Joseph Diaz <jojotheboxer@gmail.com>
> Sent: Sunday, October 7, 2018 2:23:36 PM
> To: Ralph Heredia
> Subject: Re: Travel Reservation to WASHINGTON
> REAGAN, DC on May 15 for RAFAEL HEREDIA
>
> Can we meet up sometime next week for I can barrow
> some money and we can talk? I'd prefer just me and
> you talk since I'm the one just borrowing the money I
> don't want my dad knowing my financial problems. We
> can talk about everything as well. Let me know thanks
>
> Sent from my iPhone



1

**Heredia Exh337**

## Arbitration Award Against Diaz

147.  Andrew Foster, Executive Officer for the California State Athletic
      Commission ("Commission") conducted an arbitration which
      encompassed most of Diaz's present and false allegations pursuant to the
      language of a boxer-manager contract and the Professional Boxing Rules
      of California, which mandate arbitration between boxer and manager, see
      Cal. Code Regs. tit. 4, § 221 ("All disputes between the parties to the
      contract, including the validity of the contract [which in this case
      includes, *inter alia*, the alleged dispute over the percentage received by
      Moses, HBM, and Ralph], shall be arbitrated pursuant to the provisions
      of the contract.").

148.  On February 23, 2017, Diaz and Mr. Moses Heredia signed a Boxer-
      Manager Contract.  Mr. Larry Ervin from the Commission oversaw the
      signing of the contract in accordance with the applicable Rules
      promulgated by the Commission. Cal. Code Regs. tit. 4, § 222. The
      Commission approved the Boxer-Manager Contract the very next day on
      February 24, 2017.

149.  Under this Boxer-Manager Contract, Diaz fought nine bouts from
      February 23, 2017 through June 10, 2021. Through the keen management
      provided, Diaz flourished and on January 30, 2020, Diaz became the

International Boxing Federation (IBF) super featherweight world champion by defeating Tevin Farmer.

150.   After Diaz became a world champion, MTK Global Sports Management, LLC ("MTK") (also doing business as "Global Promotion Management LTD"), an unlicensed rival promotion and boxing management company, reached out to Diaz and offered him an advance of $100,000.00 on his next purse.

151.   The controversy underpinning the instant matter arose on or about August 12, 2020, when Diaz announced that he had ended his successful years long relationship with the Heredias by sending Heredia a text and then publicly announcing that he had signed an "agreement" with MTK. Diaz then stopped communicating with Heredia.

152.   Diaz's departure and subsequent actions resulted in numerous breaches of the Boxer-Manager Contract. On or about August 20, 2020, Mr. Moses Heredia timely filed a request to arbitrate the contract issues before the Commission. Andrew Foster, the Commission's Executive Officer, conducted an arbitration hearing on June 10, 2021. Mr. Foster found the contract valid, and that Diaz had breached it. On July 9, 2021, he ordered an award in favor of Mr. Moses Heredia, directing that Diaz pay Mr. Moses Heredia $162,000.00, constituting the appropriate

management fee Mr. Moses Heredia would have earned from Mr. Diaz's two bouts in which he participated after breaching his boxer-manager contract. The Commission also explicitly found that the Heredias did a good job for Diaz, and that Diaz's various and false allegations including that Diaz had no idea about Mr. Moses Heredia's role in the relationship, were without merit.

## Diaz Breaches the Boxer-Manager Contract by Signing with MTK, Then is Led by His Counsel in Lying Out of Court and In Court So As To Negate the Heredias' Response

153. As set forth above, after winning the world championship from Tevin Farmer in January 2020, Diaz was approached by MTK to become one of their boxers.

154. Upon information and belief, MTK retained VGC, LLC as counsel on Diaz's behalf to represent him in the anticipated breakup with the Heredias.  MTK maintained a notorious relationship for "stealing" away fighters from existing managers in Europe sans consequences.

155. Upon information and belief, MTK sought to expand their roster of fighters for the first time by pursuing U.S.-based fighters, and Diaz was one of the first U.S. boxers that was signed.

156.   Further upon information and belief, MTK targeted Diaz not only because he was a World Champion, but also because they knew that his money management and other problems made him vulnerable to their treacherous entreaties.

157.   MTK was formed and run by Daniel Kinahan, an Irish national and suspected crime boss. According to the United States Department of the Treasury, Daniel Kinahan is a reputed narco-terrorist, and is presently on the run from international authorities relating to, *inter alia*, money laundering, murder, and drug distribution.







158.   Upon information and belief, VGC and Diaz implemented a strategy

whereby Diaz could breach his contract with Moses Heredia and

conterminously wage asymmetrical "warfare" against the Heredias'

reputation in the boxing community through blatant falsehoods

promulgated in this frivolous lawsuit and continuous assaults in the press. Note that Diaz is complaining about the distraction of the instant lawsuit that he is a Plaintiff in, has filed three versions of his complaint, and through his own words admits that he owes money to Heredia approximately seven months after his departure from the Heredia Team https://theathletic.com/2436658/2021/03/09/joseph-diaz-jr-lost-his-title-and-his-car-now-hes-fighting-to-get-it-all-back/

159. Diaz's declaration under oath, submitted in support of the arbitration proceedings, accuses Ralph and Moses Heredia of stealing. Notably, however, his allegations are all couched in language reflecting that his statements are made under the advice and direction of counsel ("my attorneys have informed me…;" "my attorneys have also informed me…;" "prior to engaging my attorneys, I did not understand the legal and practical significance…"). It has become apparent that Diaz was instructed to make these accusations not because they were true but because they supported the concocted legal strategy, one designed to extort, demoralize, and disparage the Heredias into submission and to walk away from the Boxer-Management Contract and provide Diaz cover so that he could avoid the consequences of his blatant breach (i.e., his contract with MTK) and not have to pay back his debts – a modern

day welch scam of titanic proportions. The plan was ambitious; however, its fundamental flaw is that it was premised upon lies.

