Rajan O. Dhungana (SBN: 297794)
rdhungana@fedpractice.com
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905

Eric S. Montalvo (admitted *Pro Hac Vice*)
emontalvo@fedpractice.com
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
Fax: (888) 899-6083

*Attorneys for Ralph Heredia*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (EASTERN DIVISION)

| | |
|---|---|
| Joseph Diaz, Jr., | Case No. 5:20-cv-02332-JWH-KK |
| Plaintiff, | |
| vs. | **DEFENDANT RALPH HEREDIA'S** |
| RALPH HEREDIA; JOHN DOE, ESQ.; | **AMENDED COUNTERCLAIM** |
| and JANE DOES 1 through 20, | |
| inclusive, | |
| Defendants. | |

**DEFENDANT RALPH HEREDIA'S AMENDED COUNTERCLAIM**

Pursuant to Rule 15(a)(1)(b) of the Federal Rules of Civil Procedure, Defendant Ralph Heredia, by counsel, asserts his amended counterclaims against Plaintiff Joseph P. Diaz Jr. ("Diaz"), and states as follows:

## JURISDICTION AND VENUE

1.      Diaz has asserted that jurisdiction is proper in this Court because Diaz's Muhammad Ali Boxing Reform Act claim arises under federal law, 15 U.S.C. § 6301, *et seq.,* and that the Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1331. Diaz's additional claims are brought pursuant to the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a)

2.      Stipulating solely for the purposes of Heredia's counterclaims that Diaz's Muhammad Ali Boxing Reform Act claim is jurisdictionally proper, Heredia's counterclaims are brought pursuant to the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a) as so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.      Diaz is subject to the Court's personal jurisdiction because the counterclaims arise out of the same actions or occurrences that are the subject of his claims, and because he consented to personal jurisdiction in this Court by prosecuting his complaint in this Court.

4.      Venue for the counterclaims is proper in this District because all parties reside in this District.

## PARTIES

5.      According to his complaint, plaintiff and counterclaim defendant Joseph Diaz, Jr. ("Diaz") is an individual residing in San Bernardino County, California.

6.      Defendant and counterclaim plaintiff Ralph Heredia ("Heredia") is an individual residing in San Bernardino County, California.

## FACTUAL ALLEGATIONS

7.      Heredia and Diaz's relationship goes back over ten years. In the lead-up to the 2012 Olympics in London, Diaz was attempting to qualify for the U.S. men's boxing team and came to the attention of Heredia and his brother, Moses.

8.      After the Olympics, Diaz entered a Boxer-Manager Contract with the Heredias through Moses Heredia's company, Heredia Boxing Management (HBM), and pursued a professional boxing career under their guidance.

9.      The operative Boxer-Manager Contract during all periods relevant to this cause of action was effective as of February 23, 2017, and was for a five-year term.

10.     For years, Diaz and the Heredias enjoyed a good working relationship.

11.     Despite the warm relationship between them, Heredia was aware that Diaz struggled with poor money management habits.

12.     Over the years, Heredia observed Diaz recklessly blow through the earnings he made from his fights (sums regularly in the six-to-seven figure range) at incredible speed, often leaving him nearly destitute.

13.     Throughout the course of their relationship, Diaz routinely asked Heredia to loan him sums of money for a variety of personal expenses. These requests typically came by text message from Diaz to Heredia.

14.     Heredia would routinely loan Diaz sums of money as requested, with Diaz's understanding that the sums were to be repaid.

15.     Diaz's understanding that he was required to repay these loans was acknowledged on multiple occasions by Diaz.

16.     The loans from Heredia to Diaz were structured as advances to Diaz against earnings from future fight purses.

17.     Despite repeated promises to repay Heredia for the advanced sums, Diaz never did so.

18.     Although bouts came and went, and purses were disbursed to Diaz, the advances from Heredia were never fully repaid.

19.     After winning the world featherweight championship from Tevin Farmer in January of 2020, Diaz was approached by MTK Global (MTK) to join

their lineup of managed boxers, even though Diaz had an active management contract with HBM.

20.     Upon information and belief, MTK retained counsel from VGC, LLP to represent Diaz in splitting away from his relationship with HBM.

21.     MTK has cultivated a notorious relationship for "stealing" fights from European managers without consequence.

22.     MTK sought to expand to U.S. fights and, upon information and belief, Diaz was one of the first U.S.-based fighters targeted by MTK.

23.     MTK was founded, and run by, an Irish national named Daniel Kinahan.

24.     According to the U.S. Department of the Treasury, Kinahan is a reputed narco-terrorist, wanted for money laundering, drug distribution, and murder.

25.     The United States Government is offering a reward of up to $5,000,000.00 for information leading to the arrest and/or conviction of Kinahan.

