1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Rajan O. Dhungana (SBN: 297794)
rdhungana@fedpractice.com
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905

Eric S. Montalvo (admitted *Pro Hac Vice*)
emontalvo@fedpractice.com
FEDERAL PRACTICE GROUP
1750 K Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 862-4360
Fax: (888) 899-6083

*Attorneys for Heredia Boxing Management*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### (EASTERN DIVISION)

| | |
|---|---|
| Joseph Diaz, Jr., <br><br> Plaintiff, <br><br> vs. <br><br> RALPH HEREDIA; JOHN DOE, ESQ.; and JANE DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 5:20-cv-02332-JWH-KK <br><br> **DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS** |

## DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, Defendant Heredia Boxing Management ("HBM"), by counsel, asserts its amended counterclaims against Plaintiff Joseph P. Diaz Jr. ("Diaz"), and states as follows:

**JURISDICTION AND VENUE**

1.     Diaz has asserted that jurisdiction is proper in this Court because Diaz's Muhammad Ali Boxing Reform Act claim arises under federal law, 15 U.S.C. § 6301, *et seq.,* and that the Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1331. Diaz's additional claims are brought pursuant to the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a)

2.     Stipulating solely for the purposes of Heredia's counterclaims that Diaz's Muhammad Ali Boxing Reform Act claim is jurisdictionally proper, Heredia's counterclaims are brought pursuant to the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a) as so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.     Diaz is subject to the Court's personal jurisdiction because the counterclaims arise out of the same actions or occurrences that are the subject of his claims, and because he consented to personal jurisdiction in this Court by prosecuting his complaint in this Court.

4.      Venue for the counterclaims is proper in this District because Diaz resides in this District and HBM is headquartered in this District.

## PARTIES

5.      According to his Second Amended Complaint, plaintiff and counterclaim defendant Joseph Diaz, Jr. ("Diaz") is an individual residing in San Bernardino County, California.

6.      Defendant and counterclaim plaintiff Heredia Boxing Management ("HBM") is a California corporation headquartered in La Verne, California.

## FACTUAL ALLEGATIONS

7.      HBM is a California corporation, owned and operated by Moses Heredia and Defendant Ralph Heredia in support of Moses Heredia's management of professional boxers.

8.      HBM's operations are inextricably linked to the Heredias' efforts to manage profession boxers.

9.      The relationship between Ralph Heredia and Diaz's relationship goes back over ten years. In the lead-up to the 2012 Olympics in London, Diaz was attempting to qualify for the U.S. men's boxing team and came to the attention of Heredia and his brother, Moses.

10. After the Olympics, Diaz entered a Boxer-Manager Contract with the Heredias through Moses Heredia's company, Heredia Boxing Management (HBM), and pursued a professional boxing career under their guidance.

11. The operative Boxer-Manager Contract during all periods relevant to this cause of action was effective as of February 23, 2017 and was for a five-year term.

12. For years, Diaz and the Heredias enjoyed a good working relationship.

13. Despite the warm relationship between them, Heredia was aware that Diaz struggled with poor money management habits.

14. Over the years, Heredia observed Diaz recklessly blow through the earnings he made from his fights (sums regularly in the six-to-seven figure range) at incredible speed, often leaving him nearly destitute.

15. Throughout the course of their relationship, Diaz routinely asked Heredia to loan him sums of money for a variety of personal expenses. These requests typically came by text message from Diaz to Heredia.

16. Heredia would routinely loan Diaz sums of money as requested, with Diaz's understanding that the sums were to be repaid.

17. Diaz's understanding that he was required to repay these loans was acknowledged on multiple occasions by Diaz.

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 4

18.    The loans from Heredia to Diaz were structured as advances to Diaz against earnings from future fight purses.

19.    Heredia loaned these sums of money to Diaz in furtherance of his work on behalf of HMB; Diaz was, at the time, one of their top fighters, and HBM had a vested interest in assisting Diaz to success.

20.    But for his role at HBM, Heredia would not have loaned the sums of money to Diaz.

21.    Despite repeated promises to repay Heredia for the advanced sums, Diaz never did so.

22.    In addition to the sums disbursed to Diaz by Heredia for personal expenses, HBM also advanced sums to Diaz to cover expenses associated with certain fights, e.g., training camps, travel expenses, hotel expenses, etc.

23.    HBM was not required to pay these sums on Diaz's behalf pursuant to the Boxer-Manager Contract; HBM paid them to protect its investment in Diaz's success as a fighter, with the expectation that the sums would be repaid from future fight purses.