160. To understand how insidious the scheme evidenced in this litigation is, it requires an understanding of the interplay between the facts of the case and the unique culture of the world of boxing. The boxing industry is heavily reliant on reputation and performance. Boxers, managers, and promoters each play a distinct role within the industry, and each party's ability to trust and respect the others is essential to a successful boxing enterprise. A manager "stealing" money from their fighter is a professional "death sentence," and understandably so: no fighter wants to work with a manager they believe will take advantage of them. This sentiment is consistent with the public policy protecting fighters from predatory managers, as reflected in both state and federal regulations governing boxing.

161. Through this lens, it becomes clear that Diaz's allegations regarding the Heredias, which he knew to be false, were made for the sole purpose of harming Heredia's reputation and preventing him from securing other fighters in the industry.  This effort has been successful in part resulting in millions of dollars in damages in contracts over the past year.  For example, Bob Arum, the number one power broker in the boxing

industry parroted the lies pushed forward by the fighter and his counsel,

VGC, having no idea regarding the facts of the case.  Arum himself is

accountable for these defamatory statements.  His mistakes are that he

believed Diaz and was unwilling to figure out the truth - the harm still

occurred.

> "The guy (Ralph) Heredia is a convicted felon and cheated the fighter and filed legal papers about Kinahan being involved with the fighter, JoJo Diaz. Nonsense," says Top Rank chairman Bob Arum, who promotes champions from the MTK stable such as Fury and Taylor.
>
> MTK is also no stranger to controversy as Kinahan has been named by the Irish high court as the leader of a drug cartel. He's denied the allegations and has never been charged.
>
> Diaz is no longer a champion, but he still

**Access all of The Athletic for just ~~$7.99~~ $1/month.**    Subscribe

◀        ●        ■

162.   At the time Diaz breached his Boxer-Manager Contract, followed

shortly thereafter by his defamatory statements, Mr. Moses Heredia was

in negotiations with several potential international Olympians, world

champions, and amateur boxers that were free agents with no contract

with any manager. Diaz's defamatory statements have tarnished the

Heredias' reputations to the point that the international boxing world and boxing media discourage anyone in the boxing industry from doing business with the Heredias. The trust and reputation that took fourteen years to build was defiled by Diaz's false and feckless statements as well as his unlawful contract with MTK. Moreover, it has heavily damaged several potential and current relationships, causing the Heredias emotional stress and financial hardship.

## **Statements from the Arbitration Transcripts Show Diaz's Knowing Mendacity**

163.   During the arbitration action for Diaz's breach of the Management Contract, the Commission heard and considered Diaz's various allegations and found them to be without merit. On the contrary – the Commission found that the Heredias did a fantastic job for Diaz.

164.   The head of the Commission held that the Heredias served Diaz well, found that Diaz was aware of Ralph Heredia's role in the management relationship, ruled that the 2017 Management Contract was valid, and noted that Diaz had admitted to owing Heredia money – not the other way around.

165.   Indeed, one of the arguments made by Diaz's counsel during the arbitration was that Diaz owed so much money to Heredia that it could

be viewed as Heredia having "leverage" over him, despite the fact that he was not the licensed manager. The Commission rejected this argument.

166.   It was clear in the arbitration record that the zero-interest advances from Heredia helped Diaz to survive while trying to manage his issues.  The following statements made under oath during the arbitration highlight these facts, and reinforce the arbitration conclusions:

> MR. FOSTER:· I think -- I think that Mr. Heredia has done a good job managing Mr. Diaz up to this point. I think that.
>
> …
>
> MR. FOSTER:· They had a good run and like I've said before, I thought Mr. Heredia did a good job for Mr. Diaz. Mr. Diaz doesn't want to work with him anymore.
>
> …
>
> MR. FOSTER:· You're right.· Look, I already have my -- I think the -- I already said this on the record. I think the Heredias did a good job for Mr. Diaz.
>
> …
>
> DIAZ: Well, I needed some money because I wasn't making as much -- that's why I was always on Ralph's ass and always telling him that I wanted to get paid more.
>
> …
>
> DIAZ:· I did my own accounting.· I wrote all this down.

QUESTION:  But ultimately the way you were going to pay for this was to take it out of your next purse; is that correct?  DIAZ:  That's correct.

QUESTION:  And the 30 percent was to negotiate through your future fights to take care of these debts that you 22· wanted to resolve or investments if they were that.

DIAZ:  Yes.

QUESTION: And was that a typical course of dealing over your relationship with him when you were in a money crunch you would come to Ralph to ask him for money?

DIAZ:  Yeah.· Because he told me not to go anywhere else.· He said he would take care of it for me.

QUESTION: And did he take care of you?

DIAZ:  Yeah, he took care of me.· He gave me those loans and I had to pay him back.· Yeah, he did.

…

MR. FOSTER:· Mr. Greeley, I mean, by Mr. Diaz's own admission they've loaned him some money over the years, I mean he -- they got that.

…

MR. GARDNER:· I'm curious about the fact is that both parties to this contract represented to the  commission that no other individuals were -- had a hand IN the management and yet both parties knew and both parties were fine with it until this relationship soured.

…

MR. GREELY: Diaz owed Ralph quite a bit of money…

**The Arbitration Decision Favored The Heredias**

167.   The Commission issued the following findings on July 9, 2021:

- The Contract entered into by Boxer and Manager on February 23, 2017, is a valid and enforceable contract.

- "The Contract Is Not Invalidated Because of Ralph Heredia's Relationship with Boxer." Boxer also asks the Commission to void the Contract because of Ralph Heredia's involvement in Boxer's career. The reality is that if Ralph Heredia's role in the management of Boxer's career warranted disclosure to the Commission, both parties failed to make that disclosure because both parties were well aware of that role. Furthermore, if as Boxer claims, he has always considered Ralph Heredia to be his true manager, it is disconcerting that Boxer would be willing to submit for Commission approval a Boxer Manager Contract that concealed information or contained misleading information about the true parties. Boxer cannot now use Ralph Heredia's participation in Manager's activities to his advantage when he undoubtedly shared in the parties' mutual obligation to provide truthful representations to Commission. 3 See Civil Code § 3517 ("No one can take advantage of his own wrong."); Moriarty v. Carlson (1960) 184 Cal.App.2d 51, 55; Camp v. Jeffer, Mangels, Butler & Marmaro (1995) 35 Cal.App.4th 620, 638; Kendall-Jackson Winery, Ltd. V. Superior Court (1999) 76 Cal.App.4th 970, 979.