26.     Heredia received a text message from Diaz on August 9, 2020, notifying him that he had signed a "business advisory agreement" with MTK, which would be publicly announced the next day.

27.     Under the terms of the Boxer-Manager Contract, Diaz was not permitted to enter into such an agreement without the written permission of his manager.

DEFENDANT RALPH HEREDIA'S AMENDED COUNTERCLAIM - 5

28.    As a result of Diaz's actions, Moses Heredia properly and timely filed for arbitration before the California State Athletic Commission, as required by the Boxer-Manager Contract.

29.    Upon information and belief, recognizing that his position in the arbitration was weak, Diaz concocted the attendant lawsuit with the goal of depleting the Heredias' resources and publicly ruining their reputation in the boxing community.

30.    Within the boxing world, a manager "stealing" money from a fighter is a professional death sentence. Fighters do not want to work with a manager they believe will rip them off.

31.    Because of his elite position within the boxing world, Diaz knew, or had reason to know, that his allegations against the Heredias would be certain to attract attention from media outlets focused on the world of boxing.

32.    Upon information and belief, Diaz concocted his claims in this lawsuit, despite knowing (or having reason to know), by virtue of information in his possession, that the Heredias had not stolen from him, and that he in fact owed them money.

33.    Diaz therefore knew, or should have known, that his claims were meritless; therefore, the only purpose it served was to disparage the Heredias'

1    reputation in the boxing community and force them to expend considerable

2    resources in litigation.

3        34.    Discovery responses and documents were provided to Heredia by Diaz

4

5    in July 2022 as part of this litigation.

6        35.    A review of the production from Diaz revealed no evidence supports

7

8    his claim that Heredia owes him any money by virtue of theft or withholding; rather,

9    the evidence in Diaz's production confirmed that it is Diaz who owes money to

10

11   Heredia.

12       36.    In the arbitration proceedings instituted by Moses Heredia, Diaz further

13

14   acknowledged his financial obligations to Heredia during examinations:

15                    DIAZ: Well, I needed some money because I wasn't
                      making as much -- that's why I was always on Ralph's 14·
16                    ass and always telling him that I wanted to get paid more.

17
                      …
18
                      DIAZ:· I did my own accounting.· I wrote all this down.
19

20                    QUESTION:  But ultimately the way you were going to
                      pay for this was to take it out of your next purse; is that
21                    correct?
22
                      DIAZ:  That's correct.
23

24                    QUESTION:  And the 30 percent was to negotiate through
                      your future fights to take care of these debts that you 22·
25                    wanted to resolve or investments if they were that.
26
                      DIAZ:  Yes.
27

28
                  DEFENDANT RALPH HEREDIA'S AMENDED COUNTERCLAIM - 7

QUESTION: And was that a typical course of dealing over your relationship with him when you were in a money crunch you would come to Ralph to ask him for money?

DIAZ:  Yeah.· Because he told me not to go anywhere else.· He said he would take care of it for me.

QUESTION: And did he take care of you?

DIAZ:  Yeah, he took care of me.· He gave me those loans and I had to pay him back.· Yeah, he did.

…

MR. FOSTER:· Mr. Greeley, I mean, by Mr. Diaz's own admission they've loaned him some money over the years, I mean he -- they got that.

37.     Upon information and belief, Diaz currently owes Heredia a substantial sum of money, to wit: not less than $48,841.95.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Breach of Contract

38.     Heredia incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

39.     Heredia entered oral contracts to lend money to Diaz on several occasions, including, but not limited to:

- April 11, 2019 - $2,500.00 to Attorney Steve Martini for Diaz's retainer.

- February 8, 2020 - $227.07 for Diaz's electric bill.

- February 11, 2020 – $590.85 to AT&T for Diaz's phone bill

- February 11, 2020 - $3,034.33 payment to The Colony at the Lakes for Diaz's condo lease.

- February 11, 2020 - $196.91 to Spectrum to cover Diaz's bill.

- February 13, 2020 - $2,000.00 to Mark St. Pierre to partially pay an outstanding loan for Diaz.

- February 21, 2020 - $4,000.00 to Diaz directly for a personal loan.

- March 2, 2020 - $55,000.00 to Diaz directly to provide enough liquidity to allow Diaz to qualify for an apartment. $49,000.00 of this was returned the same day after qualifying and the remaining $6,000 paid to Diaz to complete his first $10,000 payment as agreed.

- March 3, 2020 – $2,816.51 payment to The Colony at the Lakes for Diaz's condo lease.

- March 9, 2020 – $463.50 payment to AT&T for Diaz's phone bill.

- March 18, 2020 - $261.16 payment of Diaz's Spectrum bill.

- April 3, 2020 - $1,000.00 cash paid directly to Diaz at his request.