24.    Upon information and belief, Diaz has never made restitution to HBM for expenses advanced on his behalf from the following fights:

24a.   $31,093.40 in expenses paid by HBM on Diaz's behalf in connection with the January 30, 2020 Tevin Farmer fight; and

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 5

24b.   $8,075.00 in expenses paid by HBM on Diaz's behalf in connection

with the September 21, 2019 Jesus Cuadro fight.

25.   Although bouts came and went, and purses were disbursed to Diaz, the

advances from Heredia and HBM were never fully repaid.

26.   After winning the world featherweight championship from Tevin

Farmer in January of 2020, Diaz was approached by MTK Global (MTK) to join

their lineup of managed boxers, even though Diaz had an active management

contract with HBM.

27.   Upon information and belief, MTK retained counsel from VGC, LLP

to represent Diaz in splitting away from his relationship with HBM.

28.   MTK has cultivated a notorious relationship for "stealing" fights from

European managers without consequence.

29.   MTK sought to expand to U.S. fights, and, upon information and belief,

Diaz was one of the first U.S.-based fighters targeted by MTK.

30.   MTK was founded, and run by, an Irish national named Daniel

Kinahan.

31.   According to the U.S. Department of the Treasury, Kinahan is a reputed

narco-terrorist, wanted for money laundering, drug distribution, and murder.

32.   The United States Government is offering a reward of up to

$5,000,000.00 for information leading to the arrest and/or conviction of Kinahan.

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 6

33.     Heredia received a text message from Diaz on August 9, 2020, notifying him that he had signed a "business advisory agreement" with MTK, which would be publicly announced the next day.

34.     Under the terms of the Boxer-Manager Contract, Diaz was not permitted to enter into such an agreement without the written permission of his manager.

35.     As a result of Diaz's actions, Moses Heredia properly and timely filed for arbitration before the California State Athletic Commission, as required by the Boxer-Manager Contract.

36.     Upon information and belief, recognizing that his position in the arbitration was weak, Diaz concocted the attendant lawsuit with the goal of depleting the Heredias' resources and publicly ruining their reputation in the boxing community.

37.     Within the boxing world, a manager "stealing" money from a fighter is a professional death sentence. Fighters do not want to work with a manager they believe will rip them off.

38.     Because of his elite position within the boxing world, Diaz knew, or had reason to know, that his allegations against the Heredias would be certain to attract attention from media outlets focused on the world of boxing.

39.     Upon information and belief, Diaz concocted his claims in this lawsuit, despite knowing (or having reason to know), by virtue of information in his possession, that the Heredias had not stolen from him, and that he in fact owed them money.

40.     Diaz therefore knew, or should have known, that his claims were meritless; therefore, the only purpose it served was to disparage the Heredias' reputation in the boxing community and force them to expend considerable resources in litigation.

41.     Discovery responses and documents were provided to Heredia by Diaz in July 2022 as part of this litigation.

42.     A review of the production from Diaz revealed no evidence supports his claim that Heredia owes him any money by virtue of theft or withholding; rather, the evidence in Diaz's production confirmed that it is Diaz who owes money to Heredia.

43.     Upon information and belief, Diaz currently owes Heredia a substantial sum of money; while an accounting is necessary to determine the exact nature of the indebtedness, upon present evidence available, Heredia believes the amount owed is not less than $48,841.95.

44.     On multiple occasions, Diaz has made statements regarding his relationship with the Heredias in the public sphere, either in statements to the media or post on social media platforms, to wit:

44a.    December 27, 2020: Social media -- "Watch who you are dealing with cause a lot of people aren't what they make themselves out to me" [sic]; and

44b.    February 13, 2021: Interview -- "a lot of people that want to take a part of my exposure and talent and make some money off of me because they feel like they can.  I mean these guys are all greedy mother fuckers' man and its [sic] bullshit"; and

44c.    July 9, 2021: Interview – "for a manager to come in here and try to rob me and take my money is fucking wrong"; and

44d.    November 5, 2021: social media -- "Life [sic] been good after I got rid of shit managers and got advisors & my own lawyers to protect me. To all the young fighters that aren't knowledgeable make sure you have your own lawyer before signing to any **management or promotional company** for your best interest." [emphasis added].

45.     While Diaz does not reference the Heredias or HBM by name, the target audience of his statements, i.e., individuals operating within the boxing industry, would be aware that the Heredias were Diaz's sole managers for the duration of his professional career prior to his move to MTK.

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 9

46.     As the financial security of HBM is entirely linked to the success of the Heredias' management of professional boxers, statements which damage the reputation of the Heredias as it pertains to boxing management necessarily impact HBM.

47.     At all times relevant to Diaz making or publishing these statements, he was in conflict with the Heredias and HBM.