168.   The Heredias were singularly responsible for Diaz's successful rise to a world championship level fighter notwithstanding his long history of serious misconduct in many areas. They were patient and tireless in redirecting his unlawful and immoral actions back toward a focus on succeeding as a championship-level boxer. Diaz's own decisions

frequently resulted in him having no money to pay bills or various other living expenses.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



9:08
◄ Phone

◄ 86              B

Breeze Jojos Girl ›

Tue, Dec 10, 9:59 AM

Ralph, can you do me a favor
and deposit my allowance for
this week. Need to get
groceries for the crib. Also I
have to pay my rent today by
the 10th or else they are going
to charge an extra 700

Tue, Dec 10, 11:44 AM

Good morning.
Text me all the information to
make the lease payment so I
can forward to the office.

To: The colony at the lakes
Rent $2300

I have the amount last check
was $2,280.
I need the information to pay
online so I can forward that to
my brother.

Tue, Dec 10, 2:58 PM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22   169.   On September 9, 2019, Diaz sent an email entitled "JoJo Diaz Loan

23          Proposal" to Ralph Heredia in advance of an upcoming fight scheduled

24          and performed in Mexicali, Mexico for September 21 against Jesus

25          Cuadro. In the email, Diaz offered to increase the management fee owed

26          to Moses to 30%, in exchange for a six-figure advance payment to Diaz

27

28

so he could pay off debts owed to others, unpaid taxes to the IRS, rent,

phone bills, and material purchases such as a new Rolex and Porsche.

Diaz also acknowledged and reconfirmed in this email that he owed a

significant amount in previous loans made by Heredia, and that he would

pay back those loans with this new money. Additionally, Diaz wanted to

have in the high five figures in his bank account for "spending money."

From: Joseph Diaz <jojotheboxer@gmail.com>
Sent: Monday, September 9, 2019 1:58 PM
To: Ralph Heredia
Subject: Jojo Diaz loan Proposal

Good morning. I just wanted to share that it has been a pleasure working
with you guys for my whole career as a boxer. I know you've seen how
much I have developed and I'm extremely confident that I'll be a star in
boxing. I would like to propose and offer to help me be happy and be at my
best mentally for we can all benefit with my career even more. I've done
some calculations and seen that you guys have made a lot of money
throughout my career. While I'm stuck in a jam Currently due to some
mistakes in the past. I'm proposing an offer to help me get out of it and get
me back on track and make me feel like the star I should be. This offer is a
fair offer for both parties considering the money that will be generated in
my career from here on out. I know in the past that I've been open with
my personal life etc cause of the wrongs But is like it to be discreet from
here on out you'll see the change and everyone will be happy. I really hope
we can continue our journey together in my boxing career. Everything is a
business at the end of the day I'm aware of that. I just need someone show
the love and help me out this whole so we can all benefit.

Joseph Diaz Jr loan Proposal

Proposal 1- 4 fights at 30 percent starting with the tevin farmer fight.

Proposal number 2- pay off full loan after tevin fight with an additional
███ interest

att cell phone bill (two new phones)
chase account
LALO
mike
Fernando
Ramon
Lorraine
Rolex
Porsche car between
one main financial loan.
3 months in advance rent
IRS
Ralph Loan (paying off with ████ fight check)
n my bank account

Total ████ with Ralph loan currently

████ with loan (with high side of Porsche)

I hope we can get this done as I feel This proposal is fair and Can be done and it's beneficial for both parties. Looking forward to your response



Sep 9, 2019, 12:29 PM

Imma also send you everything I owe what I need for car and money in the bank proposal so that way You can think with Moses the best percentage to come up with or I can pay in full with a interest amount. I want it to benefit you guys as well Ralph. We gotta work together. I don't want you to just give to me I know you're a business man so I can make a little money off it as well so you can have a hard on lol. I want y'all feel comfortable with giving me the money I ask for so that way we won't have any prom lens or anything and I can just live my personal life and do what I do whiteout being poor

This request was not the first time, nor the last time Diaz asked for money in exchange for a percentage of his future purses but is an example of how Diaz would dig himself into a financially precarious position and come to the Heredias looking to be bailed out. Heredia had previously tried to convince Diaz to work out his personal problems and utilize the services of his financial provider as discussed *supra*, to no avail.

170. Diaz brought up the September 9 "Loan Proposal" again, despite earning monies from a fight in Mexicali, on September 21, 2019. The Heredias told him that Moses was working tirelessly to try and get him a world title opportunity against Tevin Farmer and insisted that he not sell any percentages on his future to the Heredias or to anyone else.

171. When Diaz mentioned that he would not be able to train for the Farmer bout properly without a car to get around, Heredia told him that they would try to come up with a solution regarding a car, but that Diaz needed to be realistic on whether he could afford a new Porsche and the high insurance rates that come with it.[1]  Additionally, Heredia was

---

[1] In addition to the above-average premium costs associated with insuring a luxury sport vehicle, such as a Porsche, Diaz's driving record, including behavior the description of which is currently under seal but will be brought forth fully at trial, significantly increased the costs of his insurance premiums.

DEFENDANT RALPH HEREDIA'S ANSWER TO THE SECOND AMENDED COMPLAINT AND COUNTERCLAIMS-
55

incentivized to resolve the car issue because he had become Diaz's

"chauffer service" and "Uber coordinator."