- April 3, 2020 - $3,000.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- April 3, 2020 - $1,000.00 to loan to Diaz's father at Diaz's request.

- April 15, 2020 - $700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- April 23, 2020 - $630.17 payment to Progressive Insurance to cover Diaz's insurance payment.

- April 24, 2020 - $1,000.00 loan to Diaz's father at Diaz's request.

- May 4, 2020 - $2,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- May 8, 2020 - $655.89 payment to AT&T to cover Diaz's phone bill.

- May 18, 2020 - $700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- May 18, 2020 - $1,000.00 loan to Diaz's father at Diaz's request.

- May 24, 2020 - $488.91 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- June 2, 2020 - $2,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- June 16, 2020 - $1,700.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- June 25, 2020 - $488.91 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- July 1, 2020 - $450.00 payment to Nitrous Garage to cover tire repair costs for the Lexus Diaz drove.

- July 2, 2020 - $3,500.00 payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- July 16, 2020 - $716.68 payment to AT&T to cover Diaz's phone bill.

- July 25, 2020 - $4,000.00 loan directly to Diaz.

- July 27, 2020 - $549.03 payment to Progressive Insurance to cover Diaz's insurance policy payment.

- August 3, 2020 - $672.03 payment to AT&T to cover Diaz's phone bill.

- August 4, 2020 - Multi-thousand dollar payment to Breezh Nunez, Diaz's girlfriend, because Diaz's account had a negative balance.

- On February 19, 2021, Joseph Diaz, Sr., Diaz's father, paid back the $3,000.00 Heredia had loaned him at Diaz's request.

40.     Diaz requested all the sums of money lent to him by Heredia.

41.     Diaz acknowledged on several occasions that he owed money to Heredia, and that additional requests would be adding to the total amount he owed to Heredia.

42.     Heredia advanced money to Diaz on the understanding that it would be repaid to Heredia out of future fight purses Diaz earned.

43.     Diaz acknowledged that he owed repayment of these sums to Heredia.

44.     Heredia did all, or substantially all, of the significant things that the oral contracts required him to do, to wit: he conveyed the sums of money requested by Diaz.

45.     All conditions for Diaz's performance to repay the loans were met, i.e., Diaz accepted the loans and agreed to repay them.

46.     Diaz failed to pay back the loans as the oral contracts required him to do.

47.     Heredia was harmed materially by the failure to repay the loans.

48.     Diaz's breaches of the oral contracts were a substantial factor in causing Heredia's harm.

49.     Heredia has suffered actual damages in an amount to be proved at trial, but upon present information and belief, an amount not less than $48,841.95.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiff Heredia prays for judgment and an award against Counterclaim Defendant Diaz as follows:

1.  For compensatory damages in an amount to be determined at trial;

2.  For pre- and post-judgment interest at the maximum rate allowed by law;

3.  For recovery of reasonable attorneys' fees;

4.  For the costs of the suit; and

5.  For such other and further relief as the Court deems just and proper.

Jury trial is demanded.

Dated:  November 4, 2022

Respectfully submitted,

/s/ *Rajan O. Dhungana*
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905
rdhungana@fedpractice.com

/s/ *Eric S. Montalvo*
Eric S. Montalvo (*Pro Hac Vice*)
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
Fax: (888) 899-6053
emontalvo@fedpractice.com

*Attorneys for Ralph Heredia*

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on November 4, 2022, I filed the foregoing Ralph

3   Heredia's Amended Counterclaim with the Clerk of the Court and sent a copy of

4   such filing via the CM/ECF system.

5        Furthermore, I sent a copy via email to the following:

6

7   James L. Greeley (SBN 218975)
       jgreeley@vgcllp.com
8   Diyari Vázquez (SBN 222461)
       dvazquez@vgcllp.com
9
    Gina M. Simas (SBN 205367)
10      gsimas@vgcllp.com
11  Andrew D. White (SBN 222628)
       awhite@vgcllp.com
12  VGC, LLP
13  1515 7th Street, No. 106
    Santa Monica, California 90401
14  Telephone: (424) 256-8296

15

16  *Attorneys for Plaintiff / Counterclaim Defendant*
    Joseph Diaz, Jr.
17

18
    Dated: November 4, 2022
19
                                Respectfully submitted,
20

21
                                /s/ *Rajan O. Dhungana*
22                              Rajan O. Dhungana (SBN: 297794)
                                FEDERAL PRACTICE GROUP
23                              14481 Aspen Street
                                Hesperia, CA 92344
24                              Telephone: (310) 795-6905
                                rdhungana@fedpractice.com
25

26

27

28

DEFENDANT RALPH HEREDIA'S AMENDED COUNTERCLAIM – CERTIFICATE OF SERVICE