48.     In fact, Diaz gave multiple interviews to boxing media outlets commenting on his litigation with the Heredias, in which some of the identified statements were made.

49.     Despite Diaz's claims in the litigation, he knew, or should have known, that the Heredias did not steal money from him.

50.     Furthermore, statements during the arbitration (which resulted in an award in Moses Heredia's favor) concluded that the Heredias had provided competent and supportive management to Diaz, and that Diaz acknowledged owing money to the Heredias, to wit:

> MR. FOSTER:· I think -- I think that Mr. Heredia has done a good job managing Mr. Diaz up to this point. I think that.
>
> …
>
> MR. FOSTER:· They had a good run and like I've said before, I thought Mr. Heredia did a good job for Mr. Diaz. Mr. Diaz doesn't want to work with him anymore.

1

…

2

3

MR. FOSTER:· You're right.· Look, I already have my --
I think the -- I already said this on the record. I think the
Heredias did a good job for Mr. Diaz.

4

5

…

6

7

DIAZ: Well, I needed some money because I wasn't
making as much -- that's why I was always on Ralph's 14·
ass and always telling him that I wanted to get paid more.

8

9

…

10

11

DIAZ:· I did my own accounting.· I wrote all this down.

12

13

QUESTION:  But ultimately the way you were going to
pay for this was to take it out of your next purse; is that
correct?

14

15

DIAZ:  That's correct.

16

17

QUESTION:  And the 30 percent was to negotiate through
your future fights to take care of these debts that you 22·
wanted to resolve or investments if they were that.

18

19

DIAZ:  Yes.

20

21

QUESTION: And was that a typical course of dealing
over your relationship with him when you were in a
money crunch you would come to Ralph to ask him for
money?

22

23

24

DIAZ:  Yeah.· Because he told me not to go anywhere
else.· He said he would take care of it for me.

25

26

QUESTION: And did he take care of you?

27

28

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 11

DIAZ:  Yeah, he took care of me.· He gave me those loans and I had to pay him back.· Yeah, he did.

…

MR. FOSTER:· Mr. Greeley, I mean, by Mr. Diaz's own admission they've loaned him some money over the years, I mean he -- they got that.

51.     Given the evidence that Diaz was indebted to Heredia, and the conclusions of the arbitrator that the Heredias had not taken advantage of Diaz, all of Diaz's statements are false, and Diaz was in possession of sufficient information to know that his statements were predicated on false facts.

52.     Even if Diaz was expressing an opinion regarding the Heredias when he made his statements, he knew, or had reason to know, that the facts underlying his opinion, and which he relied upon in his expression of said opinion, were inherently and objectively false.

53.     Diaz's false statements have also found their target audience: the Heredias have found themselves as pariahs in the boxing world.

54.     As a result of Diaz's statements, several prospective boxers have broken off negotiations to contract with the Heredias for management services, and relationships with boxers currently under contract have deteriorated or collapsed altogether.

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 12

55.     As a result of the deterioration of their business prospects, the Heredias have suffered actual and prospective monetary damages to their business, and their reputation in the industry has suffered considerable, and potentially permanent, harm.

56.     Because HBM's financial prospects are linked to the success of the Heredias' boxing management operations, the damage to the Heredias' reputation has caused financial losses to HBM.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Breach of Contract

57.     HBM incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

58.     HBM agreed to pay certain expenses associated with particular fights on Diaz's behalf, e.g., training camps, travel expenses, hotel expenses, etc.

59.     Diaz understood and accepted the payment of his expenses by HBM on the premise that he would be required to repay these sums to HBM out of future fight purses.

60.     Diaz' request for HBM to pay his expenses in advance, and HBM's agreement to do so, constituted an oral contract between them.

61.     HBM advanced the following sums for expenses on Diaz's behalf:

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 13

61a.    $31,093.40 in expenses paid by HBM on Diaz's behalf in connection with the January 30, 2020 Tevin Farmer fight; and

61b.    $8,075.00 in expenses paid by HBM on Diaz's behalf in connection with the September 21, 2019 Jesus Cuadro fight.

62.    HBM did all, or substantially all, of the significant things that the oral contracts required it to do, to wit: it conveyed the sums of money to the appropriate entities to cover the expenses on Diaz's behalf.

63.    All conditions for Diaz's performance to repay the advances were met, i.e., Diaz accepted the advances made on his behalf by HBM to cover his expenses.

64.    Diaz acknowledged that he was expected and required to return the sums advanced by HBM from the proceeds of future bout purses.