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



172.   In October 2019, Diaz approached the Heredias and indicated that he would "agree" to get a used car instead of a new car and something much less expensive than a Porsche. Diaz then requested that Heredia pay for the car outright, and Diaz pay back the money for the car, and all other previous debts he owed, from the proceeds of the Tevin Farmer fight – to include Heredia retaining title to the vehicle given Diaz's financial irresponsibility and increasing indebtedness.

173.  On October 18, 2019, Heredia relented and purchased a used 2016 Lexus RC350 for Diaz's use, at a cost of $41,185.24. As discussed, Ralph Heredia remained a lienholder on the title of the vehicle to protect his interests.  The other issue of concern was the extraordinary vehicle insurance burden Diaz was confronting given his publicly known driving history.  The insurance debt was also to be covered by Heredia and was. Heredia paid the insurance in a lump sum through February 2020 and then began to make monthly payments as described below.

174.  On January 30, 2020, Diaz defeated Tevin Farmer and became the International Boxing Federation World Super Featherweight Champion. On the night of the Farmer title bout, Diaz gave Heredia a list of people that he had to pay back loans to and asked if he could pay them back from the proceeds of his fight earnings. Days after the Farmer bout, Ralph Heredia began receiving texts and calls from various other people that were *not* on Diaz's list of obligations, all claiming that Diaz had borrowed money from them and promised to pay them after the Farmer fight. Diaz told Ralph Heredia that he will pay back some of the people and make other people wait.

175. For example, Ralph Heredia received a call from a Mark St. Pierre. Mr. St. Pierre said that he was introduced to Diaz by Scott Tetrault, an employee at Golden Boy, and loaned him $6,500 with Diaz's promise to pay him after the Farmer bout. Mr. St. Pierre was very upset, and others associated with Golden Boy had advanced Diaz money before the Farmer fight and it was becoming a problem because he failed to repay these debts. When Heredia confronted Diaz about paying back Mr. St. Pierre, Diaz became angry and said he did not want to pay Mr. St. Pierre.

176. Heredia sent $2,000.00 to Mr. St. Pierre to mitigate the situation. Golden Boy subsequently deducted $22,000.00 from Diaz's purse for advances they made to him. Notably, neither Diaz nor anyone at Golden Boy had told Heredia about the advances, preferring instead to undermine the Heredias' tireless efforts to focus Diaz on his boxing career and help mitigate his destabilizing personal conduct.

177. In February 2020, after the Heredias returned from Miami, Heredia scheduled a meeting with Diaz to go over all of the accounting for the various and extensive debts Diaz owed to them. Diaz agreed with Heredia's assessment, and understood all the accounting, but pleaded with Heredia to leave a part of his debt, specifically $25,000.00, outstanding until his next bout because he still owed other people money.

Diaz also stated that he wanted to pay off his IRS liens and other bank notes.

178. As discussed, Diaz agreed that the title of the Lexus would be left in Ralph Heredia's name until after his next bout, when he would pay the remaining balance on the car in full. Diaz also asked Heredia to wire Mike Powers a loan repayment for $12,500.00.

179. Within ten days after the Farmer bout, Diaz was once again without money which he partied away.  Diaz undertook another round of begging for more money from Heredia. Diaz admitted that he essentially threw away the entirety of his earnings from the Farmer bout in less than two weeks.  Unbeknownst to Heredia, Diaz informed Heredia after the Farmer fight that immediately prior to the fight, Diaz had begun negotiations with Mike Powers for a six-figure advance on his next bout in exchange for points. Diaz sent Heredia a text from Mr. Powers regarding the advance. Diaz had borrowed money from Mr. Powers in the past (including $12,500.00 before the Farmer bout), and contrary to Heredia's admonition that Diaz needed to get his personal and professional house in order, Diaz continued to sell points on his next fights in exchange for immediate cash.



180. Around the same time as this agreement was reached, Diaz was

repeatedly posting on social media various offers to bet large amounts of

money on boxing matches; the Heredias became concerned once more

that Diaz's bad choices were further depressing his financial situation.

Diaz then asked if the Heredias could match Mr. Powers' offered advance in exchange for higher management fees and interest.

181. After the Farmer fight Heredia stressed to Diaz that he was now a World Champion and should not be mortgaging his future earnings to other people, particularly if he was still pursuing the same set of poor personal choices.  This was in response to Diaz threatening to get additional funds from other persons because he had gambled all of his purse within two weeks of winning the world title.

182. In an effort to help this young man overcome the greatest threat to his success – himself – Heredia finally agreed to provide Diaz a $10,000.00 per month advance, which would become payable after his next fight, with no interest. In exchange Heredia imposed strict conduct terms upon Diaz as a condition of providing him with even more cash. The terms included that Diaz would keep his weight under 145 pounds, submit to regular testing, and attend specified meetings. On February 21, 2020, Heredia gave Diaz $4,000.00, with a promise of a further $6,000.00 to follow on March 1, 2020, which was made.  Heredia also fronted $55,000.00 for Diaz to qualify for housing and a repayment of $49,000.00 from Diaz shortly thereafter, leaving $6,000.00 for Diaz to use in accordance with this agreement.

183.   The Heredias knew that Diaz often ballooned in weight when he was partying and wanted to make sure he would stay healthy and mentally undiminished for future fights. The terms imposed upon Diaz as conditions of the advances were not only to protect the Heredias' investment, but to facilitate Diaz's ability to continue performing as a championship-level boxer. This deal was short lived however when Diaz failed one of his required tests administered by his father, after Diaz's participation in a hometown parade celebrating his victory in early March 2020.  The father, understanding the agreement that had been entered into between his son and Heredia, immediately forwarded the test results to Heredia via text. As soon as Heredia learned of the failed test, the advanced loan terms were modified to a subsistence level of funding only which is reflected in the accounting sheet.



184.   Heredia continued providing Diaz with monthly support up until the time
       Diaz breached his management agreement with HBM and signed on with
       MTK.