65.    Diaz failed to pay back the sums owed to HBM as required by the oral contracts.

66.    HBM was materially harmed by the failure to repay the loans.

67.    Diaz's breach of the oral contracts was a substantial factor in causing the harm to HBM.

68.    HBM has suffered actual damages in an amount to be proved at trial, but upon present information and belief, an amount not less than $39,168.40.

## SECOND CAUSE OF ACTION

### Business Disparagement/Defamation

69.     HBM incorporates by reference and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

70.     HBM claims that Diaz harmed it as a business entity by making the following statements:

70a.    December 27, 2020: Social media -- "Watch who you are dealing with cause a lot of people aren't what they make themselves out to me"[sic]; and

70b.    February 13, 2021: Interview -- "a lot of people that want to take a part of my exposure and talent and make some money off of me because they feel like they can.  I mean these guys are all greedy mother fuckers' man and its [sic] bullshit"; and

70c.    July 9, 2021: Interview – "for a manager to come in here and try to rob me and take my money is fucking wrong"; and

70d.    November 5, 2021: Social media -- "Life [sic] been good after I got rid of shit managers and got advisors & my own lawyers to protect me. To all the young fighters that aren't knowledgeable make sure you have your own lawyer before signing to any **management or promotional company** for your best interest." [emphasis added].

71.     Diaz made each of the above statements to a person or persons other than representatives of HBM.

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 15

72.     In the context of Diaz's intended audience, i.e., individuals who operate in or have knowledge of the boxing world, Diaz's statement would be obviously understood to refer to his sole previous managers, the Heredias (and, by extension, to HBM).

73.     The persons privy to Diaz's statements would, or would have reason to, understand the statement to mean that the Heredias and HBM cannot be trusted to manage professional boxers, as they would steal money from them, or otherwise take advantage of them.

74.     Diaz failed to use reasonable care to determine the truth or falsity of the statements.

75.     Even if Diaz was expressing his opinion regarding the Heredias and HBM, Diaz knew, or had reason to know, that the facts underlying the basis of his opinion were false.

76.     Diaz knew, or should have known, that Heredia had taken no money from him; in fact, Diaz owed money to Heredia.

77.     By the time of his November 5, 2021, statement, at the very latest, Diaz knew that an objective finding existed that he had received skilled and faithful management services from the Heredias and HBM, by virtue of the results of the arbitration.

78.     Diaz's wrongful conduct was a substantial factor in causing: (1) harm to HBM's property, business, trade, profession, or occupation, including the loss of earnings and profits, both actual and expected; (2) expenses that HBM had to pay as a result of the defamatory statements; (3) harm to HBM's industry reputation; and/or (4) decreased traffic of clients to the business.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Heredia Boxing Management prays for judgment and an award against Counterclaim Defendant Diaz as follows:

1. For compensatory damages in an amount to be determined at trial;

2. For pre- and post-judgment interest at the maximum rate allowed by law;

3. For recovery of reasonable attorneys' fees;

4. For the costs of the suit; and

5. For such other and further relief as the Court deems just and proper.

Jury trial is demanded.

Dated:  November 4, 2022

Respectfully submitted,

/s/ *Rajan O. Dhungana*
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905
rdhungana@fedpractice.com

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ *Eric S. Montalvo*

Eric S. Montalvo (*Pro Hac Vice*)

FEDERAL PRACTICE GROUP

1750 K Street, N.W., Suite 900

Washington, D.C. 20006

Telephone: (202) 862-4360

Fax: (888) 899-6053

emontalvo@fedpractice.com

*Attorneys for Heredia Boxing Management*

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS - 18

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2022, I filed the foregoing Heredia Boxing Management's Amended Counterclaims with the Clerk of the Court and sent a copy of such filing via the CM/ECF system.

Furthermore, I sent a copy via email to the following:

James L. Greeley (SBN 218975)
   jgreeley@vgcllp.com
Diyari Vázquez (SBN 222461)
   dvazquez@vgcllp.com
Gina M. Simas (SBN 205367)
   gsimas@vgcllp.com
Andrew D. White (SBN 222628)
   awhite@vgcllp.com
VGC, LLP
1515 7th Street, No. 106
Santa Monica, California 90401
Telephone: (424) 256-8296

*Attorneys for Plaintiff / Counterclaim Defendant*
Joseph Diaz, Jr.


Dated: November 4, 2022

Respectfully submitted,


/s/ *Rajan O. Dhungana*
Rajan O. Dhungana (SBN: 297794)
FEDERAL PRACTICE GROUP
14481 Aspen Street
Hesperia, CA 92344
Telephone: (310) 795-6905
rdhungana@fedpractice.com

DEFENDANT HEREDIA BOXING MANAGEMENT'S AMENDED COUNTERCLAIMS – CERTIFICATE OF SERVICE