185.   The Heredias endeavored, without gratitude or acknowledgement, to
       assist Diaz in the management of his life challenges.  After the Tevon
       Farmer fight, while the Heredias were providing Diaz additional funding

to manage his living expenses, Diaz was drawn away by the prospect of a new cash source – MTK.  The MTK signing bonus was $100,000.00 upfront. Apparently, Diaz could not resist the temptation of quick cash. In a short period of time, Diaz abandoned a long-lived personal/professional relationship, one which had invested considerable time and resources into Diaz to set him up for success, in exchange for the immediate gratification of receiving money which he spent almost immediately.  At the same time Diaz undertook to falsely accuse the Heredias of "stealing" monies that were due to him from his fight proceeds.

186.   Familiarity with the world of professional boxing finances renders this claim structurally impossible. Diaz himself assigns the proceeds from any contest.[2] Diaz has known from the outset that any accusations that Heredia stole money from him are patently false, yet he has persisted in spreading this false narrative both publicly and privately wherever he goes, with the cruel intent to harm the Heredias for not simply walking away from the investment they made in him.

---

[2] This is well-illustrated by Moses Heredia's case against Diaz in the Superior Court of California, County of Los Angeles, Case No. 22STCP00395, filed for enforcement of the amounts owed by Diaz to HBM pursuant to the outcome of the arbitration. Diaz was ordered to pay $162,000.00; while he paid $90,000.00 of this amount, he failed to pay the remaining $72,000.00, despite receiving a $1.8 million purse in a recent fight.

187.   Diaz has "gotten away" with this scheme up to this point because the Heredias believed, mistakenly, that Diaz would remember all that the Heredias had done to help grow and support him throughout the years and at some point, abandon this misguided path, realize he was in the wrong, and state so publicly.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7:37

◄ Phone

JD

Joseph ›

Delete All

Cancel

Aug 23, 2019, 12:35 AM

Just got home! Me and my
dad played a little blackjack.
Lost haha, thanks again for a
great time RALPH and giving
me some money, appreciate
you! Have a good night Luis
did an excellent job! Enjoy this
victory. Also thank you for
understanding where I'm
coming from after my fight. To
be rich, cause I'm destined to
be rich. Really means a lot
that I trust me and know
where I'm going to be by
doing this. I'm going to
upgrade my whole look to
even be more of a star. New
car, nice clothes, money in the
bank and also new teeth. All
these things will just make me
even more of a star I promise
you. Have a good night. Oh
and I promised Mary to start
teaching me some Spanish
and I'll work her out after my
fight so that way I can be
focused and occupied as well!
We onto something RALPH I





188.   It has become clear, however, that this expectation will never come to

pass. Accordingly, as conclusively shown in the litigation discovery

process, Diaz's claims have been a fabrication from the beginning,

designed to devastate the Heredias financially and professionally.

Throughout this litigation, Diaz dodged depositions and failed to

produce any evidence supporting his allegations (as will be further

demonstrated below); with the benefit of hindsight, it becomes clear that his conduct was part of a desperate attempt to protect "the bad lie."

### Additional False Allegations Made Against the Heredias by Diaz

189.  An additional thrust of Diaz's plan to humiliate and discredit the Heredias was to damage their relationship with Golden Boy Promotions ("GBP"), who served as the promoter for Diaz's fights. Diaz caused his counsel to send a letter to GBP containing the following statements:

- "We write this letter to address the irresolvable conflict that exists between Golden Boy Promotions ("GBP") and Diaz as a result of GBP's inability to perform its contractual obligations to Diaz and its continuous disregard of Diaz's interests.
- "GBP then catered to the Heredias (who funneled all their clients to GBP) and helped them take advantage of Diaz. This included providing illicit benefits to the Heredias—such as tickets to a high-demand fight between Canelo Álvarez and Gennadiy Golovkin in Las Vegas, Nevada."

190.  These claims were further efforts to harass and intimidate anyone who did business with the Heredias, intended to further isolate them within the boxing world.

191.  A fact long known to Diaz and his counsel -- the "infamous" tickets referenced in the second allegation were validly purchased and paid for:

This is yet another example of the abusive conduct Diaz and VGC have engaged in to further their defamatory campaign against the Heredias.

192.   After working through an entire year of discovery, these falsehoods are rendered blatantly obvious, and their use to abuse the process manifest. This lawsuit has been advanced from the start based on pure greed.  The undisputed facts are that the Heredias invested tens of thousands of dollars in Diaz's career; it is *Diaz* who owes money to the Heredia; and it is *Diaz* who has tried to steal those monies through his public statements and the abuse of process.

193.   Diaz's complaint has maintained that Heredia owes him money by virtue of "stealing" a percentage of his purse (which was resolved during arbitration), or taking personal property; however, discovery exchanged

in July 2022 as part of this litigation conclusively establishes that Diaz, in fact, *owes* money to Heredia. Upon information and belief, based upon the discovery that has been made available to date, Diaz currently owes Heredia not less $48,841.95 for the multiple loans Heredia generously advanced him during the course of their relationship.

194. Upon information and belief, the scheme devised by Diaz and VGC was designed to ruin the reputation of Heredias in the boxing community by fabricating allegations that Heredia had "stolen" money and property from Diaz, thereby damaging the Heredias' reputation in the boxing community, impacting recruiting, branding, and negotiations with promoters and sponsors. This scheme was not limited to litigation. Diaz employed further, more public means of pursuing the reputational demise of the Heredias.

195. The revelations from the litigation document production establish media statements made by Diaz falsely impute to Heredia the commission of some criminal offense involving moral turpitude, to wit: that Heredia stole money from him are either deliberately misleading or patently untrue, and Diaz should have known (and did, in fact, know) that by virtue of the documents he possessed. Diaz has knowingly and intentionally made false and defamatory statements about Heredia to

media outlets, which were then published on-line and available world-wide. The statements have included:

- December 27, 2020: Social media -- "Watch who you are dealing with cause a lot of people aren't what they make themselves out to me" [sic]; and

- February 13, 2021: Interview -- "a lot of people that want to take a part of my exposure and talent and make some money off of me because they feel like they can.  I mean these guys are all greedy mother fuckers' man and its [sic] bullshit"; and

- July 9, 2021: Interview – "for a manager to come in here and try to rob me and take my money is fucking wrong"; and

- November 5, 2021: social media -- "Life [sic] been good after I got rid of shit managers and got advisors & my own lawyers to protect me. To all the young fighters that aren't knowledgeable make sure you have your own lawyer before signing to any management or promotional company for your best interest."

196.   The documents exchanged in discovery during the course of this litigation further prove that Diaz brought and has been prosecuting his complaint in bad faith and has engaged in abuse of process. To date, Diaz has failed to produce any accounting whatsoever in support of his claim that Heredia owes him any money, even a single penny. Nothing

Diaz has produced in discovery *rebuts* the position that it is in fact Diaz who owes money to Heredia.

197.  The allegations surrounding the "taking of the vehicle are also false. After another incident involving Diaz's driving behavior, and Diaz's announcement that he was no longer going to work with the Heredias, Heredia informed Diaz that he needed to pay his bills moving forward. Predictably, Diaz did not, including his car insurance.  After numerous attempts by both Heredia and the insurance company to resolve this with Diaz to no avail, Heredia had to repossess the car to protect his interests in the vehicle and any liability given that Diaz continued to operate the vehicle on a suspended license and in other ways not compliant with the terms on which Heredia purchased the vehicle . Heredia even approached Ben Lira, Diaz's trainer, to discuss the return of the vehicle as long as full payment was made to resolve that issue. These discussions occurred prior to the filing of this action.  Diaz informed Lira that he rejected any such offer and had "other plans" for Heredia.  We now know what plans he referred to.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MINNICK INS SVCS
4622 PLUMOSA DR
YORBA LINDA, CA 92886

*DRIVE*™Insurance

Joseph P Diaz JR
Valued customer since 2019
**Policy Number:** ██████
Underwritten by:
Progressive West Ins Co
Date of Mailing: August 31, 2020
Policy Period: Apr 24, 2020 - Oct 24, 2020
Page 1 of 2
**MINNICK INS SVCS**
**1-714-777-4107**
**Online Service**
**DriveInsurance.com**
**Customer Service**
**1-800-300-3693**

JOSEPH P DIAZ JR
██████████████

# Cancellation Notice

Unfortunately, we didn't receive your payment and, as a result, your policy will be canceled at 12:01 a.m. on September 11, 2020.

Please know that this means you will no longer have insurance coverage.

We value you as a customer and want to continue being your insurance provider. To avoid cancellation, please send us your payment by check or money order so that it is received or postmarked by 12:01 a.m. on September 11, 2020. This way, there will be no lapse in your coverage.

If you've already sent your payment, thank you. Your next regular payment will be due on September 24, 2020.

You can also pay online or over the phone using a credit card or authorizing a withdrawal from your bank account. We'll credit your payment right away so your insurance coverage will continue.

We sincerely appreciate your attention to this matter and thank you for your business.

| | |
|---|---|
| Remaining balance | $1,210.26 |
| Payments remaining | 1 |
| Minimum amount due | $609.15 |
| Due date | September 11, 2020 |

**Please see the reverse side.**

 Continued on back

# Payment Coupon

**Policy Number:** ██████
Joseph P Diaz JR

**For immediate payment,** please go to DriveInsurance.com or call 1-800-300-3693.

| | |
|---|---|
| Minimum amount due | $609.15 |
| Due date | September 11, 2020 |
| Amount enclosed | $ |

To maintain continuous coverage, your payment must be received or postmarked by 12:01 a.m. on September 11, 2020.

**If you pay by check,** please allow five to seven days for your payment to reach us. Write your policy number on the check and make it payable to Progressive West Ins Co.

‖ιㅓιιιㅓιㅓ‖ιιㅓιㅓ‖ιㅓιㅓ‖ιιㅓιㅓ‖ㅓ‖ιㅓ‖ιㅓιㅓ

DRIVE INSURANCE
PO BOX 894107
LOS ANGELES CA 90189-4107

Do not write below this section of coupon.
V2-01VTT        Form 6268 (07/08)

As a result, upon information and belief, Diaz knowingly filed a

meritless action against Heredia to damage Moses and Ralph Heredia's

reputation within the boxing and managerial industry.

198.   Consequently, Heredia has been forced, to date, to incur tens of

thousands of dollars in legal fees to defend himself against Diaz's

meritless lawsuit and has suffered unrecoverable damage to his

reputation within the boxing industry; he, and by association his brother

Moses, who serves as the licensed manager, have been thwarted in

attempts to sign promising young talent, despite a record of success in

bringing Diaz from Olympic hopeful to world champion.

199.   Upon information and belief, the reticence of other boxers to sign with

the Heredias is directly linked to the reputational harm the Heredias have

suffered as a result of Diaz's public statements that the Heredias "stole"

money from him.

**Attempted Extortion of Heredia by Diaz**

200.   When it became clear that Heredia would not kowtow to the malicious

and false public campaign or the abuse of process, Diaz resorted to

extortion.  On or about April 12, 2022 Mr. Greely issued a threat to

counsel and Heredia and on or about May 3, 2022 Heredia was sent a

photograph of woman accompanied by a text message that stated:

**Pro boxer Joseph Diaz accused of attempted coercion,
enticement of minor in lawsuit**
Apr 12, 2022

**Brett Okamoto ESPN Staff Writer**

"These frivolous allegations on behalf of an anonymous
source have been brought by the attorney for Joseph Diaz's
former manager, Ralph Heredia, **who Mr. Diaz is suing in
federal court for stealing his money and violating his
trust**," Diaz's attorney, James Greeley of VGC LLP, told
ESPN. "Mr. Heredia and his counsel appear to be making a
desperate attempt to gain leverage in that lawsuit by
fabricating claims by a 'Jane Doe' as part of an ongoing effort
to defame Mr. Diaz and derail his career. **They will be made**

**to answer for their actions.** It should go without saying that Mr. Diaz staunchly denies these claims."

https://www.espn.com/boxing/story/_/id/33726915/pro-boxer-joseph-diaz-accused-attempted-coercion-enticement-minor-civil-lawsuit



201.   Upon information and belief, this message was sent by Diaz.  Heredia understood that Diaz was threatening to tell Heredia's wife and his brother that Heredia had engaged in some undetermined inappropriate activity which could purportedly further damage his reputation, a

situation Heredia could ill-afford to be in, thanks to Diaz's smear campaign.

202.   This threat was a direct act of attempted extortion, committed with the intent to pressure Heredia to stop defending this legal action brought by Diaz.  Heredia, knowing the falsity of this threat, remains undeterred in his determination to ensure that the world knows one simple truth – that Heredia's only mistake was to commit himself emotionally and financially to the success of Diaz, who has proved himself to be a disrespectful, ungrateful, and blatant liar focused on his selfish needs and greed.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Breach of Contract

203.   Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

204.   Diaz and Heredia entered oral contracts on several occasions, including, but not limited to:

- April 11, 2019 - $2,500.00 to Attorney Steve Martini for Diaz's retainer.

- February 8, 2020 - $227.07 for Diaz's electric bill.

- February 11, 2020 – $590.85 to AT&T for Diaz's phone bill

- February 11, 2020 - $3,034.33 payment to The Colony at the Lakes for Diaz's condo lease.

- February 11, 2020 - $196.91 to Spectrum to cover Diaz's bill.

- February 13, 2020 - $2,000.00 to Mark St. Pierre to partially pay an outstanding loan for Diaz.

- February 21, 2020 - $4,000.00 to Diaz directly for a personal loan.

- March 2, 2020 - $55,000.00 to Diaz directly to provide enough liquidity to allow Diaz to qualify for an apartment. $49,000.00 of this was returned the same day after qualifying and the remaining $6,000 paid to Diaz to complete his first $10,000 payment as agreed.

- March 3, 2020 – $2,816.51 payment to The Colony at the Lakes for Diaz's condo lease.

- March 9, 2020 – $463.50 payment to AT&T for Diaz's phone bill.

- March 18, 2020 - $261.16 payment of Diaz's Spectrum bill.

- April 3, 2020 - $1,000.00 cash paid directly to Diaz at his request.

- April 3, 2020 - $3,000.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- April 3, 2020 - $1,000.00 to loan to Diaz's father at Diaz's request.

- April 15, 2020 - $700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- April 23, 2020 - $630.17 payment to Progressive Insurance to cover Diaz's insurance payment.

- April 24, 2020 - $1,000.00 loan to Diaz's father at Diaz's request.

- May 4, 2020 - $2,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- May 8, 2020 - $655.89 payment to AT&T to cover Diaz's phone bill.

- May 18, 2020 - $700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- May 18, 2020 - $1,000.00 loan to Diaz's father at Diaz's request.

- May 24, 2020 - $488.91 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- June 2, 2020 - $2,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- June 16, 2020 - $1,700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- June 25, 2020 - $488.91 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- July 1, 2020 - $450.00 payment to Nitrous Garage to cover tire repair costs for the Lexus Diaz drove.

- July 2, 2020 - $3,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- July 16, 2020 - $716.68 payment to AT&T to cover Diaz's phone bill.

- July 25, 2020 - $4,000.00 loan directly to Diaz.

- July 27, 2020 - $549.03 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- August 3, 2020 - $672.03 payment to AT&T to cover Diaz's phone bill.

- August 4, 2020 - Multi-thousand dollar payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- On February 19, 2021, Joseph Diaz, Sr., Diaz's father, paid back the $3,000.00 Heredia had loaned him at Diaz's request.

205. Heredia did all, or substantially all, of the significant things that the oral contracts required him to do;

206. All conditions for Diaz's performance to repay the loans were met, i.e., Diaz accepted the loans and agreed to repay them;

207. Diaz failed to pay back the loans as the oral contracts required him to do;

208. Heredia was harmed; and

209. Diaz's breaches of the oral contracts were a substantial factor in causing Heredia's harm.

210. Heredia has suffered actual damages in an amount to be proved at trial, but upon present information and belief, an amount not less than $48,841.95.

## SECOND CAUSE OF ACTION

### Attempted Extortion

211. Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

212. Diaz, or an agent of Diaz's at Diaz's specific direction, had a specific intent to commit extortion, or to obtain property from another, with his or her consent, induced by a wrongful use of fear, in that Diaz, or an agent of Diaz's at Diaz's specific direction, sent Heredia a text message stating in full:

> Before you continue on doing what [you] are doing, think twice about this situation that occurred march [sic] 8th. She is willing to talk and tell the truth about what happen [sic], Mary and your brother will also know soon You [sic] sick bastard[.]"

213. Diaz, or an agent of Diaz's at Diaz's specific direction, committed a direct ineffectual act done towards its commission. The act was ineffectual because at the time the threatening communication was

received by Heredia, he was not a plaintiff in any action against Diaz, nor did he have the ability to control any other plaintiff in any action against Diaz.

214. This action was perpetrated with the intent of obtaining a tangible benefit from Heredia by means of the threat; i.e., the cessation of any legal claims or defenses against Diaz by Heredia.

215. Diaz was not entitled to obtain the benefit he sought to extort from Heredia; i.e., the abandonment of valid legal claims and defenses to which Heredia was entitled.

## THIRD CAUSE OF ACTION

### Abuse of Process

216. Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

217. Diaz undertook a specific legal procedure, i.e., he sued Heredia in this matter, Case No. 5:20-cv-02332-JWH-KK;

218. Diaz intentionally used this legal procedure for an improper purpose that the procedure was not designed to achieve, to wit: Diaz instituted a proceeding alleging that Heredia owed him money, when in fact the inverse was true. Upon information and belief, the true purposes of these

allegations was to create a narrative that could be employed to ruin Heredia's reputation in the boxing industry.

219. Heredia was harmed by Diaz's use of this legal proceeding, reputationally and financially. Diaz's lawsuit damaged Heredia's reputation within the boxing industry, damaging relationships with active clients and quashing the prospect of future clients. Additionally, Heredia has been forced, to date, to spend hundreds of thousands of dollars in legal fees to defend himself against Diaz's meritless lawsuit, in addition to the unrecoverable damage to his reputation within the boxing industry; he, and by association his brother the licensed manager, have been unable to sign star up-and-coming boxers, despite a record of success in bringing Diaz from Olympic hopeful to world champion; and

220. Diaz's conduct was a substantial factor in causing Heredia's harm.

### FOURTH CAUSE OF ACTION

### Defamation

221. Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

222. Heredia claims that Diaz harmed him by making the following statements:

a.   December 27, 2020: Social media -- "Watch who you are dealing with cause a lot of people aren't what they make themselves out to me"[sic]; and

b.   February 13, 2021: Interview -- "a lot of people that want to take a part of my exposure and talent and make some money off of me because they feel like they can.  I mean these guys are all greedy mother fuckers' man and its [sic] bullshit"; and

c.   July 9, 2021: Interview – "for a manager to come in here and try to rob me and take my money is fucking wrong"; and

d.   November 5, 2021: Social media -- "Life [sic] been good after I got rid of shit managers and got advisors & my own lawyers to protect me. To all the young fighters that aren't knowledgeable make sure you have your own lawyer before signing to any management or promotional company for your best interest."

223.   Diaz made each of the above statements to a person or persons other than Heredia;

224.   This other person or these other persons reasonably understood that the statements were about Heredia;

225. These people reasonably understood the statement(s) to mean that Heredia cannot be trusted to work with managers within the boxing industry; and

226. Diaz failed to use reasonable care to determine the truth or falsity of the statements.

227. Diaz's wrongful conduct was a substantial factor in causing: (1) harm to Heredia's property, business, trade, profession, or occupation; (2) expenses that Heredia had to pay as a result of the defamatory statements; (3) harm to Heredia's reputation; and/or (4) Heredia's shame, mortification, or hurt feelings.

## FIFTH CAUSE OF ACTION

## Fraudulent Inducement

228. Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

229. As alleged herein, Diaz was requesting and accepting monies from Heredia up until his announcement of his deal with MTK.

230. The fact that Diaz did not discuss his impending MTK contract with the Heredias prior to the announcement, despite the substantial relationship between himself and the Heredias, and the investment they had made in him, evinces a design to conceal his intention to breach his agreement

with the Heredias until after the announcement of his agreement with MTK.

231. Diaz had knowledge that he would be breaching his agreement with the Heredias, and that he had no intention to repay Heredia for the loans and financial assistance he received, and nevertheless persisted in requesting and accepting monies from Heredia.

232. Diaz's concealment of his impending contractual relationship with MTK, and break from his contract with the Heredias, was intended to induce Heredia to continue providing him with monies to support his lifestyle until he could receive monies from MTK.

233. As a result of Diaz's concealment of his impending breach of his contract, Heredia believed that Diaz intended to perform his obligations subject to the loans; i.e., repayment. Heredia justifiably relied upon this intended performance to his detriment, unaware of the truth that Diaz worked to conceal.

234. As a result of Diaz's fraudulent concealment of his anticipatory breach of his agreement with the Heredias, and abandonment of his obligations to repay Heredia for the financial assistance Heredia had provided him with, Heredia has suffered actual damages.

## SIXTH CAUSE OF ACTION

### Accounting

235. Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

236. As alleged herein, a contractual relationship existed between Heredia and Diaz.

237. An accounting would formally confirm the amounts as reflected in the source documents.

238. Accordingly, Heredia requests an accounting of all unsettled accounts between Heredia and Diaz.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiff Heredia prays for judgment and an award against Counterclaim Defendant Diaz as follows:

1. For compensatory damages in an amount to be determined at trial;

2. For an accounting;

3. For pre- and post-judgment interest at the maximum rate allowed by law;

4. For recovery of reasonable attorneys' fees;

5. For the costs of the suit; and

6. For such other and further relief as the Court deems just and proper.

Jury trial is demanded.

Dated:  September 23, 2022                    Respectfully submitted,

/s/ *Rajan O. Dhungana*
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905
rdhungana@fedpractice.com

/s/ *Eric S. Montalvo*
Eric S. Montalvo (*Pro Hac Vice*)
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
Fax: (888) 899-6053
emontalvo@fedpractice.com

*Attorneys for Defendant / Counterclaim Plaintiff* Ralph Heredia

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, I filed the foregoing Defendant Ralph Heredia's Answer to the Second Amended Complaint and Counterclaims with the Clerk of the Court and sent a copy of such filing via the CM/ECF system.

Furthermore, I sent a copy via email to the following:

James L. Greeley (SBN 218975)
   jgreeley@vgcllp.com
Diyari Vázquez (SBN 222461)
   dvazquez@vgcllp.com
Gina M. Simas (SBN 205367)
   gsimas@vgcllp.com
Andrew D. White (SBN 222628)
   awhite@vgcllp.com
VGC, LLP
1515 7th Street, No. 106
Santa Monica, California 90401
Telephone: (424) 256-8296

*Attorneys for Plaintiff / Counterclaim Defendant*
Joseph Diaz, Jr.

Dated: September 23, 2022

Respectfully submitted,

/s/ *Eric S. Montalvo*
Eric S. Montalvo (Admitted *Pro Hac Vice*)
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
emontalvo@fedpractice.com

DEFENDANT RALPH HEREDIA'S ANSWER TO THE SECOND AMENDED COMPLAINT AND COUNTERCLAIMS- – CERTIFICATE OF SERVICE